RICHARD A. VAN WAGONER (4690)
NATHAN A. CRANE (10165)
LASHEL SHAW (13862)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 521-9000
rav@scmlaw.com
nac@scmlaw.com
lss@scmlaw.com

*Attorneys for Defendant Matthew A. Baker*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>MATTHEW A. BAKER,<br><br>        Defendant. | **MOTION TO SUPPRESS ITEMS SEIZED DURING MARCH 30, 2022 WARRANTLESS SEARCH AND SEIZURE**<br><br>Case No. 2:20CR00301<br><br>Judge David Barlow |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ 3

I.     INTRODUCTION ............................................................................................ 4

II.    FACTS ........................................................................................................... 5

          A.    Conditions of Mr. Baker's pretrial release ........................................ 5

          B.    Sunrise at Spanish Terrace, LLC ("SAST") ..................................... 5

          C.    Foxtrot United, LLC ........................................................................ 8

          D.    Mr. Baker's recurring bills ............................................................. 9

          E.    Pretrial Services' multiple visits and walk-throughs of Mr. Baker's
               residence ....................................................................................... 10

          F.    The Search and Seizure ................................................................ 10

          G.    The Petition .................................................................................. 13

          H.    The Evidentiary Hearing .............................................................. 14

III.    ARGUMENT ................................................................................................ 16

          A.    SPECIAL NEEDS EXCEPTION: THE MARCH 30, 2022 WARRANTLESS
               SEARCH WAS A SUBTERFUGE IN VIOLATION OF THE ORDER SETTING
               CONDITIONS OF RELEASE AND THE FOURTH AMENDMENT ............... 17

          B.    THE MARCH 30, 2022 WARRANTLESS SEARCH AND SEIZURE WAS
               PERFORMED IN VIOLATION OF THE TERMS OF THE ORDER SETTING
               CONDITIONS OF RELEASE RENDERING THE TOTALITY OF
               CIRCUMSTANCES EXCEPTION INAPPOSITE ............................... 21

          C.    ALL EVIDENCE SEIZED FROM THE BAKER HOMES SHOULD BE
               SUPPRESSED .............................................................................. 23

IV.    CONCLUSION ............................................................................................. 24

# **TABLE OF AUTHORITIES**

## **Cases**

*Griffin v. Wisconsin*, 483 U.S. 868, 875 (1987)............................................................ 16, 17, 18, 21

*Samson v. California*, 547 US. 843, (2006).................................................................................... 22

*United States v. Cardona*, 903 F.2d 60, 62 (1st Cir. 1990) ......................................... 17, 18, 19, 23

*United States v. Freeman*, 479 F.3d 743, 746 (10th Cir. 2007).................................... 17, 18, 21, 22

*United States v. Knights*, 534 U.S. 112, 117 (2001) ....................................................... 16, 21, 22

*United States v. McCarty*, 82 F.3 943, 947 (10th Cir. 1996) ................................................. 18, 19

*United States v. Tucker*, 305 F.3d 1193, 1200 (10th Cir. 2002) ..................................................... 22

*United States v. Warren*, 566 F.3d 1211, 1215 (10th Cir. 2009) ...................................... 18, 19, 23

## **Statutes**

Utah Code Ann. § 48-3a-503 .................................................................................................... 7, 9

Matthew Baker ("Mr. Baker"), by and through undersigned counsel, moves the court for an order suppressing all items seized in the warrantless search conducted on March 30, 2022 and to return originals of all property to the Bakers without the government retaining copies or images of the seized items.

## I.   <u>INTRODUCTION</u>

On March 30, 2022, the U.S. Attorney's Office directed Pretrial Services to conduct a warrantless search of the Baker home.  Pretrial Services did not evaluate the basis for the warrantless search but simply acted at the direction of the United States Attorney's office. Acting under others' direction and on behalf of the U.S. Attorney's Office, Pretrial Services seized documents, computers, cash, checks, two small boxes of ammunition, a so-called "sword," and other items.  After the search, Pretrial Services conducted no evaluation of the seized items and simply turned everything over to the FBI who is working with the U.S. Attorney's Office to investigate Mr. Baker.  While the order on conditions of release authorized "the pretrial officer" to search the home of Mr. Baker under limited circumstances, that right was not without Fourth Amendment limitations or restrictions in the order itself.

Here, the warrantless search and seizure of the Bakers was coordinated by and under the specific direction and instruction of the U.S. Attorney's office.  Indeed, the assigned AUSA gave information and directions to Pretrial Services both before the search and seizure of the Baker homes and while the search and seizure was underway. The search and seizure, here a "subterfuge" or "stalking horse," violated the order on conditions of release, violated Mr. Baker's expectations of privacy, and exceeded the Fourth Amendment limitations of such warrantless searches.

All seized items should be suppressed from evidence and, with minor exceptions, immediately returned to the Bakers.

II.   **FACTS**

**A.  Conditions of Mr. Baker's pretrial release**

1.      On September 23, 2020, a magistrate judge entered an order setting conditions of Mr. Baker's release.  *See Gov. Ex. 1.*

2.      On page 3 of the order, ¶ 6(u), "[t]he defendant must . . . submit person, residence, office, or vehicle to a search, *conducted by the pretrial officer* at a reasonable time and in a reasonable manner, *based upon reasonable suspicion of contraband or evidence of a violation of a condition of release*."  *Id.* (emphasis added).[1]

**B.  Sunrise at Spanish Terrace, LLC ("SAST")**

3.      On November 18, 2013, Mr. Baker acquired a property at 215 E. 100 N., Spanish Fork, Utah ("Property").

4.      On July 30, 2015, Mr. Baker created Sunrise at Spanish Terrace, LLC ("SAST"). He was SAST's sole member and its manager.

5.      On August 3, 2015, Mr. Baker transferred the Property into SAST.

6.      On April 14, 2019, Mr. Baker transferred his membership interest in SAST to his wife Staci Baker, as memorialized in a transfer of assets and revised operating agreement for SAST.  *Def. Exs. 2 and 3.*

---

[1] Mr. Baker is also on supervised release.  The terms of supervised release include a virtually identical condition.  The only difference is the identity of the person who the order authorizes to conduct the search – the "pretrial officer" for a pretrial releasee and the "probation office" for a probationer.  *See* 2:19-cr-94, Dkt. 32.

7.      Also on April 14, 2019, Mr. Baker assigned management of SAST to Staci Baker. *Def. Exs. 2 and 3.*

8.      On March 25, 2021, SAST, through its owner and manager Staci Baker, entered a REPC for the sale of the Property to a buyer.  Staci Baker signed the REPC and all addenda. *Evidentiary Hr'g* 143:6-20.

9.      In finalizing the closing on the Property, title company Charger Title asked Mr. or Mrs. Baker to provide Articles of Organization to confirm that Staci Baker owned and had authority to act on behalf of SAST.  *Def. Ex. 12.*

10.     On June 9, 2021, Mr. Baker sent the title company a two-page certificate of organization.  The first and second pages were mismatched: the first page was for SAST, but the second page was for a different limited liability company owned by Staci Baker. *Gov. Ex.7.  T*he information the title company sought to confirm – that Staci owned SAST, was its manager, and had authority to act on its behalf – was indisputably true and correct but was provided with a mismatched document.[2]

11.     On July 19, 2021, Jones Paint and Glass, Inc. filed a small claims action in Provo City Justice Court[3] against Aarons Pressure Washing Services, LLC, a defunct LLC of Mr. Baker, seeking to collect an allegedly unpaid sum for installation of car windows.

12.     On September 15, 2021, default judgment was entered in favor of Jones Paint and Glass, Inc. for $4,654.18 and individually against Mr. Baker.

---

[2] Mr. or Mrs. Baker would have been better to send the April 14, 2019 transfer of assets or revised operating agreement, *Def. Exs. 2 and 3.*  Regardless, Staci Baker owned and managed SAST and at all relevant times had exclusive authority to act on its behalf, including closing on the Property.

[3] *Jones Paint & Glass v. Matthew Baker*, Provo City Justice Court, Case No. 218000414.

13.     On September 23, 2021, Sunny Skies Capital, LLC substituted in place of Jones Paint and Glass, Inc. and became the judgment creditor.

14.     Sunny Skies Capital, LLC is owned in whole or part by attorney Matthew Grimmer (collectively "Mr. Grimmer").

15.     On October 6, 2021, Mr. Grimmer sought a writ of execution against SAST to satisfy the judgment against Mr. Baker, even though Staci Baker was SAST's sole owner, and Mr. Baker owned no interest in SAST after April 14, 2019.

16.     The small claims court granted the writ on October 13, 2021.[4]

17.     On November 15, 2021, Mr. Grimmer purportedly acquired Mr. Baker's (non-existent) interest in SAST through a constable's sale.

18.     Based on his purported acquisition of Mr. Baker's interest in SAST, Mr. Grimmer sent Staci Baker a letter on January 10, 2022, claiming damages over $6 million[5] and demanding settlement of his claims to "avoid having a public record of the suit."  The draft Settlement Agreement that accompanied Mr. Grimmer's letter included a "confidentiality" clause.  Staci Baker declined his demand.[6]

---

[4] As detailed in certain state court filings, Utah Code Ann. § 48-3a-503(8) provides the exclusive remedy for a creditor seeking to execute on a limited liability company – a charging order – which Mr. Grimmer failed to obtain.  Hence, that constable's sale is being challenged as invalid. Regardless, Mr. Baker owned no interest in SAST at the time the small claims court improperly issued the writ and Mr. Grimmer purchased Mr. Baker's "interest" at the constable's sale. Hence, Mr. Grimmer obtained nothing.

[5] Mr. Grimmer was a judgment creditor for $4,654.18. That judgment was satisfied long ago.

[6] Mr. Grimmer actively pursued the assets of Mr. Baker vastly beyond the amount of the judgment.  Indeed, Mr. Grimmer has been wrongfully, and without authority, filing lawsuits on behalf of entities owned by Staci Baker.  Mr. Grimmer never received permission to represent Mrs. Baker's entities or have access to the entities' assets.  *Evidentiary Hr'g 159-161, May 6, 2022.*

19.     Mr. Grimmer then sued Staci Baker.  Mr. Grimmer is involved in three lawsuits against the Bakers.[7]  In each lawsuit, Mr. Gimmer has been met with resistance in his efforts to obtain assets to which he has no legal (or moral) right.

20.     When Staci Baker did not respond to his efforts and threats to his satisfaction, Mr. Grimmer turned to the prosecuting arm of the United States for what appears to be assistance in bolstering his claims, which included making false allegations of fraud.

**C.  Foxtrot United, LLC**

21.     On October 28, 2019, Mr. Baker created Foxtrot United, LLC ("Foxtrot").  He was its sole member and manager.  Foxtrot held real property known as "Center Street" in which Mr. Baker held an interest.

22.     On August 18, 2021, Mr. Baker transferred to his wife Staci Baker all membership interest in Foxtrot (*Def. Ex. 11*), but by this time Center Street had transferred into a bankruptcy estate and was under management of a trustee.  *Evidentiary Hr'g 109:1-3, May 6, 2022.*

23.     When he transferred his membership interest in Foxtrot to Staci Baker, Mr. Baker reserved to himself any potential disbursements out of bankruptcy.  *See Def. Ex. 11.*  Nothing of value remained in Foxtrot on August 18, 2021, when he transferred its membership interest to Staci Baker.  *Evidentiary Hr'g 185:1-8, May 6, 2022.*

24.     On November 15, 2021, the bankruptcy trustee for Center Street issued a check for $829,640.63 for proceeds Mr. Baker had reserved to himself.  *See Gov. Ex. 8.*

---

[7] *Foxtrot adv. Old Republic, et.al.*, Case No. 200401089; *Sunrise a Spanish Terrace v. Staci Baker*, Case No. 220400082; and *Sunny Skies v. Staci Baker*, Case No. 220100032.

25.     On November 17, 2021, Mr. Grimmer improperly sought another writ of execution from the small claims court to satisfy the $4,654.18 judgment,[8] falsely asserting that Mr. Baker owned membership interest in Foxtrot.

26.     The small claims court granted the writ on November 29, 2021.

27.     On December 21, 2021, Mr. Baker caused $628,539.82 to be moved to his personal account from Foxtrot's account on which he remained a signatory. *See Gov. Ex. 10.*

28.     On December 22, 2021, Mr. Grimmer purported to acquire Mr. Baker's membership interest in Foxtrot at a constable's sale, an interest Mr. Baker did not own, despite not having obtained a charging order as required under Utah Code Ann. § 48-3a-503(8).

29.     On February 3, 2022, on the advice of counsel and in connection with protecting himself and his wife from Mr. Grimmer's attempts improperly to attach assets and extort the Bakers,[9] Mr. Baker moved $600,000 of the Center Street bankruptcy proceeds from his own account to an account in the name of his wife. *Evidentiary Hr'g 196:2-8, May 6, 2022.*

### D.  Mr. Baker's recurring bills

30.     Mr. Baker testified that when he was first placed on pretrial supervision, he met with Pretrial Officer ("PO") Law and informed him that Mr. Baker was a real estate developer, owned several properties, and had bills (mortgage payments) that exceeded $1,500 which

---

[8] Again, Utah Code Ann. § 48-3a-503(8) provides the exclusive remedy for a creditor seeking to execute on a limited liability company – a charging order – which Mr. Grimmer failed to obtain. Hence, that transaction is under challenge.  Regardless, Mr. Baker owned no membership interest in Foxtrot at the time the small claims court improperly issued the writ and Mr. Grimmer's collection entity purchased Mr. Baker's "interest" at the constable's sale.  Hence, Mr. Grimmer obtained nothing.

[9] In January 2022, the Bakers met with civil counsel to discuss the ongoing dispute with Mr. Grimmer and his improper if not illegal efforts to obtain monies and assets in connection with a satisfied judgment of $4,654.18.  Counsel instructed Mr. Baker to move the funds out of Mr. Grimmer's reach.  *Evidentiary Hr'g 194:25-196:22, May 6, 2022.*

recurred on a regular basis.  *Evidentiary Hr'g 186:3-9, May 6, 2022.*  He also informed PO Law that he was involved in civil litigation in addition to the pending criminal case and had regular attorney fee obligations.  *Evidentiary Hr'g 187:9-20, May 6, 2022.*

31.     PO Law and the other pretrial officers each supervise 40-50 individuals at any given time.  *Evidentiary Hr'g 60:21-25, May 6, 2022.*

32.     Mr. Baker understood from those discussions that PO Law did not require Mr. Baker to notify PO Law or obtain his permission each time he had a recurring payment or attorney fee payment that exceeded $1,500.  *Evidentiary Hr'g 186:1-9; 187:9-20, May 6, 2022.*

### E. Pretrial Services' multiple visits and walk-throughs of Mr. Baker's residence

33.     Prior to the March 30, 2022 search and seizure, PO Law and later PO King visited and walked through the Baker residence on multiple occasions and never identified any concerns about computers or electronics. *Evidentiary Hr'g 91:3-14, May 6, 2022.*

34.     In the Baker's home there were four operable computers: Mr. Baker's computer, Staci Baker's computer (both located in the basement office), and two children's computers located in the kitchen and laundry room.  *Evidentiary Hr'g 88:6-90:18, May 6, 2022.*

### F.  The Search and Seizure

35.     Looking to leverage his position against the Bakers after his failed attempt to persuade them to pay him large sums of money, Mr. Grimmer turned to the prosecuting arm of the federal government.  On March 8 and 15, 2022, Mr. Grimmer gave the U.S. Attorney a letter and various documents falsely suggesting Mr. Baker had engaged in fraud.

36.     On March 22, 2022, the government interviewed Mr. Grimmer.   In each submission and in his interview with the government, Mr. Grimmer gave false and misleading

10

information concerning Mr. Baker.

37.     On March 29, 2022, AUSA Jennifer Muyskens provided PO King the letter and documents Mr. Grimmer gave her.  *Evidentiary Hr'g 62:19-23; 63:17-64:4, May 6, 2022.* AUSA Muyskens told PO King she believed this information pointed to an instance of fraud committed by Mr. Baker.  AUSA Muyskens directed PO King to conduct a search of Mr. Baker's house and seize all financial records.  *Evidentiary Hr'g 95:9-25, May 6, 2022.*

38.     Prior to conducting the search of the Baker home, PO King and other pretrial officers who would be involved in the search met with AUSA Muyskens and FBI SA Garland to discuss the search and seizure.  *Evidentiary Hr'g 95:9-14, May 6, 2022.*

39.     AUSA Muyskens directed the pretrial officers to what she wanted searched and seized.  Specifically, AUSA Muyskens directed the pretrial officers to seize documents related to warranty deeds, articles of incorporation, and property sales.  *Id.*; *see also Report of PO Graham at 2, attached as Def. Ex. 15.*

40.     On March 30, 2022, PO King and 11 other pretrial officers conducted a three-hour search at the Baker homes in Spanish Fork and Orem, Utah,[10] beginning at approximately 6:15 p.m.

41.     From the Orem house the pretrial officers seized a 1917 antique bayonet,[11] Mr. Baker's cell phone, and various items listed only as "check books, bank stubs, mail, misc.

---

[10] In October 2021, the Bakers moved from a home in Orem to a home in Spanish Fork.  Staci Baker owns the Orem home and the family stores a few items at the Orem home but do not reside there.

[11] This so-called "sword," a rusted Turkish bayonet circa. 1917, was an item Staci Baker found when she was a young child and kept.  It was in storage with others of her things at the time of the search.

docs."[12]  *Def. Ex. 14.*  Some of the mail and documents seized were solely in the name of Staci

Baker. *Evidentiary Hr'g 97:19-98:24, May 6, 2022.*

      42.    At the conclusion of the search of the Orem residence, the six pretrial officers

went to the Spanish Fork residence to join in the search.

      43.    At the Spanish Fork home the 12 pretrial officers seized: 12 computers (only four

of which were plugged in and operable),[13] cell phones, two small boxes of ammunition,[14] over

$88,000 in cash, documents and mail in the name of Staci Baker, external storage devices, a

check for $39,563.79 made out to Mr. Baker from the law firm Parsons, Behle & Latimer

identified as refund of balance of retainer, a check for $10,509.91 made out to Mr. Baker from

Investors Title Insurance Agency, Inc., identified as a "Refund Springville City Taxes,"[15] and

"Misc. documents."  *See* Checks attached as *Def. Ex. 16.*

      44.    During the search at the Spanish Fork residence, PO Graham contacted AUSA

Muyskens to report on the search and seizure. *Evidentiary Hr'g 95:15-25, May 6, 2022; Report

of Officer Graham Def. Ex 15.*  During the call AUSA Muyskens directed PO Graham to also

search for and seize "any specific documents with LLC names or Foxtrot, Sunrise Terrace, and

---

[12] While at the Orem house the officers searched Mr. Baker's vehicle, a Scion IQ. No Evidence/Property Receipt was left for items seized from the Scion.

[13] The seven computer towers in the garage were not attached to any monitors, were not plugged in, and were covered in dust.  *See Def. Ex. 9-10.*

[14] Upon finding the ammunition, officers returned to the Orem location to search for a firearm. None was found. Staci Baker submitted testimony that the ammunition belonged to her, and she had no reason to believe Mr. Baker was aware of the ammunition in the home. *Def. Ex. 1.* Both Staci and Matthew Baker testified that when Mr. Baker became a restricted person, he transferred to third persons his firearms (approximately 20) and related items.  Mrs. Baker also testified she was unaware that the restriction went beyond firearms and included ammunition.

[15] The checks from Parsons, Behle & Latimer and Investors Title Insurance Agency, Inc. were not listed in pretrial's Evidence/Property Receipts.  PO King testified the checks were included in the inventory sheet under "various financial documents."  *Evidentiary Hr'g 114:25-118:15, May 6, 2022.*

Maple Mountain Investments." *Id*.  PO Graham passed AUSA Muyskens's directive "to the other officers searching throughout the residence." *Id*.

45.     At the time of the search, PO King knew that SAST, Foxtrot, and Maple Mountain Investments were owned solely by Staci Baker.  *See Def. Exs.2, 11*; *Evidentiary Hr'g 46:10-11, May 6, 2022.*

46.      The pretrial officers conducted no further review of the seized items and turned them over to the FBI.  *Evidentiary Hr'g 96:1-3, May 6, 2022.*

47.     In a letter to defense counsel dated March 31, 2022, AUSA Muyskens confirmed her involvement in an investigation of Mr. Baker that formed the basis of her coordinating the warrantless search of the Baker homes.

48.     On April 8, 2022, FBI SA Garland filed an application for a warrant in connection with the items seized during the March 30, 2022 search and handed over to her by Pretrial Services.

49.     The warrant application failed to disclose to the court that AUSA Muyskens orchestrated the March 30, 2022 warrantless search and seizure, including meeting with PO King and others to coordinate the search, and directing what she wanted the officers to seize both before and during the March 30, 2022 search.

50.     The court issued the warrant to search the items AUSA Muyskens had already directed pretrial services to seize.

## G.  The Petition

51.     On April 7, 2022, PO King filed a petition against Mr. Baker alleging five violations of the conditions of pretrial release.  The petition was amended on April 28, 2022,

adding a sixth allegation. *See Gov. Ex. 2.* The petition alleges Mr. Baker violated the terms of pretrial release by (1) committing fraud; (2) obtaining employment in a fiduciary capacity or position allowing him access to credit and personal information of others; (3) transferring assets valued above $1,500 without approval from his PO on three dates: August 18, 2021, January 12, 2022, and February 3, 2022[16]; (4) possessing ammunition and a "sword"; (5) failing to report all computer devices, external drives, and other electronic devices he uses or has access to; and (6) committing animal cruelty.

### H. The Evidentiary Hearing

52.     On May 9, 2022, Magistrate Judge Romero held an evidentiary hearing on the issues of pretrial detention and the alleged violations of conditions of pretrial release. The government called as witnesses PO King and SA Garland. The defense called Kennedy Nate[17] and Mr. Baker.

53.     During his testimony, PO King confirmed several facts, including the following:

a.      After receiving information from AUSA Muyskens, PO King conducted no independent investigation of the allegations made by Mr. Grimmer in what he handed over to the U.S. Attorney. *Evidentiary Hr'g 64:5-71:8, May 6, 2022.*

---

[16] The Petition identified transfers of assets with value greater than $1,500 on three dates:
- August 18, 2021, in connection with Mr. Baker's transfer of his membership interest in Foxtrot to Staci Baker at a time when Mr. Baker believed it had no value.
- January 12, 2022, in connection with making recurring mortgage payments.
- February 3, 2022, in connection with moving $600,000 of the Center Street bankruptcy proceeds from his personal account to an account in his wife's name to protect the funds from improper attachment or seizer by Mr. Grimmer.

[17] Mr. Nate is counsel for Staci Baker, Foxtrot, and SAST. Mr. Nate provided the Court with background concerning the lawsuits involving Mr. Grimmer referenced above.

b.      At the time of the search, PO King knew that SAST, Foxtrot, and Maple Mountain Investments were limited liability companies that Staci Baker owned in their entirety, and that his pretrial releasee Mr. Baker owned no membership interest in any of these entities. *See Def. Exs.2, 11*; *Evidentiary Hr'g 46:10-11, May 6, 2022.*

c.      PO King consulted with the U.S. Attorney's Office on what items the prosecutors wanted seized. *Id. at 95:9-11.*

d.      PO King testified the U.S. Attorney's Office directed what pretrial should seize from the Baker homes. *Id. at 95:12-14.*

e.      During the search of the Baker's home, PO Graham called AUSA Muyskens to report on what had been seized. *Id. at 95:15-25; Def. Ex. 15.* During the call, AUSA Muyskens gave direction on additional items to seize. *Id.*

f.      PO King did not know why they seized items belonging to Staci Baker.

Q. So why were those seized if they are Staci Baker's documents?

King. I don't know

*Id. at 98:3-5.*

Q. . . . why did you seize documents that belonged to Staci Baker?

King. I don't know.

*Id*. at 98:17-24.

g.      PO King did not know why they seized the check from Parsons Behle & Latimer and the check from Title Insurance Agency. *Id. at 114:25-118:15.*

h.      PO King testified the Pretrial Office should not have seized certain items, including records belonging to Staci Baker and the referenced checks. *Id. at 98:24.*

i.      After the search, neither PO King nor anyone else from Pretrial Services evaluated any of the seized items.

j.      Pretrial Services turned over all seized items to the FBI. *Id. at 96:1-3.*

54.    On May 9, 2022, Judge Romero ordered the two checks and all cash that was seized returned to the Bakers, along with the computers.

55.    On May 9, 2022 Judge Romero determined the government had not met its burden – probable cause – on allegations (1) fraud and (6) animal cruelty.

56.    Judge Romero concluded the government had met its burden by clear and convincing evidence on allegations (2) obtaining employment as a fiduciary or in a position allowing him access to credit or personal information of others, (3) transfer of assets with a value over $1,500 without his PO's approval, (4) possession of ammunition, and (5) failing to report all computer devices.

57.    The search and seizure conducted under the direction of AUSA Muyskens is the exclusive source of evidence purporting to support allegations (4) and (5).

## III.   ARGUMENT

The United States Supreme Court has recognized two tests for determining the legality of a warrantless search of a probationer,[18] the "special needs" test, *Griffin v. Wisconsin*, 483 U.S. 868, 875 (1987), and the "totality of circumstances" test, *United States v. Knights*, 534 U.S. 112, 117 (2001). Both tests require that the search be performed in compliance with the terms of a

---

[18] For this argument only, Mr. Baker does not distinguish among probation, parole, and pre-trial release.

search provision in a valid order setting the conditions.  The order on conditions of release did

not authorize a warrantless search to be performed by anyone other than "the pretrial officer."

*Gov. Ex. 1.*  Here the warrantless search was directed by and conducted at the behest of the U.S.

Attorney's office.  Moreover, any warrantless search of Mr. Baker could not be performed absent

"reasonable suspicion of contraband or evidence of a violation of a condition of release."  *Id.*

The search and seizure here failed both tests.

## A. SPECIAL NEEDS EXCEPTION: THE MARCH 30, 2022 WARRANTLESS SEARCH WAS A SUBTERFUGE IN VIOLATION OF THE ORDER SETTING CONDITIONS OF RELEASE AND THE FOURTH AMENDMENT

In *Griffin v. Wisconsin*, the Supreme Court held that "[s]upervision [of parolees] . . . is a

'special need' of the State permitting a degree of impingement upon the privacy that would not

be constitutional if applied to the public at large."  *United States v. Freeman*, 479 F.3d 743, 746

(10th Cir. 2007) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 875 (1987) (emphasis added)).[19]

That impingement on Fourth Amendment rights is not unlimited, however.  The home of

a probationer, "like anyone else's, is protected by the Fourth Amendment's requirement that

searches be 'reasonable.'"  *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (*quoted in United*

---

[19] The *Griffin* Court recognized a "special needs" exception to the Fourth Amendment warrant and probable-cause requirements for probationers. "The dichotomous goals to which probation is dedicated – rehabilitation and public safety – coalesced to justify substantial restrictions upon probationers.  Hence, the special needs of the situation 'permitt[ed] *a degree of impingement* upon privacy that would not be constitutional if applied to the public at large.'"  *United States v. Cardona*, 903 F.2d 60, 62 (1st Cir. 1990)(quoting *Griffin*, 483 U.S. at 873-75) (cited with approval in *United States v. McCarty*, 82 F.3d 943, 947 (10th Cir. 1996)) (emphasis added); *Warren*, 566 F. 2d at 1215 ("'These restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large'" (quoting *Griffin*, 483 U.S. at 875)).  Indeed, in the case of a probationer, "'the effect of dispensing with [the] warrant [requirement]' would be less offensive than in the typical criminal investigation *because probation officers are not police officers and are 'supposed to have in mind the welfare' of their clients*."  *Warren*, 566 F.3d at 2115 (citing *Griffin*, 483 U.S. at 876) (emphasis added).

*States v. McCarty*, 82 F.3 943, 947 (10th Cir. 1996)).; *United States v. Warren*, 566 F.3d 1211, 1215 (10th Cir. 2009) (quoting *Griffin*, 483 U.S. at 873).

Under the special needs test, the legal authority to conduct a warrantless search of a probationer begins and ends with the probation officer. "This court has already recognized that a police officer may participate in a search of a parolee's home by parole officers *so long as the police officer is acting under the direction of a parole officer*." *Warren,* 566 F.3d at 1217 (emphasis added)*.* "In many cases, the police may . . . search a probationer's premises without a warrant *at the behest of the parole officer*." *United States v. McCarty*, 82 F.3d 943, 947 (10th Cir. 1996) (emphasis added). In *Warren*, the Court explained, "we interpreted the *Griffin* special-needs exception 'as resting on the rehabilitative relationship between the parolee and the parole officer, and thus not extending to other law enforcement officers *unless they are acting under the direction of the parole officer.'" Warren,* 566 F.3d at 1217 (emphasis in original, *citing United States v. Freeman*, 479 F.3d 743, 748 (10th Cir. 2007)). The Tenth Circuit further noted: "As stated by the First Circuit, '*Police officers and parole officers are fungible when the former serve as mere implementers of decisions already made by the latter.*'" *Warren,* 566 F.3d at 1217 (citing *United States v. Cardona*, 903 F.2d 60, 66 (1st Cir. 1990)) (emphasis added).

The Tenth Circuit has noted that "neither this Court nor the Supreme Court has . . . blessed a search by law enforcement acting independently of the parole officer under this rationale." *United States v. Freeman*, 479 F.3d 743, 746 (10th Cir. 2007). While "[i]t is clear that a probation officer may search a probationer's home or even arrest a probationer without a warrant and with less than probable cause," *United States v. McCarty*, 82 F.3d 943, 947 (10th Cir. 1996) (citing *Griffin*, 483 U.S. at 877-78), "[i]t is equally well established that a probation officer

cannot act as a 'stalking horse' on behalf of police to assist police in evading the Fourth Amendment's warrant requirement." *Id*.; *United States v. Warren*, 566 F.3d 1211, 1213 (the search of a probationer or parolee's home cannot be a "subterfuge" on behalf of others to evade the requirements of the Fourth Amendment).

The analysis begins with the language of the order on conditions of release. Any search must be based on "reasonable suspicion of contraband or evidence of a violation of a condition of release"; and the search must be performed "by the "pretrial officer at a reasonable time and in a reasonable manner." *Gov. Ex. 1*. As discussed in section **B** below, the search lacked "reasonable suspicion of contraband or evidence of a violation of a condition of release." And, given the search's origination and orchestration, the search was conducted by the United States Attorney's office with Pretrial Services serving as "*mere [fungible] implementers of decisions already made by the*" prosecuting attorney. *See Warren,* 566 F.3d at 1217 *citing United States v. Cardona*, 903 F.2d 60, 66 (1st Cir. 1990) (emphasis added).

The search and seizure of the Baker homes fell outside the special needs test. The search and seizure did not begin and end with Pretrial Services. The United States Attorney's office orchestrated, coordinated, and directed the warrantless search and seizure of the Baker homes on March 30, 2022. The day before the warrantless search, AUSA Muyskens provided PO King information she had received from Mr. Grimmer. PO King did no independent investigation and nothing to vet or verify any of the information contained in what AUSA Muyskens provided him.[20] Prior to conducting the warrantless search, PO King and others from Pretrial Services met

---

[20] Had PO King vetted the information in the documents AUSA Muyskens provided him, he would have determined that it related to entities he admittedly knew at the time of the search were owned by Mrs. Baker and the Mrs. Baker had authority to conduct the transactions,

with AUSA Muyskens and the FBI to go over what the U.S. Attorney's office wanted the officers to look for and seize. During the warrantless search, PO Graham contacted AUSA Muyskens to report progress on what they had found. AUSA Muyskens directed Pretrial Services on what else she wanted seized, including documents related to Foxtrot, SAST, and Maple Mountain Investments.  PO Graham in turn informed the other POs what AUSA Muyskens requested that they look for and seize.

PO King admitted, however, that at the time of the search and seizure, he knew that Staci Baker – not Matt Baker – owned Foxtrot, SAST, Maple Mountain.  In testimony PO King acknowledged that he did not know why they seized anything related to those entities – tacitly admitting that no reasonable suspicion existed, it was wrong for them to seize those documents, and Pretrial Services did so only at the direction of the United States Attorney pursuant to instructions she gave, in part, *during the middle of the search*.

Pretrial Services conducted no review of the seized items and simply handed them over to the FBI.  This fact further establishes that Pretrial Services was not in charge of the warrantless search and seizure, and that the United States Attorney's office simply used Pretrial Services as fungible implementers of decisions made by the former, the exact opposite of what *Griffin* allowed.  The U.S. Attorney's Office improperly used Pretrial Services as a subterfuge to undermine Mr. Baker's rights under the order on conditions of release and the Fourth Amendment.  All evidence seized must be suppressed.

---

rendering any claim of "reasonable suspicion" invalid.  *See Def. Exs.2, 11*; *Evidentiary Hr'g 46:10-11, May 6, 2022.*

**B. THE MARCH 30, 2022 WARRANTLESS SEARCH AND SEIZURE WAS PERFORMED IN VIOLATION OF THE TERMS OF THE ORDER SETTING CONDITIONS OF RELEASE RENDERING THE TOTALITY OF CIRCUMSTANCES EXCEPTION INAPPOSITE**

The Supreme Court expanded *Griffin* by creating a "totality of circumstances" test. *United States v. Freeman*, 479 F.3d 743, 746-47 (10ᵗʰ Cir. 2007) (citing *United States v. Knights*, 534 U.S. 112, 117-19 (2001)).   "To determine whether such a search is reasonable under the Fourth Amendment, a court must balance 'on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for promotion of legitimate government interests.'"  *Id*. at 447 (citing *Knights*, 534 U.S. at 119).

*Knights* held that under this test, "*searches performed in compliance with a valid parole agreement search provision* may be constitutional even if they were not 'conducted by a probation officer monitoring whether the probationer is complying with probation restrictions.'" *United States v. Freeman*, 479 F.3d 743, 746-47 (10ᵗʰ Cir. 2007) (citing *United States v. Knights*, 534 U.S. 112, 117 (2001)) (emphasis added)).  For the totality of circumstances test to apply, the search and seizure must, in the first instance, be "performed in compliance with a valid [order of conditions of release search provision]."

In *Knights*, the probation order that formed the basis for the court's expansion of *Griffin* included "that Knights would 'submit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer.'" Knights signed the probation order, confirming he had "received a copy, read and understood the above terms and conditions of probation and agree[d] to abide by the same."  *Knights*, 534 U.S. at 114.  The court found that the "probation order clearly expressed the search condition and Knights was

unambiguously informed of it.  The probation condition thus significantly diminished Knights'

reasonable expectation of privacy" under the Fourth Amendment.  *Id.* 119-20.[21]

By contrast, the search provision in the order on conditions of release here had two terms

that the search must satisfy before the court engages in a totality of circumstances balancing test:

any search must be based on "reasonable suspicion of contraband or evidence of a violation of a

condition of release"; and the search must be performed "by the "pretrial officer at a reasonable

time and in a reasonable manner."  *Gov. Ex. 1.*

The warrantless search fails the first requirement of the "totality of circumstances" test

because it was not "performed in compliance with" the terms of the order on conditions of

release.  *First*, "the pretrial officer" – the only person authorized under the order on conditions of

release to conduct a warrantless search of his charge Mr. Baker – lacked reasonable suspicion to

conduct the search.  PO King testified that he did not investigate any allegations in the materials

provided to him by AUSA Muyskens.  Those items, under even a cursory review, were based on

false allegations of "fraud" by an adversary in civil litigation who was seeking the assistance of

the United States attorney to bolster its claims against the Bakers to obtain millions of dollars to

satisfy a $5,000 judgment.  PO King testified he did not know why Pretrial Services seized many

of the items all of which, he also testified, Pretrial Services simply turned over to the FBI

without evaluating or investigating.

---

[21] The Tenth Circuit interpreted *Knights* to mean that "a probation search [is] permissible so long
as supported by reasonable suspicion, regardless of the motivations for the search."  *United
States v. Freeman*, 479 F.3d at 747 (citing *United States v. Tucker*, 305 F.3d 1193, 1200 (10th
Cir. 2002)).  Thereafter, the Supreme Court "extended the principles of *Knights* to uphold a
warrantless search of a parolee even in the absence of reasonable suspicion, where the parolee
had signed a parole agreement that allowed parole officers or other peace officers to search the
parolee '*with or without a search warrant and with or without cause.*'"  *Id.* (citing *Samson v.
California*, 547 US. 843, (2006)).

*Second*, under the "totality of circumstances" test as applied here, any warrantless search must be conducted by "the pretrial officer." The search and seizure was not conducted by "the pretrial officer" within the meaning of the order, in violation of Mr. Baker's expectation of privacy under the order and the Fourth Amendment. The search was conducted by the United States Attorney's office with Pretrial Services serving as "*mere [fungible] implementers of decisions already made by the*'" prosecuting attorney. *See Warren*, 566 F.3d at 1217 *citing United States v. Cardona*, 903 F.2d 60, 66 (1st Cir. 1990) (emphasis added).

The order cannot be construed to mean that any law enforcement or prosecutorial agency can simply use "the pretrial officer" as a front to conduct warrantless searches on their behalf. Otherwise, the language of the order of conditions of release has no parameters, no limitations, and loses all significance in providing an expectation of privacy. If the order was intended to expand warrantless searches to those beyond the pretrial officer, namely the U.S. Attorney's office or the FBI, the order would have expressly said so. Here, the warrantless search was conducted under the direction and supervision of the U.S. Attorney's office who simply used Pretrial Services as a "subterfuge" to perform its work, in violation of both the order on conditions of release and Mr. Baker's expectation of privacy.

Because the search was not performed by the "pretrial officer" within the meaning of the order on conditions of release, and the search was conducted absent "reasonable suspicion of contraband or evidence of a violation of a condition of release," the court cannot engage in the balancing test for application of the totality of circumstances test.

## C. ALL EVIDENCE SEIZED FROM THE BAKER HOMES SHOULD BE SUPPRESSED

Evidence the government is using against Mr. Baker was obtained from the Baker home

in violation of the order on conditions of release and the Fourth Amendment.  The warrantless search and seizure at the Baker homes was nothing more than a smash and grab.  There was seemingly no rhyme or reason to what was seized.  The U.S. Attorney's Office directed Pretrial Services what the prosecuting attorney wanted searched and seized.  When PO King was repeatedly asked why they seized certain items, his only response was "I don't know."  All items and "evidence" seized from the Baker's home on March 30, 2022 must be suppressed and the originals must be returned.

The two small boxes of ammunition and electronics found in the Baker home must be suppressed.  The government's illegal exploitation of Pretrial Services led to the discovery of two small boxes of ammunition, the so-called "sword," and the electronics. But for the U.S. Attorney's Office orchestrating the search of the Baker home and the warrantless search in violation of the terms of the order on conditions of release, these items would not have been discovered.

## IV.   <u>CONCLUSION</u>

Based on the foregoing, Mr. Baker requests that all items seized from his home be suppressed and that all items seized be immediately returned to him.

DATED this 2nd day of June 2022.

**SNOW CHRISTENSEN & MARTINEAU**


By:    /s/ Nathan A. Crane
       Richard A. Van Wagoner
       Nathan A. Crane
       LaShel Shaw
       ***Attorneys for Defendant***

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of June 2022, a true copy of the foregoing **MOTION TO SUPPRESS ITEMS SEIZED DURING MARCH 30, 2022, WARRANTLESS SEARCH AND SEIZURE** was served by the method indicated below, to the following:

Jennifer Muyskens
Attorney for the United States of America
111 South Main Street, Ste. 1800
Salt Lake City, Utah 84111

(  ) U.S. Mail, Postage Prepaid
(  ) Hand Delivered
(  ) Overnight Mail
(  ) Facsimile
(X) Electronic Filing

*/s/Nathan A. Crane*
**Attorney for Defendant**

4877-8000-6433, v. 2