1                   IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4

 UNITED STATES OF AMERICA,        )
5                                  )
                Plaintiff,         )
6                                  )
        vs.                        )
7                                  )
 MATTHEW AMBROSE BAKER,            )   Case No:  2:20-CR-00301
8                                  )
                Defendant.         )
9                                  )
                                   )
10  _____)

11

12

13

14

15

16
           BEFORE THE MAGISTRATE JUDGE CECILIA M. ROMERO
17
                         MAY 6, 2022
18
         ELECTRONIC RECORDING PROBABLE CAUSE HEARING
19
                      PAGES 1 - 246
20

21

22

23
                      Reported by:
24            KELLY BROWN HICKEN, RPR, RMR
                      801-521-7238
25

```
 1                      APPEARANCES OF COUNSEL

 2    FOR THE GOVERNMENT:          OFFICE OF THE US ATTORNEY

 3                                 BY:  JENNIFER MUYSKENS

 4                                      Attorney at Law

 5                                 111 SOUTH MAIN ST, STE 1800

 6                                 SALT LAKE CITY, UTAH  84111

 7

 8    FOR THE DEFENDANT:           SNOW CHRISTENSEN & MARTINEAU

 9                                 BY:  NATHAN A. CRANE

10                                      RICHARD A. VAN WAGONER

11                                      Attorneys at Law

12                                 10 EXCHANGE PLACE 11TH FL

13                                 SALT LAKE CITY, UTAH  84145

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I  N  D  E  X

 2    WITNESS                EXAMINATION BY                 PAGE

 3    JACOB KING             DIRECT BY MUYSKENS             9
                             VOIR DIRE BY CRANE             41
 4                           DIRECT(CONT'D) BY MUYSKENS     43
                             CROSS BY CRANE                 60
 5                           REDIRECT BY MUYSKENS           118

 6    LINDSAY GARLAND        DIRECT BY MUYSKENS             122
                             CROSS BY VAN WAGONER           136
 7
      KENNEDY NATE           DIRECT BY CRANE                156
 8                           CROSS BY MUYSKENS              164

 9    MATTHEW BAKER          DIRECT BY CRANE                166
                             CROSS BY MUYSKENS              207
10                           REDIRECT BY CRANE              223

11                 (EXHIBITS RECEIVED INTO EVIDENCE)

12    GOVERNMENT'S        PAGE        DEFENDANT'S          PAGE
      1                   13          2                    74
13    2                   14          3                    75
      3                   17          4                    103
14    4                   23          5                    75
      5                   24          6                    202
15    6                   31          7                    92
      8                   47          8                    87
16    9                   49          9                    88
      10                  51          10                   91
17    11                  51          11                   202
      12                  52          12                   140
18                                    13                   191

19

20

21

22

23

24

25
```

```
 1                  SALT LAKE CITY, UTAH, FRIDAY, MAY 6, 2022

 2                          *   *   *   *   *

 3            THE COURT:  Good morning.  We are here in the

 4       matter of the United States vs. Matthew Baker, Case

 5       Number 2:20-CR-301.  We are here today for the detention

 6       hearing, which we started earlier this week.  I believe we've

 7       addressed any preliminary matters that we need to cover, but

 8       when I asked counsel to make their notice of appearance if

 9       you'll let me know if there's anything we need to address

10       before we get started.  Let's start first with who is present

11       on behalf of the United States.

12            MS. MUYSKENS:  Good morning, Your Honor.  Jennifer

13       Muyskens for the United States, and also with me is Special

14       Agent Lindsay Garland and US Probation Officer Jacob King,

15       both of whom will be testifying.  There is one preliminary

16       matter based on the material that the defense submitted last

17       night.

18            THE COURT:  Okay.  Thank you.

19            And who is present for Mr. Baker?

20            MR. CRANE:  Nathan Crane and Richard Van Wagoner,

21       and Mr. Baker is present in custody.  Your Honor, he is in

22       handcuffs, and we ask that the handcuffs on his hands be

23       removed so he can take notes and participate with us in the

24       hearing today.  As of the Court knows there is no history of

25       violence, and there's no violence allegations.  This is a
```

1    white collar matter.

2              THE COURT:  Ms. Muyskens, do you have any position

3    on that?

4              MS. MUYSKENS:  Your Honor, I defer to the marshals

5    and the Court.

6              THE COURT:  All right.  Thank you.  Do the marshals

7    have any concerns on that?  Do you want to come up and speak

8    with me?

9              (Discussion at the bench off the record.)

10             THE COURT:  All right.  The Court will go ahead and

11   grant that request, Mr. Crane.

12             MR. CRANE:  Thank you.

13             THE COURT:  All right.  Miss Muyskens, you

14   indicated that there was a preliminary matter in regards to an

15   exhibit.  Do you want to address it now or do you want to wait

16   until it's presented?

17             MS. MUYSKENS:  I would ask to address it now as it

18   may impact the government's presentation in this case likely.

19             THE COURT:  All right.  Thank you.  And then I --

20   in terms of the exhibits, this is a binder of the defendant's

21   exhibits; is that correct, Mr. Crane?

22             MR. CRANE:  Yes, Your Honor.  I brought that hard

23   copy this morning.  I also brought one for the witness.

24             THE COURT:  Thank you.  All right.

25             MS. MUYSKENS:  Yes, Your Honor.  Yesterday late in

1     the afternoon the government received what -- the defense's

2     exhibits, to include Defendant's Exhibit Number 1, which

3     purports to be a declaration of Staci Baker.  It's a four-page

4     document, the fourth page being -- has shading on it with no

5     number at the bottom.

6               THE COURT:  Yes, I see that.

7               MS. MUYSKENS:  Okay.  And the government has a

8     preliminary inquiry through the Court, which is, is the

9     defense proposing to submit this in lieu of Miss Baker taking

10    the stand or as in addition to her taking the stand?  Because

11    I think that raises our ability to cross-examine and challenge

12    testimonial evidence that they're purported to present.  And

13    while I recognize that it's within the Court's discretion to

14    consider evidence in the manner in which it is, should the

15    Court choose to consider it recognizing the government does

16    not have the ability to in any way cross-examine the witness

17    directly, the government is requesting then that counsel for

18    the defendant place on the record that Ms. Baker submitted

19    this declaration with the understanding that it would be

20    submitted in this hearing as her statement in the case.  And I

21    say that because the implications of the waiver of marital

22    privilege come into play once this is admitted into evidence.

23              And just to be clear, there are two privileges that

24    are often encompassed within marital, that is spousal

25    communications, a privilege that Mr. Baker holds.  I'm not

1    speaking to those.  I'm speaking to her testimonial privilege,

2    one that Ms. Baker holds, and at the moment she waives it can

3    have huger implications for whether or not she can reassert

4    later.  And we submit that there's federal case law that it is

5    deemed a waiver, and she can be called as a witness by either

6    party in the future.

7         So I think because she holds the privilege on

8    testimonial, she holds the testimonial privilege, we simply

9    need on the record that she's aware that this is being

10   submitted because it's her privilege.

11        And finally, the third issue being if Ms. Baker --

12   or if this is intended to be submitted, then the government

13   then has a few inquiries for its own witnesses to impeach the

14   witness Ms. Baker as if she took the stand, which I believe

15   we're permitted to do pursuant to Rule 806 of the Rules of

16   Evidence, but also just on other rules of fairness impeach her

17   credibility.

18        THE COURT:  Thank you, Miss Muyskens.

19        Mr. Crane?

20        MR. CRANE:  Your Honor, if I could have just one

21   minute?

22        THE COURT:  Certainly.

23        (Time lapse.)

24        MR. CRANE:  Thank you, Your Honor.  I appreciate

25   that.

1         Well, I guess the question I have first, then, is

2    are we going to adhere to the Rules of Evidence in today's

3    hearing?  If we are strictly going to adhere to them that may

4    dictate if we submit that because under the Rules of Evidence

5    it probably is inadmissible in the hearing.

6         THE COURT:  So the Rules of Evidence don't apply in

7    these types of hearings, and I'm not inclined to deviate from

8    that.  As you know, the Court is entitled to consider what

9    must be considered, and then I can give it the weight that I'd

10   like to give it.

11        MR. CRANE:  I understand that.  Okay.  Well, then,

12   if the Court wants me to answer counsel's questions, we

13   obtained that declaration from Ms. Baker's counsel knowing

14   that we would be using it at the hearing today.

15        THE COURT:  And is it your issue is she going to be

16   called today or are you going to proffer this by way of

17   declaration?

18        MR. CRANE:  By proffer.  She'll not be called

19   today.

20        THE COURT:  She'll not be called today.  Okay.

21   Then I think the way that this will work is Ms. Muyskens

22   wanted to know that, the answer to that question, if she's

23   going to be called or you're going to proffer it, and then go

24   on the record providing the notice that it may be her position

25   at a later date that some privilege may or may not have been

1    waived or she'll take that position later.  And you heard

2    that, and you understand that, so you may have to deal with

3    that or her counsel may have to deal with that at a later

4    date.

5              MR. CRANE:  Yes.

6              THE COURT:  Thank you.

7              All right.  With that, let's go ahead and get

8    started.  Miss Muyskens, will you call your first witness?

9              MS. MUYSKENS:  Thank you, Your Honor.  The United

10   States calls Jacob King.

11             THE COURT:  Thank you.  Mr. King?

12             THE CLERK:  Please raise your hand.

13                        JACOB KING,

14       called as a witness at the request of Plaintiff,

15          having been first duly sworn, was examined

16                and testified as follows:

17             THE CLERK:  If so, please say I do.

18             THE WITNESS:  I do.

19             THE CLERK:  Thank you.

20                   DIRECT EXAMINATION

21   BY MS. MUYSKENS:

22        Q.   Good morning.

23        A.   Good morning.

24        Q.   Can you please state and spell your name for the

25   record?

```
 1              A.    Jacob King.  J-A-C-O-B, K-I-N-G.

 2              Q.    And where are you employed, Mr. King?

 3              A.    I'm sorry.  Will say it again?

 4              Q.    Where are you employed?

 5              A.    With the US Probation Office in the District of

 6    Utah.

 7              Q.    And what is your responsibility with the US

 8    Probation Office here in the District of Utah?

 9              A.    I am a probation officer.

10              Q.    How long have you been a probation officer here in

11    the District of Utah?

12              A.    In the District of Utah it has been about three and

13    a half years.  Prior to that I was -- did about a little over

14    two years as a federal probation officer in South Dakota.

15              Q.    And what kind of training have you received, sir?

16              A.    Umm, initial academy training, as well as we are

17    required to participate in at least 40 hours of training,

18    various types of trainings every year.

19              Q.    I want to direct your attention to an individual by

20    the name of Matthew Ambrose Baker.  Do you know this

21    individual?

22              A.    I do.

23              Q.    Have you met this person before?

24              A.    Yes.

25              Q.    Do you see Mr. Baker in the courtroom today?
```

```
 1          A.   I do.
 2               MR. CRANE:  We will waive the identification.
 3               THE COURT:  I'm sorry.  I missed that, Mr. Crane.
 4               MR. CRANE:  We'll stipulate to identification.
 5               THE COURT:  All right.  Thank you.
 6               Go ahead, Ms. Muyskens.
 7               MS. MUYSKENS:  Thank you.
 8          Q.   BY MS. MUYSKENS:  And what role do you play in the
 9     supervision of Matthew Baker?
10          A.   I am his supervising probation officer.
11          Q.   And you said supervising probation officer; is that
12     correct?
13          A.   Yes.
14          Q.   In what matters do you supervise him?
15          A.   The conditions that were set by the Court in
16     both -- since Mr. Baker is on both post-conviction supervision
17     as well as pretrial supervision, I have two different sets of
18     conditions that I am monitoring Mr. Baker for.
19          Q.   Thank you.
20               At this time, Your Honor, may I approach the
21     witness to provide a copy of the exhibits?
22               THE COURT:  Yes.
23               MS. MUYSKENS:  And I have a copy for the Court.  I
24     provided one for the Court yesterday via electronic e-mail.
25     Does the Court need a hard copy?
```

```
 1                    THE COURT:  If you have a hard copy.  I did print
 2    out what I received, but I just want to make sure that we're
 3    working off the same set.  So if you want to give me a copy
 4    that would be great.
 5                    MS. MUYSKENS:  Sure.  I previously provided
 6    counsel.
 7                    MR. CRANE:  Thank you.
 8                    MS. MUYSKENS:  And, Your Honor, with permission of
 9    the Court I would like to provide all of the exhibits at one
10    time to the witness to save going back and forth.
11                    THE COURT:  Yes, that's fine.  Thank you.
12                    THE WITNESS:  Your Honor, I have some notes that I
13    prepared for this hearing.  May I reference those, as well?
14                    THE COURT:  Yes, you may.
15                    THE WITNESS:  Thank you.
16          Q.   BY MS. MUYSKENS:  Now, Mr. King, you said you had
17    notes for this hearing that you wanted to reference?
18          A.   Yes.
19          Q.   Okay.  Have you had an opportunity to review the
20    file in this case, the supervision file prior to testifying?
21          A.   Yes.
22          Q.   Okay.  First I'd like to direct your attention to
23    Government's Exhibit Number 1 in the packet that I just
24    provided to you.  It is a four-page document.
25          A.   Yes.
```

1    Q.    Do you recognize what this is?

2    A.    I do.

3    Q.    What is it?

4    A.    This is a copy of the conditions set by the Court

5    for Mr. Baker's pretrial release.

6          MS. MUYSKENS:  At this time, Your Honor, the

7    government offers into evidence Government's Exhibit Number 1.

8          THE COURT:  Admitted.

9          (Whereupon, Government's Exhibit 1 was received.)

10         THE COURT:  I wonder if we can save some time on

11   this.  I obviously authored this order and know what it says,

12   and I'm familiar with the conditions that I put in place.

13         Mr. Crane, do you have any concerns with the Court

14   just sort of recognizing that this is my order and

15   understanding what it means?

16         MR. CRANE:  No, Your Honor.

17         THE COURT:  All right.  Thank you.

18         With that, Miss Muyskens, let's have you move

19   forward with the content of what you want to cover.

20         MS. MUYSKENS:  Thank you.  And just while we're

21   doing that, at this time I would also ask Mr. King to look at

22   Government's Exhibit Number 2 titled, Request and Order to

23   Amend Previous Petition on Conditions of Pretrial Release,

24   containing six allegations.

25         Q.    BY MS. MUYSKENS:  Do you recognize this document,

1    Mr. King?

2         A.   I do.

3         Q.   Is this a copy of the petition that was submitted

4    to the Court in this case and which outlines the

5    allegations --

6         A.   Correct.

7         Q.   -- of pretrial violations?

8         A.   Correct.

9              MS. MUYSKENS:  At this time, the government also

10   offers into evidence Government's Exhibit Number 2.

11             MR. CRANE:  No objections.

12             THE COURT:  Admitted.

13        (Whereupon, Government's Exhibit 2 was received.)

14        Q.   BY MS. MUYSKENS:  Now, Mr. King, I want to direct

15   your attention to May 30th of 2022.  On May 30th of 2020, did

16   you participate in the search of defendant Matthew Baker's

17   residences?

18        A.   I'm sorry.  Do you mean March 30th?

19        Q.   I'm sorry.  March 30th.  Thank you for correcting

20   me.

21             March 30th of 2022, did you participate in the

22   search of Matthew Baker's residences?

23        A.   I did.

24        Q.   When I say "residences" what specifically was

25   searched?  Which residences?

1          A.    There is a residence in Orem.   I unfortunately

2     don't have the exact address in front of me.   I believe it's

3     on Glendell Drive.   And there is a residence in Spanish Fork.

4     Again, I don't have the exact address, but I believe it's on

5     River Bottoms Road.

6          Q.    Okay.   For purposes of this hearing, may I refer to

7     one as the Orem residence and one as the Spanish Fork

8     residence?

9          A.    Yes.

10         Q.    Okay.   And at the time that you participated in the

11    search on March 30th of 2022, did you have an understanding

12    from the defendant about which residence he was living in?

13         A.    Yes.

14         Q.    Which one was that?

15         A.    The Spanish Fork residence.

16         Q.    And what was the connection to the Orem residence

17    then?

18         A.    They had previously lived at that residence until

19    October of 2021, at which time he informed me that they were

20    moving to the Spanish Fork residence.   However, my

21    understanding was that the Orem residence was still owned by

22    the defendant's wife and that the defendant still accessed

23    that residence at least occasionally.

24         Q.    Okay.   Now I want to turn your attention of what's

25    outlined in Government's Exhibit 2 as Allegation Number 4.

1    That is:  On or about March 30th, 2022, the defendant

2    possessed a firearm, ammunition, destructive device or other

3    dangerous weapon, that is 37 rounds of 9 millimeter

4    ammunition, 40 rounds of .38 special ammunition and a sword.

5              So my line of questions are going to focus first on

6    that allegation.

7         A.   Sure.

8         Q.   At the Spanish Fork residence was ammunition found?

9         A.   Yes.

10        Q.   Where was ammunition found at the Spanish Fork

11   residence?

12        A.   There was 9 millimeter ammunition found in a duffle

13   bag in the basement and .38 special ammunition found in a

14   dresser drawer of the master bedroom.

15        Q.   Okay.  First let me talk about the .38 special

16   ammunition.  Was it a single round?  Was it a box?  How many

17   rounds are we talking about?

18        A.   It was a box, not complete.  I believe it had

19   40 rounds in it.

20        Q.   And when you say not complete, meaning some rounds

21   were missing?

22        A.   Correct.

23        Q.   Okay.  And you said it was found in a dresser

24   drawer.  Was it found with clothing?

25        A.   Yes.

1        Q.   What kind of clothing?

2        A.   There was boxer shorts.  It appeared to be male

3   clothing.

4        Q.   At this time I'm going to direct your attention to

5   Government's Exhibit Number 3, a photograph.  And do you

6   recognize what this photograph is of?

7        A.   I do.

8        Q.   What is it?

9        A.    It's of the ammunition sitting inside the dresser

10   drawer where it was found.

11        Q.   And it's a photograph of how the ammunition was

12   found, meaning where it was located; is that correct?

13        A.   Correct.

14        Q.   Is it a fairly accurately depiction at the time of

15   its recovery on March 30th of 2022?

16        A.   Yes.

17             MS. MUYSKENS:  At this time the government offers

18   into evidence Government's Exhibit Number 3.

19             MR. CRANE:  No objection.

20             THE COURT:  Admitted.

21        (Whereupon, Government's Exhibit 3 was received.)

22        Q.   BY MS. MUYSKENS:  And you stated it was found with

23   men's clothing; correct?

24        A.   Correct.

25        Q.   And also directing your attention to the picture to

1    what also appears to be a box of Lifestyles condoms; is that

2    correct?

3          A.   Correct.

4          Q.   Are there any other adult males that reside at the

5    Spanish Fork residence?

6          A.   Not that I'm aware of.

7          Q.   Okay.  Now you also mentioned a box of 9 millimeter

8    ammunition that was found in a duffle bag.

9          A.   Correct.

10         Q.   And did you say where the duffle bag was?  Did you

11   clarify that?

12         A.   It was in a room in the basement that initially was

13   locked.  But the defendant under our orders unlocks that room

14   for us.  And what appeared to be in the room was a lot of

15   storage bins.  That appeared to be just basically a storage

16   room.

17         Q.   Okay.  And you said it was 9 millimeter ammunition.

18   How many rounds?

19         A.   I believe 37.

20         Q.   Okay.  Was it a box or were they loose?

21         A.   It was a box.

22         Q.   Okay.  And you said it was found in like I think

23   you said a blue duffle bag?

24         A.   Correct.

25         Q.   Was anything else found inside the blue duffle bag?

1        A.    Yes.   Over $80,000 in cash.

2        Q.    Okay.   Were there also some documents found in the

3    bag?

4        A.    Yes, there were.

5        Q.    All right.   And you said over $80,000 in cash.   On

6    March 30th of 2022 did the defendant Matthew Baker make any

7    statements claiming ownership of the cash that was found with

8    the ammunition?

9        A.    Not direct statements of -- well, he stated at one

10   point while I was supervising him in the living room upstairs,

11   he did ask me unsolicited, are you guys taking my money?

12       Q.    Okay.

13             And did he make any other statements about that

14   being his money?

15       A.    Other than calling us thieves, not that I recall.

16       Q.    Okay.   At the Orem residence was any item found?

17       A.    A sword.   Are we speaking strictly under

18   Allegation 4?

19       Q.    Yes, under Allegation 4.

20       A.    Yes.   A sword.

21       Q.    Okay.   And I think -- have you described it or has

22   that been described before as sort of a decorative sword?

23       A.    Yeah.

24       Q.    Okay.

25       A.    It appeared old.   It certainly was fairly sharp and

1    would absolutely be considered a weapon.

2         Q.    Okay.  Was a firearm recovered at either the Orem

3    or Spanish Fork residence?

4         A.    No.

5         Q.    Was a firearm searched for?

6         A.    Yes.

7         Q.    Okay.  Why were you searching for a firearm?

8         A.    Because we found ammunition, and generally, you

9    know, where there's smoke there's fire.  So when we found

10   ammunition we believed that there was a high probability of

11   there being a firearm somewhere.

12        Q.    Okay.  During the search on March 30th of 2022, was

13   Stacie Baker asked about either ammunition or a firearm?

14        A.    Yes.

15        Q.    And can you describe that conversation?

16        A.    So after we found the firearm -- or I'm sorry, the

17   ammunition at the Spanish Fork residence we were discussing it

18   among some of the officers there.  The consensus was that when

19   Mr. Baker was first approached at the Orem residence the

20   officers that were at the Orem residence had witnessed him get

21   out of his vehicle rapidly essentially move quickly over to a

22   garbage can outside and then quickly move into the backyard.

23              At the time that didn't seem to have much context

24   when the officer saw it at first, but after we found the

25   ammunition we were concerned that maybe those actions had been

1    in an attempt to conceal a firearm somewhere.  So after the

2    search at t.

3           He Spanish Fork residence was -- as it was reaching

4    its conclusion, I believe three officers went back to the Orem

5    residence and searched in the garbage can as well as the

6    backyard as best as they could to see if they could locate a

7    firearm.  They weren't able to search some areas because

8    Mr. Baker and his wife owned dogs that were in kennels in the

9    backyard, so we weren't able to enter those.

10          The officers did not locate a firearm at the Orem

11   residence.  And as they were finishing up their second search

12   of that exterior area as I just described, Mrs. Baker arrived,

13   and a conversation with Mrs. Baker occurred.  She was asked --

14   or she was informed that we had found ammunition at the

15   Spanish Fork residence.  I believe Mrs. Baker's response was,

16   I did not know that he could not have ammunition.  And then

17   she was asked if there is a firearm somewhere, and she said

18   she did not know anything about a firearm.

19       Q.   Okay.  Did Mrs. Baker at any time during that

20   conversation claim ownership or possession of the ammunition?

21       A.   No.

22       Q.   Thank you.  Now I want to direct your attention to

23   allegation -- or one final question on that.  You said you

24   supervised Mr. Baker in a post-conviction matter, as well; is

25   that correct?

1        A.    Correct.

2        Q.    And just for record, that is a felony matter;

3   correct?

4        A.    Correct.

5        Q.    So the defendant is a convicted felon as of

6   March 30th of 2022.

7        A.    Correct.

8        Q.    Thank you.

9              I want to direct your attention to Allegation

10  Number 5:  On or about March 30th, 2022, the defendant failed

11  to comply with the provisions outlined in Appendix A, the

12  Limited Internet Access of the US Probation and Pretrial

13  Services Office Computer and Internet Monitoring Program.

14  That is, failed to report all computer devices, external

15  drives and other electronic devices that he uses or has access

16  to.  Okay?

17       A.    Yes.

18       Q.    I'd like to direct your attention to Government's

19  Exhibit Number 4.  Do you recognize that?

20       A.    I do.

21       Q.    What is it?

22       A.    It is the rules of the Computer and Internet

23  Monitoring Program.

24       Q.    Okay.  And directing -- and this is a copy specific

25  to Mr. Baker's supervision or just a standard copy?

1          A.    It's specific to Mr. Baker.

2          Q.    And on the last page Mr. Baker signed it on

3    October the 1st of 2020; correct?

4          A.    Correct.

5                MS. MUYSKENS:  At this time the government offers

6    into evidence Government's Exhibit Number 4.

7                MR. CRANE:  No objection.

8                THE COURT:  Admitted.

9          (Whereupon, Government's Exhibit 4 was received.)

10         Q.    BY MS. MUYSKENS:  And directing your attention to

11   Paragraph 1, can you just simply read for the record

12   Paragraph 1, please?

13         A.    I acknowledge I am to comply with all program rules

14   set forth in this appendix and the instructions US Probation

15   and Pretrial Services Office.  I understand that this appendix

16   is by reference part of the order setting conditions for my

17   release.  I acknowledge I am to comply with its provisions and

18   the instructions of the USPO.  Failure to do so may be

19   considered a violation of my supervision and may result in an

20   adverse action.  I agree to call the USPO if I have any

21   questions about the rules of the program or if I experience

22   any problems that may hinder my compliance with this program.

23         Q.    And one additional paragraph.  I'll ask you to note

24   for the record as I have some questions about that.  Well,

25   Paragraph 3, please.  Can I read that for the record?

1           A.   I shall possess and/or access only computer

2    hardware and software including operating system software

3    approved by the USPO.  I shall obtain permission from the USPO

4    prior to obtaining or accessing any additional computer

5    hardware, software or making any alterations to my system.

6           Q.   Now as part of the USPO's Computer and Internet

7    Monitoring Program, did the defendant fill out a

8    questionnaire?

9           A.   He did.

10          Q.   May a direct your attention to Government's

11   Exhibit Number 5?  Can you please look at that document?

12               For the record, this is a seven-page document.

13   It's up there.

14          A.   Yes.

15          Q.   All right.  And is this a copy of the -- is this a

16   true and accurate copy of the questionnaire that was filled

17   out by the defendant as part of his participation in the

18   monitoring program?

19          A.   Yes.

20               MS. MUYSKENS:  At this time the government offers

21   into evidence Government's Exhibit Number 5.

22               MR. CRANE:  No objection.

23               THE COURT:  Admitted.

24          (Whereupon, Government's Exhibit 5 was received.)

25          Q.   BY MS. MUYSKENS:  Now, Mr. King, for the record,

                                                              24

 1    can you please go through the information that the defendant

 2    provided on the first page?  And what is the purpose of the

 3    questionnaire?  Let me ask that first.

 4         A.   The purpose of the questionnaire is for the

 5    defendant to have the opportunity to inform US probation of

 6    any electronic devices that he may already own or possess at

 7    the time that the SIM condition -- I'm sorry.  SIM is the

 8    Computer Internet Monitoring Program -- at the time hat the

 9    SIM condition is put in place.

10         Q.   Thank you.  And this was filled out at the start of

11    his supervision; correct?

12         A.   Correct.

13         Q.   All right.  So how many computers does the

14    defendant identify that he has access to or uses?

15         A.   One.

16         Q.   Okay.  And just for the record, it states at the

17    top of the portion where you fill out on Page 1:  Complete for

18    each computer device you have access to or use, and then in

19    parentheses, it says:  Computers in your residence, at work,

20    et cetera.  Correct?

21         A.   Correct.

22         Q.   So he identified one computer?

23         A.   Correct.

24         Q.   How many storage devices or external drives,

25    directing your attention to Page 3, did the defendant identify

                                                              25

1    that he had access to or used?

2         A.    None.

3         Q.    On the same page when it comes to, other

4    accessories, it states:  List all peripherals you own, possess

5    or have access to.  Examples are cellphones, tablets,

6    e-readers, game systems, MP3 players, digital cameras,

7    scanners, printers, devices, et cetera.

8              How many devices did the defendant list?

9         A.    One.

10        Q.    And what did he list?

11        A.    A scanner/printer.

12        Q.    Did he identify any cellphones?

13        A.    No.

14        Q.    And cellphones that had Internet capability;

15   correct?  Or he identified none?

16        A.    He identified no cellphones.

17        Q.    All right.  All right.  Now on May 30th of 2022

18   during the search, can you describe the quantity and type of

19   electronic devices which you observed at the Spanish Fork

20   residence, or were observed by pretrial and probation officers

21   at the Spanish Fork residence?

22        A.    I believe you said May again.

23        Q.    Did I?  March 30th of 2022.  Thank you.

24        A.    We found 12 computers, 17 jump drives and two

25   external hard drives, at least that amount.  There were some

26

1    items that we actually didn't seize.

2         Q.   Okay.  And when you say "some items," like what?

3         A.   There was another jump drive that was labeled

4    pre-indictment discovery, so we didn't find that that would be

5    relevant to our reason for being there.  So we left that.  And

6    there was another computer that officers -- I'm not sure how

7    they came to this conclusion, but officers deemed to have

8    likely belonged to Mrs. Baker, so we did not take that,

9    either.

10         Q.   Okay.  Now I want to talk just briefly about the

11    devices that you found.  Now, some of the computers and

12    devices were found in the garage; is that correct?

13         A.   Correct.

14         Q.   And they were dusty and didn't appear to be plugged

15    in and being used at the time; correct?

16         A.   That's correct.

17         Q.   So let's focus first on the devices that were found

18    inside the home and appeared to be running and operable.

19         A.   Okay.

20         Q.   Were two computers located in the laundry room?

21         A.   Yes.

22         Q.   And was one of them plugged in and running?

23         A.   Yes.

24         Q.   Was there also a computer located in the kitchen

25    that was plugged in and appeared operable?

1      A.   Yes.

2      Q.   And in the basement area, the same basement where

3 the bag with the money and ammunition were found, was there

4 effectively what your team called a computer room?

5      A.   Yes.

6      Q.   And what kinds of things were found in there?

7      A.   That's where the vast majority of the jump drives

8 were found.  I know at least one external hard drive was found

9 in there.  I am not sure where the second one was found.

10 That's also where at least one operable computer was found.

11 There was also I believe some cellphones found there, as well,

12 as well as a lot of documents.

13      Q.   Okay.  And when you say cellphones, are these

14 smartphones capable of accessing the Internet?

15      A.   Yes.

16      Q.   And then you mentioned there were some items found

17 also in the garage; is that correct?

18      A.   Correct.

19      Q.   All right.  Were other -- approximately how many

20 smartphones or cellphones were recovered from the defendant

21 either from the residence or from his person?

22      A.   Prior -- or during -- on the day of the search I

23 believe there was six cellphones.

24      Q.   And some were recovered from his person; is that

25 correct?

1            A.    Yes.

2            Q.    All right.  And did you also recover evidence of

3     the defendant purchasing prepaid phones?

4            A.    Yes.

5            Q.    Directing your attention to Government's

6     Exhibit Number 6.

7                  THE COURT:  Before you move to Number 6,

8     Miss Muyskens, I just want to ask one question.

9                  Mr. King, looking at Exhibit Number 5 and the

10    computer that is identified there, if you could tell me what

11    you understand to be identified on Exhibit Number 5 with

12    respect to the desktop computer that was identified and if it

13    included in any of the running and operable computers that you

14    just referenced that were found either in the laundry, kitchen

15    or basement.

16                 THE WITNESS:  Your Honor, I do recognize that there

17    were many Dell, I believe it it's Vostro computers.  There

18    were multiple ones found.  Unfortunately I could certainly

19    find that answer in our records, but off the top of my head I

20    don't know if this was one of the ones that was running or

21    not.

22                 THE COURT:  All right.  But in terms of what you

23    recall, were any outside of what was identified in

24    Exhibit Number 5 under the desktop computer?  Were they the

25    same brand or different brands?

 1                    THE WITNESS:  I'm sorry.  I'm not understanding

 2      your question.

 3                    THE COURT:  I'm just trying to figure out if you

 4      remember if the basement computer, the kitchen computer and

 5      the laundry room computer, were they Windows computers that

 6      were identified here, or were they different types of -- were

 7      they laptops, for example?  Desktops?

 8                    THE WITNESS:  All the computers seized were

 9      desktops.

10                    THE COURT:  Desktops, okay.

11                    THE WITNESS:  I don't know if the one listed on the

12      SIM questionnaire was one that was running.  As I said, there

13      were multiple Dell Vostro computers, and I don't remember

14      which ones were the actual running ones and which ones

15      weren't.

16                    THE COURT:  Thank you.

17                    All right.  Go ahead, Miss Muyskens.

18                    MS. MUYSKENS:  Thank you.

19                    THE COURT:  I'm sorry.  What exhibit did you direct

20      his attention to?

21                    MS. MUYSKENS:  Exhibit Number 6.

22                    THE COURT:  Number 6.

23           Q.   BY MS. MUYSKENS:  Do you recognize Government's

24      Exhibit Number 6?

25           A.   Yes.

1       Q.    What is it?

2       A.    These are some of the documents that we seized from

3    the defendant's residence.

4       Q.    Okay.

5       A.    Or possibly in his vehicle.

6       Q.    Okay.

7             And at this time the government offers into

8    evidence Government's Exhibit Number 6.

9             MR. CRANE:  No objection.

10      Q.    BY MS. MUYSKENS:  And just referencing the receipt

11   that's listed --

12            THE COURT:  Just so the record is clear that will

13   be admitted.  Thank you.

14            (Whereupon, Government's Exhibit 6 was received.)

15      Q.    BY MS. MUYSKENS:  -- there is among rent documents

16   there is also a receipt for boost referencing a prepaid

17   cellphone dated January 26 of 2022; correct?

18      A.    That's correct.

19      Q.    How many phone numbers did you have for Mr. Baker

20   to reach him personally?

21      A.    One.

22      Q.    Okay.  Now, at the time of the search on March 30th

23   of 2022, did you request the passwords for his phone?

24      A.    Yes.

25      Q.    And did he provide them?

1      A.    No.

2      Q.    Did you request the passwords for the computers?

3      A.    I believe another officer did.  I can't speak for

4  certain.

5      Q.    Okay.  Do you know if he provided any passwords for

6  the computers to access the devices?

7      A.    I do know we were not provided any passwords for

8  any electronic devices.

9      Q.    And the number and type of devices, electronic

10  devices that were both observed and recovered from the

11  defendant's home as well as from his person or his vehicle,

12  was that consistent or inconsistent with what the defendant

13  had been reporting to you as a probation officer?

14      A.    Inconsistent.

15      Q.    And after March 30th of 2022, did you learn of

16  another smartphone that the defendant was in possession of?

17      A.    Yes.

18      Q.    Can you describe that?

19      A.    That was a cellphone that's after the pretrial

20  violation warrant had been issued.  Utah County sheriff

21  deputies picked up Mr. Baker on that warrant.  I believe it

22  was April 13th.  And when they picked him up they found

23  another cellphone on his person.

24      Q.    And had Mr. Baker reported that number to you?

25      A.    No.

1          Q.    Had he reported his possession of that to you?

2          A.    No.

3          Q.    Now I want to direct your attention to Allegation

4    Number 6:  On or about March 31st, of 2022, the defendant

5    committed an offense in violation of federal, state or local

6    or Tribal law, that is animal cruelty.

7                Now I only have a few questions for you about this

8    because I have another witness on this matter.

9          A.    Sure.

10         Q.    On or about April 14th of 2022 a total of 83 dogs

11   were recovered by law enforcement at three of the defendant's

12   properties to include the Orem residence and the Spanish Fork

13   residence; is that correct?

14         A.    That's correct.

15         Q.    And approximately how many dogs were recovered from

16   the Spanish Fork residence where the defendant had been

17   living?  Do you know?

18         A.    I believe it was over 50.

19         Q.    When you were at the Spanish Fork residence on

20   March 30th of 2022, did you observe any pets inside the home?

21         A.    Yes.

22         Q.    Can you describe the condition you observed?

23         A.    I observed two puppies that appeared no more than a

24   few months.  I mean, they're certainly under a year.  They

25   were in a kennel in the living room, and they were not very

1    active.  They were laying.  One of them I'm not sure moved the

2    entire time we were there.  And I witnessed the other one

3    struggling to move.  And they were both crying and whimpering

4    throughout our time there.

5         Q.   As a result of the conditions that were observed by

6    US probation officers was a phone call placed to animal

7    control that day?

8         A.   The following day.

9         Q.   The following day?

10        A.   Yes.

11        Q.   Correct.

12             Now, at the time the defendant was stopped by

13   US probation officers on March 30th, 2022, you previously

14   testified he was stopped at the Orem residence where he

15   appeared to be going towards the back; is that correct?

16        A.   That's correct.

17        Q.   All right.  Did it appear to the officers who

18   observed him that he had -- was there to take care of or to do

19   anything related to the dogs that were at that residence?

20        A.   Yes.  And I believe he, Mr. Baker also made some

21   statements that he was -- he needed to care for the dogs.

22             MR. CRANE:  Speculation.

23             THE COURT:  Denied.  I'll consider its weight,

24   Mr. Crane.  Thank you.

25        Q.   BY MS. MUYSKENS:  Did the defendant make any

1    statements during his supervision about any work or duties he

2    performed in caring for dogs as part of his wife's business?

3         A.   At the beginning of supervision he did report that

4    he was helping his wife with her dog business.

5         Q.   And are you aware of the dog business?

6         A.   Maple Mountain English Creams.

7         Q.   Okay.  Did the defendant also make statements

8    throughout his supervision including statements to you about

9    the dog business providing a means of income and support for

10   him?

11        A.   Yes.

12        Q.   What did he say?

13        A.   He said that, I had asked him about his finances,

14   and he said that part of the way that he and his family were

15   sustaining were through the income from that business.

16        Q.   And did he also provide to you during the course of

17   supervision financial statements from a bank account held by

18   Maple Mountain English Creams, the dog business?

19        A.   Yes.

20        Q.   All right.  Now I'm going to direct your attention

21   to Allegations 1 through 3 involving defendant's finances as

22   well as his employment.  The allegations being:  On or about

23   June 9th, 2021, the defendant committed an offense in

24   violation of federal, state or local or Tribal law, that is

25   fraud.  Allegations 2:  On or about June 9th, 2021, the

1    defendant obtained employment in a fiduciary capacity or

2    position allowing access to credit of personal information of

3    another; and that on or about August 18th of 2021,

4    January 12th of 2022 and February 3rd of 2022, the defendant

5    transferred substantial assets over $1500 without approval

6    from his probation officer.

7         Now throughout his supervision what has the

8    defendant reported regarding his employment and ability to

9    work?

10        A.   He said he's unable to work because of a medical

11   condition.

12        Q.   Okay.  Had you inquired about how the defendant

13   supports himself and his family financially?

14        A.   Yes.

15        Q.   And can you talk a little bit about your inquiries

16   and his responses?

17        A.   On -- well, the previous officer as I mentioned,

18   the officer that was previously supervising Mr. Baker, at the

19   beginning of supervision Mr. Baker informed him that he is no

20   longer doing his real estate business, that he is not looking

21   for work and that he's helping his wife with the dog business.

22   Approximately a year later after I took over supervision of

23   the case I inquired with Mr. Baker as to how he was

24   sustaining, he and his family were surviving if he was not

25   working.  And he said that he was living off of savings, that

1    he was living off of income from Maple Mountain English Creams

2    and that he was living off of the house.  I understood that to

3    mean the Orem residence that they were according to Mr. Baker

4    planning on selling.

5         Q.   Did you ask him to provide financial statements or

6    information to verify this?

7         A.   Yes.  That's when I asked him to provide me with

8    bank statements from Maple Mountain English Creams.

9         Q.   And did you ever discuss with him why you needed

10   specificity regarding how he was making income or his assets?

11        A.   Yes.  At one point I said to him, I need to ensure

12   that you are not receiving income through fraudulent means.

13        Q.   Okay.  Now, when and how many bank accounts

14   statements did the defendant provide you?

15        A.   One.

16        Q.   Being Maple Mountain English Cream?

17        A.   Correct.

18        Q.   And did you review it?

19        A.   I did.

20        Q.   And what kind of inflow and outflow of money did it

21   show?

22        A.   A few thousand dollars every month.  There was one

23   transaction that kind of caught my attention that there was a

24   deposit for $10,000 that was then immediately withdrawn.  But

25   I believe Mr. Baker provided me with six months worth of bank

1    statements.  And throughout that -- other than the one I

2    stated there really wasn't anything that seemed alarming.  It

3    seemed like there was probably enough money for them to

4    survive off of that business.

5         Q.   And I just want to get to the timing of when you're

6    having these conversations with him about needing to

7    understand his financial income and where money is coming

8    from.

9              What was the timing of those statements, meaning

10   when?  In what month and what year did they occur?

11        A.   I believe the first time I asked him was October of

12   2021, the second time was November of 2021, and then the third

13   time was March of 2022.

14        Q.   Okay.  And in March of 2022 before or after you

15   searched the residence?

16        A.   Before.

17        Q.   And were his answers consistent throughout with

18   what you've explained?

19        A.   Yes.

20        Q.   Now, did the defendant -- what if any statements

21   did the defendant make during the course of his supervision

22   regarding the condition concerning the transfer of assets?

23        A.   There was -- at the very beginning of supervision

24   again with the officer that was previously supervising

25   Mr. Baker there was a statement at the very beginning of

1    supervision when they were going over the conditions initially
2    Mr. Baker voiced some concern about the condition of not
3    transferring assets over $1500.  He stated that he does that
4    all the time.
5              There was then shortly after, it was in December of
6    2020, so approximately two months after that initial
7    conversation that Mr. Baker sent an e-mail to the previous
8    officer seeking permission for his wife to sell a property
9    that was in her name and that Mr. Baker reported that the sale
10   of this property had actually begun, the process had actually
11   begun prior to these pretrial conditions being put into place.
12             Beyond that there has never been any communication
13   from Mr. Baker seeking permission or asking questions about
14   that, the transfer of assets.
15   Q.   And at any point during supervision did the
16   defendant ask or request permission to act in a fiduciary
17   capacity for any person or entity?
18   A.   No.
19   Q.   And beginning in March of 2022 and continuing
20   through today, have you obtained evidence that the defendant
21   has been involved in a transfer of assets greater than $1500
22   in the sale of the property?
23   A.   Yes.
24   Q.   Okay.  So in March of, late March of 2022 did you
25   receive some documents from the United States Attorney's

1    Office, from me?

2         A.   Yes.

3         Q.   Okay.

4         A.   Yes.

5         Q.   Did you have an opportunity to review them?

6         A.   I did.

7         Q.   Now I'd like to direct your attention to

8    Government's Exhibit Number 7.  It consists of a two-page

9    e-mail and an attachment.

10             Do you recognize Exhibit Number 7?

11        A.   I do.

12        Q.   Is this one of the documents provided to you by the

13   US Attorney's Office?

14        A.   Yes.

15        Q.   Okay.

16             At this time, Your Honor, the government would

17   offer into evidence Government's Exhibit Number 7.

18             MR. CRANE:  Your Honor, if may voir dire on this

19   exhibit?

20             THE COURT:  For what reason, Mr. Crane?

21             MR. CRANE:  It's an incomplete document,

22   foundation, general inquiries as to when he obtained it,

23   authenticity.  Multiple reasons.

24             THE COURT:  Go ahead.

25             MR. CRANE:  Thank you.

```
 1                    VOIR DIRE EXAMINATION

 2   BY MR. CRANE:

 3         Q.   Mr. King, you just testified that you received this

 4   e-mail from the United States Attorney's Office; is that

 5   right?

 6         A.   Not direct -- I received a copy of this e-mail from

 7   them, yes.

 8         Q.   And how did you receive that?  From who?

 9         A.   From AUSA Muyskens.

10         Q.   Okay.  When did you receive it?

11         A.   March 29th, 2022.

12         Q.   And what did she tell you about this document?

13         A.   Nothing specifically about this document.

14         Q.   Okay.  And what did you do?

15         A.   This document came in a file of a lot of documents

16   and information.  She didn't say anything specifically about

17   this e-mail.

18         Q.   Okay.  But all those documents and information came

19   from Ms. Muyskens?

20         A.   Yes.

21         Q.   Okay.  What did you do to verify the authenticity

22   of this e-mail?

23         A.   Nothing.

24         Q.   You didn't call the title company that's listed

25   here?
```

1          A.   No.

2          Q.   You have no idea if this is an authentic document

3     or not?

4          A.   Not other than on its face.

5          Q.   Did you do anything to try to find the missing page

6     from this document?

7          A.   No.

8               MR. CRANE:   Your Honor, we object to this exhibit

9     as he's indicated there's no authenticity here.  This is

10    directly from the United States Attorney's Office.  There's no

11    information as to where it came from.  We're missing a page.

12    It's incomplete.

13              THE COURT:   Mr. Crane, help me understand.  What do

14    you mine you're missing a page?  I don't see where that --

15              MR. CRANE:   If you look at Page 2 of this e-mail,

16    it sells at the very bottom there:  Matt or Staci, can you

17    please assist us with items below, question mark?  If you look

18    below there's no questions there.  So if you go to the next

19    page, and the e-mail is done.  So we're missing a page of this

20    e-mail or pages from this e-mail, which we believe goes to

21    explain a lot about this e-mail and even if it's authentic.

22    But I think we have an issue here with the various issues I've

23    raised.

24              THE COURT:   All right.  Thank you, Mr. Crane.  Your

25    objection is overruled, and I will consider the points that

1     you made with respect to the weight I give it.

2               Miss Muyskens, go ahead and proceed.

3               MS. MUYSKENS:  Thank you.

4               DIRECT EXAMINATION (Continued)

5        Q.    BY MS. MUYSKENS:  With respect to Government's

6     Exhibit 7 what the government purports is an e-mail exchange

7     from Matt Baker at matt4freedom@yahoo.com to Leslie Peterson

8     at Charger Title Company; correct?

9        A.    Correct.

10       Q.    And there is, the context that's attached are

11    articles for SAST, LLC, and Pages 3 and 4 of Government's

12    Exhibit 7 indicate LLC certificate of organization for Sunrise

13    at Spanish Terrace, which has an acronym of SAST, LLC;

14    correct?

15       A.    Correct.

16       Q.    Okay.  Now the e-mail address

17    matt4freedom@yahoo.com, this e-mail address, is that the

18    e-mail address Matthew Baker provided at the start of

19    supervision --

20       A.    It is.

21       Q.    -- on his Internet form; correct?

22       A.    Yes.

23       Q.    Okay.  And is it your understanding that the

24    document reflects Matthew Baker submitting information and an

25    article of incorporation to a title company in connection with

1    the sale of property?  Is that your understanding?

2         A.   That's my understanding.

3              MR. CRANE:  I object to the speculation again, Your

4    Honor.

5              THE COURT:  Overruled.  It will go to weight.

6         Q.   BY MS. MUYSKENS:  Now, were you aware prior to

7    receiving information from the United States Attorney's Office

8    that there was any sale of property that Mr. Baker was

9    involved in?

10        A.   Not outside the statements of Mr. Baker that at

11   some point they were going to sell the Orem residence.  That's

12   the only sale of property that I have ever discussed with

13   Mr. Baker.

14        Q.   Okay.  And Pages 3 and 4 which purport to be a

15   certificate of organization, did you have an opportunity to

16   review that when this document was provided to you?

17        A.   Yes.

18        Q.   And what concerns, if any, did you have about that?

19        A.   It appeared in my opinion to be doctored.  With the

20   documents that I received from you I received another copy of

21   this certificate of organization that differed from the one in

22   this e-mail.

23        Q.   And how did it differ?

24        A.   First, Article IV on this copy here, the heading

25   Article IV appears twice.  It differed from the original one I

1      saw in that the manager had been changed to Mrs. Baker,

2      Staci -- well, under her maiden name Staci Milligan.  The date

3      underneath where it says, Staci Milligan, that had been

4      changed.  And the -- that date listed, 5th of September 2019,

5      doesn't match with the date listed inside of the stamp on

6      Page 1 from the Department of Commerce, which that date lists

7      the 30th of July 2015.  And then lastly, that stamp indicates

8      Kathy Berg as the division director, and Ms. Berg had actually

9      retired from the Department of Commerce in 2018, which would

10     have been prior to the date on the second page of the 5th of

11     September 2019.

12          Q.   Now based on your review of Government's

13     Exhibit Number 7 and your -- is that what forms the basis of

14     Allegations 1 and 2 in your petition?

15          A.   Sorry.  I'd have to remember what Allegation 2 is.

16               Yes.

17          Q.   Now, I want to then talk about Allegation Number 3,

18     the transfer of assets.  And you in your petition have listed

19     several dates.  Had you ever heard of a business called

20     Foxtrot United prior to the end of March 2022?

21          A.   No.

22          Q.   Okay.  Do you have an understanding now of what

23     Foxtrot United is?

24          A.   I understand it was a business that at one point

25     was registered to the defendant and then had later been

1     transferred to his wife.

2         Q.   Did the defendant ever mention a business called

3     Foxtrot United to supervision at any point?

4         A.   No.

5         Q.   Did you attempt to do some investigation inquiry

6     into Foxtrot United as well as a number of assets relating to

7     Foxtrot United?

8         A.   Yes.

9         Q.   And can you describe that?

10        A.   I learned that on August 18th, 2021, the defendant

11    transferred Foxtrot United to his wife.  Approximately three

12    months later Foxtrot -- a check was made out to the defendant

13    as well as to Foxtrot United for $829,640.63.  And the origin

14    of that money appeared to be -- appeared to be involved with a

15    bankruptcy proceeding that Foxtrot United was involved in.

16        Q.   Okay.  And based on your own investigation is it

17    your understanding the bankruptcy proceeding began a few

18    months before the defendant began supervision?

19        A.   Yes.

20        Q.   Okay.  But you mentioned that there was a transfer

21    on August 18th of 2021 to his wife.

22        A.   Correct.

23        Q.   Mr. Baker transferred his ownership interest --

24        A.   Correct.

25        Q.   -- in Foxtrot to his wife; is that correct?

 1          A.    Correct.

 2          Q.    Were you ever asked about that transfer?

 3          A.    No.

 4          Q.    Did he ever discuss that with you?

 5          A.    No.

 6          Q.    Okay.  Now, you also mentioned certain payments and

 7    checks.  I want to direct your attention to Government's

 8    Exhibit Number 8.  Do you recognize what this is?

 9          A.    Yes.

10          Q.    What is it?

11          A.    This is a copy of a check for $829,640.63.

12          Q.    And who's it made payable to?

13          A.    Made payable to Foxtrot United, LLC, care of

14    Matt Baker, registered agent.

15          Q.    And is this the check that you were referring to

16    when you were doing your investigation into the transfer of

17    assets?

18          A.    Yes.

19          MS. MUYSKENS:  At this time the government offers

20    into evidence Government's Exhibit Number 8.

21          MR. CRANE:  No objection.

22          THE COURT:  Admitted.

23          (Whereupon, Government's Exhibit 8 was received.)

24          Q.    BY MS. MUYSKENS:  Now the date of this check is

25    what?

1        A.    November 15th, 2021.

2        Q.    Okay.  And you previously testified that in

3   November of 2021 you asked Mr. Baker how he was financially

4   living; is that correct?

5        A.    Correct.

6        Q.    At any time did Mr. Baker advise you that he had

7   come into $829,000?

8        A.    No.

9        Q.    Okay.  Ever mention that he was expecting to come

10  into it?

11       A.    No.

12       Q.    Or any money?

13       A.    No.

14       Q.    Now, did you track or attempt to track how that

15  $829,000 was then spent?

16       A.    Yes.

17       Q.    And I want to direct your attention to Government's

18  Exhibit Number 9.

19             Do you recognize Government's Exhibit Number 9?

20       A.    Yes.

21       Q.    What is it?

22       A.    It's a wire transfer from Foxtrot United, LLC,

23  Matthew Baker, in the amount of $200,000 to Gregory N. Hoole,

24  PC Lawyer's Trust Account.

25             MS. MUYSKENS:  At this time government offers into

 1    evidence Government's Exhibit Number 9.

 2              MR. CRANE:  No objection.

 3              THE COURT:  Admitted.

 4         (Whereupon, Government's Exhibit 9 was received.)

 5         Q.   BY MS. MUYSKENS:  Did Mr. Baker ever request

 6    permission to transfer $200,000 on the date of September 13th,

 7    2021?

 8         A.   No.

 9         Q.   Now this appears to be going to a lawyer; correct?

10         A.   Correct.

11         Q.   What were the steps that you would have taken if

12    Mr. Baker had asked you if he could transfer money to pay a

13    lawyer for a purpose?

14         A.   I likely would have verified that that amount of

15    money was something that was owed to the attorney.  I in no

16    way would have tried to hinder Mr. Baker from paying his bills

17    that were due.

18         Q.   But why would you have then followed up on it?

19         A.   Because it's over $1500, and he needs permission

20    from me to do so.

21         Q.   Now I want to direct your attention to Government's

22    Exhibit Number 10.  Do you recognize this document?

23         A.   I do.

24         Q.   It's actually a two-page document.  One appears to

25    be a check and then a transaction slip; correct?

1        A.   Correct.

2        Q.   And what is Government's Exhibit Number 10?

3        A.   It is a check made out to Matthew Baker in the

4    amount of $628,539.82.

5        Q.   And the account that it is written on is the

6    Security Service Federal Credit Union; correct?

7        A.   Correct.

8        Q.   And it reflects a withdraw and a deposit into

9    Matthew Baker's account on Page 2 on or about December 21st;

10   correct?

11       A.   Correct.

12       Q.   Did Mr. Baker make you aware that he had received

13   or deposited a check for $628,539?

14       A.   No.

15       Q.   Okay.  Now, did you know anything about a bank

16   account with Security Service Federal Credit Union in Matthew

17   Baker's name?

18       A.   No.  Not prior to the information that you provided

19   to me in March.

20       Q.   Okay.  I direct your attention to Government's

21   Exhibit Number 11.  And you stated that you attempted to

22   traced how the money was spend; correct?

23       A.   Correct.

24            THE COURT:  Just one second.  I didn't write a note

25   down.

1          Mr. Crane, did you have any objection to this

2    Exhibit Number 10?

3          MR. CRANE:  No, Your Honor.

4          THE COURT:  All right.  This one is admitted.

5          (Whereupon, Government's Exhibit 10 was received.)

6          THE COURT:  Sorry, Miss Muyskens.  Go ahead.

7          Q.   BY MS. MUYSKENS:  Government's Exhibit Number 11,

8    do these reflect what appear to be a series of checks written

9    on Matthew Baker's Security Service Federal Credit Union

10   personal account?

11         A.   Correct.

12         MS. MUYSKENS:  At this time the government offers

13   into evidence Government's Exhibit Number 11.

14         MR. CRANE:  No objection.

15         THE COURT:  Admitted.

16         (Whereupon, Government's Exhibit 11 was received.)

17         Q.   BY MS. MUYSKENS:  And your allegations in the

18   petition indicate what you believe to be an unauthorized

19   transfer on January the 12th of 2022.  Can you describe what

20   it is you're referring to there?

21         A.   I'm referring to the check, a copy of the check at

22   the bottom of Page 1 of the exhibit, in which Mr. Baker wrote

23   a check to Tango 305 for $10,000.  After seeing that, after

24   seeing all of these checks I looked into who the recipients of

25   these checks were, and I discovered that Tango 305 was a

1    business that was previously registered to Mr. Baker, but the

2    registration had since lapsed with the State.

3         Q.   And there were also other checks written as

4    reflected in Government's Exhibit 11 that are above $1500;

5    correct?

6         A.   Correct.

7         Q.   Were you asked about the transfer of any of these?

8         A.   No.

9         Q.   Okay.  Did you also track where the bulk of the

10   $628,000 was ultimately transferred to you by Matthew Baker?

11        A.   Yes.

12        Q.   Directing your attention to Government's

13   Exhibit Number 12.

14             What is Government's Exhibit Number 12?

15        A.    It's another receipt for a wire transfer from

16   Matthew Baker to a bank account at Alpine Credit Union with

17   the payee listed as Staci Baker, the defendant's wife, in the

18   amount of $600,000.

19             MS. MUYSKENS:  At this time the government offers

20   into evidence Government's Exhibit Number 12.

21             MR. CRANE:  No objection.

22             THE COURT:  Admitted.

23        (Whereupon, Government's Exhibit 12 was received.)

24        Q.   BY MS. MUYSKENS:  And the date of that wire

25   transfer is February the 3rd of 2022; correct?

1      A.   That's correct.

2      Q.   Did Mr. Baker ever discuss with you the transfer of

3 the $600,000 to his wife?

4      A.   No.

5      Q.   Now one month after the transfer of $600,000 to his

6 wife you previously testified in March you asked the defendant

7 how he was living financially; correct?

8      A.   Correct.

9      Q.   How much discussion did he bring up about this

10 $820-plus-thousand that he had received and transferred out of

11 the course of the previous few months?

12     A.   None.

13     Q.   Now, during the course of your investigation did

14 you also, have you also uncovered evidence of other transfers

15 of assets of sales involving Matthew Baker?

16     A.   Yes.

17     Q.   Can you describe any other sale of property that

18 you've uncovered?

19     A.   After I had already filed the petition of

20 violations of pretrial release I continued to look into any

21 information I could find related to any of Matthew Baker's

22 transfers of financial, finances or property. And I

23 discovered that on August 12th, 2021, Mr. Baker transferred

24 the real property at 1156 North Geneva Road in Provo from the

25 S&B Revocable Trust, which is held by both Mr. Baker and his

53

1    wife.  So it was transferred out of the revocable trust to a

2    company with the name BAK-1, B-A-K-1, LLC.  Looking into that

3    company, the registered agent of that company is Mr. Baker's

4    wife.  Mr. Baker's wife then proceeded to sell that property

5    in February of 2022.

6         Q.   Was the sale of that property for more than $1500,

7    to your knowledge?

8         A.   Yes.  I believe it was somewhere in the ballpark of

9    $330,000.

10        Q.   Did Mr. Baker ever discuss with you a transfer of

11   property out of a jointly held trust with his wife to a

12   business controlled by his wife?

13        A.   No.

14        Q.   Now, you previously testified that at the time of

15   the defendant's arrest on August 13th --

16        A.   April.

17        Q.   -- April 13th, thank you, April 13th of 2022, there

18   was a cellphone that was recovered.  Was that cellphone

19   provided to you?

20        A.   Yes.

21        Q.   Okay.  And did the defendant or anyone give you the

22   password so you could look at it?

23        A.   No.

24        Q.   Okay.

25        A.   Admittedly I personally didn't, never asked him for

1    it.  I mean, he was in custody at that point.  I don't know if

2    the arresting officer ever asked him for it.  But we do not

3    have the pass code for that phone.

4         Q.   So you were not able to open it and read through

5    it; correct?

6         A.   That's correct.

7         Q.   But were you able to see any push notifications

8    that were visible on the phone that indicated Mr. Baker may be

9    involved in the transfer of sale of yet another property?

10        A.   Yes.

11             MR. CRANE:  I object.  We have not received this

12   discovery evidence copy of whatever he's going to testify to.

13   So I object to lack of notice.

14             MS. MUYSKENS:  There's no copy, Your Honor.  It's

15   his testimony.

16             THE COURT:  Overruled.

17             MR. CRANE:  They could have taken a photograph of

18   it to provide to us.

19             THE COURT:  I understand, Mr. Crane.  Overruled.

20   And a little late.

21             Go ahead, Mr. King.

22             THE WITNESS:  I'm sorry.  Can you repeat the

23   question?

24        Q.   BY MS. MUYSKENS:  What if anything could you

25   observe in the push notification on the phone that indicated

1    Mr. Baker may be involved in yet another sale or transfer of

2    property?

3          A.    There was a text message from an individual.  The

4    name was not listed on the text message, leaving me to believe

5    that the phone number was not saved in his phone.  But the

6    text message from this phone number said something to the

7    effect of, if I were to transfer this property -- if I were to

8    transfer this property to Steve, something along the lines of

9    that, I don't remember verbatim what it said, asking about I

10   believe it was the tax implications if some property were

11   transferred.

12         Q.    Okay.  And during the search of the defendant's

13   residence and his person and vehicle, what evidence or

14   information did you, your team observe regarding access to

15   bank accounts and substantial sums of money?

16         A.    We found several documents from multiple different

17   financial institutions.  We found multiple checks made out to

18   Mr. Baker along the lines of $10,000 or more.  We found a

19   bank, what appeared to be a bank deposit slip or a balance

20   slip for an account that had over $1 million in it.

21         Q.    And based on the both dollar amounts that you were

22   seeing in the accounts as well as the number of bank accounts

23   that Mr. Baker appeared to have access to, was that consistent

24   or inconsistent with the statements he's made throughout the

25   supervision to you and to the prior officer concerning his

1    financial status?

2            A.    Inconsistent.

3            Q.    And finally, what additional conditions or

4    combination of conditions do you believe could be added or

5    imposed so that you could effectively monitor the defendant

6    should he be released into the community?

7            A.    At this point I don't know what conditions.  You

8    know, we had some of the strictest conditions on him already

9    as far as allowing us access to all of his electronic devices,

10   but with the white collar cases unfortunately a lot of our

11   supervision is dependent on what the defendant is willing to

12   disclose to us.  You know, obviously Mr. Baker was on

13   supervision for a year-plus, over a year and a half --

14            MR. CRANE:  Your Honor, we object.  This is just

15   now argument by the witness, and I think it's inappropriate at

16   this juncture.

17            THE COURT:  Overruled.  It is in response to a

18   question.  And I'll allow it.  Thank you.

19            Go ahead.

20            MS. MUYSKENS:  Thank you.

21            MR. CRANE:  I object to the question as an

22   inappropriate question at this juncture asking his opinion.

23            THE COURT:  Overruled, Mr. Crane.  Thank you.

24            THE WITNESS:  As I was saying, the white collar

25   cases in general are very hard to supervise because a lot of

 1     times we are handcuffed by what the defendant is willing to

 2     provide to us.  You know, we don't have the resources in the

 3     probation office to be able to run record checks of every

 4     financial institution to determine if a white collar

 5     individual has other bank accounts that we don't know about.

 6     So it's very much dependent on how truthful and how much the

 7     defendant is willing to work with us.

 8          Q.   BY MS. MUYSKENS:  And in your experience with this

 9     defendant and the information he provided or lack thereof, how

10     would you describe his forthcoming nature with respect to

11     answering these kinds of questions for you so you could do

12     your supervision job?

13          A.   Throughout supervision with Mr. Baker, it's been,

14     he answers the questions that I pose to him and nothing more.

15          Q.   Thank you.

16               No further questions.

17               THE COURT:  Thank you.

18               Mr. Crane, will you be doing the cross?

19               MR. CRANE:  Yes, I will, Your Honor.

20               THE COURT:  Okay.

21               MR. CRANE:  We'd ask for a copy of the witness'

22     notes to refer to throughout this and if we could take a short

23     break so we can get that prior to his cross-examination.

24               THE COURT:  Mr. King, are these notes that you had

25     previously in your file, or were they notes that you prepared

1    in anticipation of today's hearing?

2           THE WITNESS:  They were notes that I prepared in

3    anticipation of today's hearing.

4           THE COURT:  That request is denied, Mr. Crane.  But

5    if you do need a short break, I'm happy to give you one before

6    you start.  Is that what you want?

7           MR. CRANE:  I guess I -- he represented he's been

8    reading from and referring to them.  We're entitled to those

9    as being part of his testimony.

10          THE COURT:  Well, he prepared them in anticipation.

11    And I think you have everything that was prepared prior.  So

12    that request is denied, and that's the order of the Court.

13          Do you still need a break?

14          MR. CRANE:  Yes.

15          THE COURT:  All right.  Let's go ahead and take a

16    10-minute break.

17          (Recess.)

18          THE COURT:  And I got a copy of Mr. King's notes

19    that he took in preparation of the hearing today.  And you

20    were provided those.  Is that correct, Mr. Crane?

21          MR. CRANE:  Yes.  We acknowledge the receipt of

22    them.

23          THE COURT:  All right.  Thank you.  Let's go ahead

24    and start.  You said you're doing the cross?  Is that correct?

25          MR. CRANE:  Yes.

```
 1                    THE COURT:  All right.  Thank you.
 2                    CROSS-EXAMINATION
 3    BY MR. CRANE:
 4         Q.   Good afternoon, Officer King.
 5         A.   Good afternoon.  Good morning.
 6         Q.   Or good morning.
 7              How long have you been a pretrial officer employed
 8    by the US Probation Office?  Let's go there.
 9         A.   About five and a half years total.  I did a little
10    over two years in South Dakota before transferring to the
11    District of Utah --
12         Q.   Okay.
13         A.   -- about three and a half years ago.
14         Q.   Okay.  Great.  So is it fair to say you've
15    represented a lot of people -- represented -- you've
16    supervised a lot of people in your time; is that right?
17         A.   So not all of that time was doing supervision.  I
18    began supervising individuals in August of 2019.
19         Q.   Okay.  So three years?
20         A.   Yeah.  Coming up on three years.
21         Q.   How many typically do you supervise at a time?
22         A.   Anywhere between 40 and 50, sometimes it gets
23    upwards over 50.
24         Q.   That's a hefty caseload.  It seems like a lot.
25         A.   It can be.
```

1          Q.    Okay.  And is it fair to say and the people that

2     you supervise they often have questions about what they can

3     and can't do on pretrial release?

4          A.    Yes.

5          Q.    And if they have questions they should go to their

6     pretrial officer to get those questions answered; is that

7     right?

8          A.    Correct.

9          Q.    And if they're questions that the pretrial officer

10    can't answer, then they'll sometimes lead to the Court; is

11    that right?

12         A.    Yes, sir.

13         Q.    But for the most part you try to answer their

14    questions as best you can to avoid having to come into the

15    judge on every little question; is that fair?

16         A.    Correct.

17         Q.    Okay.  And you actually encourage people to ask

18    questions and work with you so that there's no confusion as to

19    what they should or should not do while on supervision; is

20    that right?

21         A.    Correct.

22         Q.    Okay.  You mentioned several times in your

23    testimony today that Mr. Baker did not provide you with his

24    bank accounts or let you know that he had certain bank

25    accounts; is that right?  Is that a fair statement of your

1    testimony?

2         A.   Yes.

3         Q.   But isn't it true in the conditions of this

4    pretrial release he's not required to provide you with that

5    information?  Correct?

6         A.   That's correct.

7         Q.   So there's no violation for him not telling you

8    what bank accounts he does or doesn't have; right?

9         A.   Not on its face, no.

10        Q.   Okay.  So he could have one, he could have 80 bank

11   accounts.  Either way he's not in violation of any order from

12   the Court; correct?

13        A.   To my understanding, yes.

14        Q.   Okay.  So you referencing that he never provided

15   you with bank accounts there's actually nothing wrong with

16   that because he didn't have to; correct?

17        A.   Not in the mere fact of providing the information

18   to me, correct.

19        Q.   Okay.  The government has gone through multiple

20   exhibits with you today.  And for a lot of these exhibits you

21   indicated your investigation discovered or you found this.

22   Where did you get this information?

23        A.   From AUSA Muyskens.

24        Q.   So all of the information in the government's

25   exhibits that you testified today, everything was received

1     from Miss Muyskens; is that right?

2          A.   No.   Some of the exhibits were photographs that

3     were taken during the course of our search.

4          Q.   Okay.   Well, let's just go through it real quickly,

5     then.

6          A.   Okay.

7          Q.   1 and 2 we know came from the Court; 3 is a

8     photograph, that came from someone taking a photograph from

9     the probation office; right?

10         A.   Correct.

11         Q.   You didn't take that, though?

12         A.   Correct.

13         Q.   4 and 5 came from the probation office; correct?

14         A.   Correct.

15         Q.   6 is a photograph from probation office; correct?

16         A.   Correct.

17         Q.   7 you've already testified came from Miss Muyskens;

18    correct?

19         A.   Correct.

20         Q.   8 came from Miss Muyskens?

21         A.   Correct.

22         Q.   9 came from Miss Muyskens?

23         A.   Correct.

24         Q.   10 came from Miss Muyskens?

25         A.   Correct.

1      Q.   11 came from Miss Muyskens; correct?

2      A.   Correct.

3      Q.   And 12 came from Miss Muyskens; correct?

4      A.   Correct.

5      Q.   So you indicated that in your investigation you

6   discovered this information.  Your investigation really was

7   just Miss Muyskens handing you information; is that right?

8      A.   And my own personal review of it.

9      Q.   Okay.  So you received the documents.  You reviewed

10  it.  What did you do in addition to that?

11     A.   I looked up public records on what I could find.

12     Q.   Okay.  So we know on Exhibit 7 you testified you

13  didn't do any additional investigation on that for that

14  e-mail; correct?

15     A.   Sorry.  Let me just see what Exhibit 7 is.

16     Q.   Government's Exhibit -- take your time.

17     A.   That's correct.

18     Q.   Okay.  Number 8, did you do any additional

19  investigation on Exhibit Number 8?

20     A.   Yes.  I looked up -- I first attempted to figure

21  out who George B. Hofmann, trustee, was --

22     Q.   Okay.

23     A.   -- because that appeared to be where the check was

24  coming from.  And that's what led me to finding the bankruptcy

25  proceedings that were going on for Foxtrot United.

 1          Q.    Okay.  So you discovered on public records that
 2     Foxtrot was in bankruptcy.
 3          A.    Correct.
 4          Q.    All right.  Did you speak to the trustee,
 5     Mr. Hoffman?
 6          A.    No.
 7          Q.    Did you speak to anyone from his office?
 8          A.    No.
 9          Q.    Other than look up the public bankruptcy records,
10     did you do any other investigation on Exhibit Number 8?
11          A.    Not the check itself, but I did look in at that
12     point to Foxtrot United and looked at public records for
13     Foxtrot United.
14          Q.    Okay.  We'll come back to that.
15                Exhibit Number 9, did you do any additional
16     investigation besides just review this document?
17          A.    I looked up who Greg -- I'm sorry -- Gregory Hoole
18     is.
19          Q.    Okay.  Did you speak to Mr. Hoole?
20          A.    I did not.
21          Q.    Did you ask him -- did you try to figure out what
22     the legal fees were for?
23          A.    No.
24          Q.    Did you do a search of the state database to show
25     the several lawsuits where he represents Mr. Baker?

1           A.    Yes.

2           Q.    Okay.  So you do see that there are some ongoing

3     civil litigation?

4           A.    Uh-huh (affirmative).

5           Q.    Okay.  Do you have any reason to believe that there

6     is anything but legal fees?

7           A.    No.  And that's actually why I didn't allege this

8     one as part of the allegation because, you know, again, had

9     Mr. Baker told me that he had to pay a legal bill for an

10    attorney --

11          Q.    Sure.  But someone thought it was important enough

12    to bring it as an exhibit before the Court today.

13          A.    It was brought in as an exhibit before the Court

14    today, yes.

15          Q.    Exhibit Number 10, you received this from

16    Ms. Muyskens.  What investigation did you do regarding this

17    check?

18          A.    Nothing beyond what's in the exhibit.

19          Q.    Okay.  Exhibit Number 11?

20          A.    No.  Nothing beyond what -- or 10, sorry.

21          Q.    Exhibit Number 11 here, these checks, did you do

22    anything besides review what you had received from

23    Miss Muyskens on these?

24          A.    I looked up what all these -- what all the payees

25    were.

1         Q.    Okay.

2         A.    You know, as I testified, I looked up Tango 305.

3         Q.    Okay.

4         A.    As well as all the other ones, Gordon Auto,

5    SS Marine.  I didn't really have to look up the Utah County

6    Treasurer.  But --

7         Q.    Did you do anything to verify that that amount of

8    taxes was actually owing to the State?

9         A.    No.

10        Q.    Okay.  With SS Marina, did you learn this was to

11   pay a settlement invoice dated back to 2018 on repair work on

12   a boat?

13        A.    No.

14        Q.    And with regard to Tango 305, did you speak to

15   pretrial Officer Law regarding this check?

16        A.    No.

17        Q.    Okay.  And then the last exhibit there, Exhibit 12,

18   did you do anything besides review what Miss Muyskens had

19   given you?

20        A.    No.

21        Q.    In the documents that she provided to you there was

22   information from a Matthew Grimmer; is that right?

23        A.    Correct.

24        Q.    Did you do any research as to who Matthew Grimmer

25   was?

1      A.   Yes.

2      Q.   You verified that's an attorney in Utah; correct?

3      A.   Correct.

4      Q.   And you verified that he has three ongoing lawsuits

5   against Staci Baker and some of her entities; correct?

6      A.   I don't know that I knew it was three.  But I did

7   know that, yes, there were lawsuits.

8      Q.   Did you look up those lawsuits?

9      A.   Yes.

10     Q.   Did you review the documents that were public

11   filings in those lawsuits?

12     A.   Some of them.

13     Q.   Did you look at the position documents and exhibits

14   that had been presented by Staci Baker's counsel in those

15   lawsuits?

16     A.   Yes.

17     Q.   And you saw that for the information provided there

18   is a contrary and different position than the one that

19   Mr. Grimmer was asserting; correct?

20     A.   Of course.  Yeah.  It's the nature of a lawsuit,

21   yes.

22     Q.   But those weren't included as exhibits here today;

23   were they?

24     A.   No.

25     Q.   And you didn't testify about those today, did you?

1          A.   No.

2          Q.   Okay.  You also learned that Mr. Grimmer's sister

3     is neighbors with the Bakers; correct?

4          A.   I did not learn that.

5          Q.   And that Mr. Grimmer's sister --

6               MS. MUYSKENS:  Your Honor, the government objects.

7     Your Honor --

8               THE COURT:  I'm sorry?

9               MS. MUYSKENS:  The government objects at this

10    point.  The basis being Officer King has testified as to what

11    documents he reviewed and looked at.  And counsel seems to be

12    doing an underlying attack that had nothing to do with the

13    substance of this witness' testimony but seems to be simply a

14    speaking discussion about a bias and unrelated lawsuit that

15    the government has not brought out.

16              THE COURT:  Overruled.

17              I'm not quite sure where you're going, Mr. Crane,

18    but I want to give you leave to sort of establish that fact.

19              MR. CRANE:  Thank you, Your Honor.

20         Q.   BY MR. CRANE:  You'd also learned that Matthew

21    Grimmer had purchased a default judgment from a painting

22    company for about $4,000 for a debt that was owed by Matthew

23    Baker; is that right?

24         A.   No.

25         Q.   You didn't know that?

1          A.   I did not.

2          Q.   You haven't done -- that's referenced in the

3     underlying civil lawsuits.  Had you not reviewed those

4     documents?  I thought you just testified that you did.  I

5     don't want to be obstinate here.

6          A.   I testified that I reviewed some of them, is what I

7     said.

8          Q.   But you didn't discover the origins of where

9     Mr. Grimmer came into all of this.

10         A.   I'm not sure I understand the question.  I

11    understand that he's the attorney representing the plaintiff

12    in a civil lawsuit against Mr. Baker's wife.

13         Q.   Okay.  And that he's trying to get a lot of money

14    out of the Bakers; is that right?

15              MS. MUYSKENS:  Object, Your Honor, as to the intent

16    of another person.

17              MR. CRANE:  He's been testifying --

18              THE COURT:  Overruled.

19              MR. CRANE:  Thank you.

20              THE WITNESS:  I mean, that's -- I would assume so,

21    yes, because that's the nature of a civil lawsuit typically.

22         Q.   BY MR. CRANE:  Did this cause you concern when you

23    received all of this information from this guy -- from

24    Miss Muyskens that apparently originated with Matthew Grimmer?

25         A.   It did come into my mind, yes.

1       Q.    Okay.  So what if anything did you do to look at

2    the other side of the civil disputes?

3       A.    What I had testified to.

4       Q.    Okay.  Just reviewed the documents and submitted

5    the petition for the allegations; right?

6       A.    Reviewed the documents.

7       Q.    That Ms. Muyskens had given you.

8       A.    And the public records.

9       Q.    Okay.  Let's go through the allegations

10   specifically.  Allegation Number 1, you allege in the petition

11   fraud.  And as I understand your testimony it is that on

12   June 9th Matthew Baker sent an e-mail to Charger with an

13   articles of organization that you say is fraudulent; is that

14   right?

15      A.    Yes.

16      Q.    And that based upon that e-mail to the title

17   company that's what in your mind constitutes fraud; correct?

18      A.    Wire fraud, yes.

19      Q.    Okay.  And the purpose of that e-mail was Charger

20   was trying to verify that Staci Baker was the owner of Sunrise

21   at Spanish Terrace, LLC; correct?

22      A.    That's my understanding.

23      Q.    Okay.  And you also know that Sunrise at Spanish

24   Terrace has been Stacie's entity since April of 2019; correct?

25      A.    I know that -- I will take your word for that exact

1    date.  But, yes, I do know that she had been the owner since

2    prior to this e-mail.  And then long prior.

3         Q.   So this is right in your report.  I don't want to

4    put words in your mouth.  I'm happy to show it to you to

5    refresh your recollection.

6         A.   Yes.  Please refresh my memory.

7         Q.   Okay.  No problem.  This is just --

8              THE COURT:  What exhibit are you referring to,

9    Mr. Crane?

10             MR. CRANE:  This is not an exhibit.  This is just

11   his report.  This is just to refresh his memory.

12             THE COURT:  Okay.  Thanks.

13        Q.   BY MR. CRANE:  I'll refer you to this paragraph.

14        A.   Right here?

15             Oh, yes.  That's in my report.

16        Q.   So after refreshing your memory it's your testimony

17   that Sunrise at Spanish Terrace was Staci's entity as of

18   April 2019; correct?

19        A.   Correct.

20        Q.   Okay.  So if we look at Government's Exhibit

21   Number 7, what is the date of that e-mail?

22        A.   June 9, 2021.

23        Q.   Okay.  So this is after April of 2019.

24        A.   Yes.

25        Q.   And as of April 2019 as you testified Staci Baker

1    was the owner of Sunrise at Spanish Terrace, LLC?

2         A.   Yes.

3         Q.   And it seems that Charger is trying to just receive

4    verification of that fact --

5         A.   That's what it appears.

6         Q.   -- in a dispute as of June 9, 2021, that Sunrise at

7    Spanish Terrace is Staci Baker's entity?

8         A.   I'm sorry.  Can you repeat?

9         Q.   Sure.  Sure.

10        You're saying that Matt Baker committed fraud by

11   sending this document on June 9, 2021 --

12        A.   Yes.

13        Q.   -- letting the title company know that Staci Baker

14   owned Sunrise at Spanish Terrace.  That's your testimony;

15   correct?

16        A.   My testimony is that he sent a, what I believe is a

17   doctored document.

18        Q.   Okay.  So it's doctored in that it fraudulently

19   informs the title company that Staci is the owner of Sunrise

20   at Spanish Terrace?

21        A.   I don't know the reason for him sending it.  But my

22   allegation is that he sent what I believe is a doctored

23   document.

24        Q.   Well, let's -- you're alleging fraud.  So let's

25   look at it this way.  So if April 2019 Sunrise at Spanish

                                                              73

1    Terrace is Staci's entity, 100 percent her entity, and if Matt

2    Baker informs the title company on June 9th, 2021, it's

3    Staci's entity, where's the fraud?

4         A.   The fraud is sending a doctored document.

5         Q.   And you testified it's doctored because you went

6    through all of those reasons.

7              If you'll go to -- there's a binder on your left

8    there.  It contains defendant's exhibits.  Go to Defendant's

9    Exhibit Number 2.

10             Are you familiar with this document?

11        A.   I've seen it, yes.

12        Q.   Okay.  And this is the document where Sunrise at

13   Spanish Terrace, the membership is assigned from Matthew Baker

14   to Staci Baker on April 14th, 2019; correct?

15        A.   Correct.

16             MR. CRANE:  Move to admit Defendant's Exhibit

17   Number 2.

18             MS. MUYSKENS:  No objection.

19             THE COURT:  Admitted.

20        (Whereupon, Defendant's Exhibit 2 was received.)

21        Q.   BY MR. CRANE:  If you look at Exhibit Number 3,

22   Defendant's Exhibit 3.  Are you familiar with this operating

23   agreement?

24        A.   I've seen it.  Yes.

25        Q.   Okay.  And this also -- on the operating agreement

1      if you go to Page, the third page in that's listed as --

2      fourth page in listed at Page 1 at the bottom, top paragraph,

3      it states:  Effective as of the 14th day of April, 2019, by

4      Staci Milligan, sole member of Sunrise at Spanish Terrace.

5                You're familiar with this document.  And this

6      further confirms Staci is the sole member and manager of

7      Sunrise at Spanish Terrace; correct?

8           A.   Correct.

9                THE COURT:  Mr. Crane, were you moving to admit

10     Number 3?

11               MR. CRANE:  Yes.  Move to admit Number 3.

12               MS. MUYSKENS:  No objection.

13               THE COURT:  Admitted.

14          (Whereupon, Defendant's Exhibit 3 was received.)

15          Q.   BY MR. CRANE:  If you go to Exhibit Number 5.  Are

16     you familiar with this document?  It's got two pages.

17          A.   Yes.  I've seen it.

18          Q.   Okay.  And what is it?

19          A.    It is the original certificate of organization

20     filed with the -- for Sunrise at Spanish Terrace, filed with

21     the Department of Commerce.

22               MR. CRANE:  I move to admit Number 5, Your Honor.

23               MS. MUYSKENS:  No objection.

24               THE COURT:  Admitted.

25          (Whereupon, Defendant's Exhibit 5 was received.)

1        Q.    BY MR. CRANE:  So this was filed on the first page

2   July 30th, 2015, on Page 1.  And if you go to Page 2, it lists

3   manager Matt Baker, dated July 30, 2015; is that right?

4        A.    Correct.

5        Q.    Now the first page, maybe you can keep your thumb

6   there and go to Government's Exhibit Number 7.  Government's

7   Exhibit 7 is going to be in a different book.

8        A.    Oh.

9        Q.    So the binder has the plaintiff's exhibits.

10       A.    Sorry.

11       Q.    You're okay.

12       A.    I heard government.

13       Q.    You've got a lot of pages there, so this might be

14   easier to have them both in front of you.  So we're looking at

15   Defendant's Exhibit 5 and Government's Exhibit Number 7.

16             On Government's Exhibit 7 if you'll go to third

17   page, this is the certificate of organization for Sunrise of

18   Spanish Terrace.  Those two, the first page of Defendant's

19   Exhibit 5 and the third page here of Government's Exhibit 7,

20   those appear to be the same document; correct?

21       A.    Yes.  They appear to be.

22       Q.    Okay.  And it's when you go to the second page of

23   both of those that there's the differences.  On Defendant's

24   Exhibit Number 5, it has manager, Number 1, Matt Baker on the

25   date of July 30, 2015; right?

 1          A.    Correct.

 2          Q.    And then Government's Exhibit 7, that second page

 3    is the one that you claimed is doctored fraudulent; correct?

 4          A.    Correct.

 5          Q.    If you look at Defendant's Exhibit Number 6,

 6    keeping Government's Exhibit 7 there.  In your investigation

 7    are you familiar with this document?

 8          A.    No.

 9          Q.    Are you familiar with the company BAG1 Funding,

10    LLC, an entity owned by Staci Baker?

11          A.    No.

12          Q.    Okay.

13                THE COURT:  You're not moving to admit --

14                MR. CRANE:  I am going to move to admit Number 6,

15    Your Honor.

16                THE COURT:  Miss Muyskens?

17                MS. MUYSKENS:  Foundation.

18                THE COURT:  I think that's a fair point, Mr. Crane.

19                MR. CRANE:  Well, we can do this a couple ways.

20    The Rules of Evidence are lax here.  I'm happy to place my

21    witness on to lay foundation and then recall Mr. King.  But to

22    try to help expedite things --

23                THE COURT:  Sure.

24                MR CRANE:  -- I would ask the Court to reserve

25    ruling and allow me to ask questions.

1              THE COURT:  So you have a witness that will be able
2    to speak to Exhibit 6 is what I heard you just say?
3              MR. CRANE:  I did.
4              THE COURT:  With that I'll allow you to proceed.
5              MR. CRANE:  Thank you, Your Honor.
6         Q.   BY MR. CRANE:  Looking at Defendant's
7    Exhibit Number 6, Page 2, we compare that with Government's
8    Exhibit Number 7, that second page of the articles of
9    incorporation.
10        A.   Upon a cursory look it appears to be the same.
11        Q.   Exactly the same; correct?
12        A.   Upon a cursory look it appears to be the same.
13        Q.   Okay.
14             THE COURT:  Sorry, Mr. Crane.  Can you ask that
15    question again?  I just missed what you were asking him to
16    compare.
17             MR. CRANE:  So looking at Defendant's
18    Exhibit Number 6, Page 2 and Government's Exhibit Number 7,
19    the second page, the one that is alleged to be the altered
20    document, my question is, do those two -- are those two pages
21    exactly the same?
22             THE COURT:  Thank you.  And he responded yes;
23    correct?
24             MR. CRANE:  Yes.
25        Q.   BY MR. CRANE:  In Allegation Number 3 it is alleged

1    that there's three dates listed.  The first one is August 18,

2    2021.  And on that date you indicate that the entity Foxtrot

3    United was transferred to Staci Baker; correct?

4         A.   Correct.

5         Q.   This is in violation because you weren't informed

6    and it had a value of over $1500.

7         A.   Correct.

8         Q.   What was the value of Foxtrot on August 18, 2021?

9         A.   I don't know off the top of my head.

10        Q.   So how is it a violation of the $1500 rule if you

11   don't know the valuation of that entity?

12        A.   Because it then received a check worth $830,000.

13        Q.   Isn't it true that Foxtrot United on August 18,

14   2021, had a value of zero dollars?

15        A.   I don't know the answer to that.

16             MR. CRANE:  Your Honor, this one is -- I have a new

17   exhibit.  I do not have copies, and I apologize.  This came up

18   based on his testimony that we didn't anticipate.  If I may

19   show the Court?  I've shown a copy to counsel.

20             THE COURT:  Yes.  Is this for me to keep, or do you

21   need it to --

22             MR. CRANE:  I do need it.

23             THE COURT:  So you have just one.

24             MR CRANE:  (Inaudible.)

25             THE COURT:  Yes, you can.

```
 1              MR. CRANE:  Thank you.

 2              THE COURT:  Very well.

 3              MR. CRANE:  Do you have an overhead in here?

 4              THE CLERK:  No.  We do not have one in here.  I can

 5    go make copies of it.

 6              MR. CRANE:  I apologize.  I'll move on to something

 7    else, if that's okay.

 8              THE COURT:  Yes.  Thank you.

 9         Q.   BY MR. CRANE:  All right.  We'll come back to that.

10    Let's go to -- you testified that on March 30, 2022, that you

11    carried out search warrants at two properties owned by the

12    Bakers, one was in Orem and one was in Spanish Fork; is that

13    right?

14         A.   It wasn't a warrant.  It was --

15         Q.   Excuse me.  You performed a search is what you did.

16         A.   Correct.

17         Q.   Okay.  And that was based upon information that you

18    had obtained from Miss Muyskens.

19         A.   Yes.

20         Q.   Okay.  And you had indicated that the family in

21    October had moved from the Orem address to the Spanish Fork

22    address; is that right?

23         A.   Correct.

24         Q.   And they had informed -- Matt had informed you that

25    he was moving; correct?
```

 1          A.    Correct.

 2          Q.    You knew about the new address; you knew about the

 3     old address.

 4          A.    Correct.

 5          Q.    Okay.  And at the Orem address there was some

 6     personal items belonging to the Bakers, but they weren't

 7     living there, were they?

 8          A.    It did not appear so.

 9          Q.    Okay.  In fact, the home was in a bit of a

10     disarray.  It didn't look like anyone had lived there except

11     for just stopping by; correct?

12          A.    That's how it appeared, yeah.

13          Q.    The Spanish Fork home was their only residence;

14     correct?

15          A.    I don't know that it was their only residence, but

16     it did -- my understanding is that was their primary

17     residence.

18          Q.    Okay.  You had testified that there was $80,000 in

19     cash found, and you were asked multiple questions about what

20     admissions or statements Mr. Baker made about the money.  And

21     I believe your testimony was his only indication was, are you

22     taking my money; correct?

23          A.    Yes.

24          Q.    The money, the $80,000 wasn't the only money found

25     in that house, was it?

1        A.    Correct.

2        Q.    There was actually a couple thousand dollars found

3   in a dresser drawer; correct?

4        A.    Correct.

5        Q.    And there was money found in a jacket; correct?

6        A.    Correct.

7        Q.    So when he made the statement, are you taking my

8   money, you didn't know what he was referring to, did you?

9        A.    As far as the specific location of the money, no, I

10   did not.

11        Q.    So you don't know who owns or whose money that was

12   in the backpack in the basement, do you?

13        A.    No.

14        Q.    You indicated that officers had found ammunition in

15   two different locations, one was the Orem house; correct?

16        A.    No.

17        Q.    They were both in the Spanish Fork house?

18        A.    Correct.

19        Q.    Okay.  One was in a dresser drawer; correct?

20        A.    Correct.

21        Q.    Did you find that ammunition there?

22        A.    I did not.

23        Q.    Are you familiar with that room as you walked

24   through the house; correct?

25        A.    I had seen -- I've been in that room before, yes.

1      Q.    Okay.  And that -- in that bedroom were two dresser

2   drawers, two large separate dressers in that bedroom; correct?

3      A.    I believe so.  Yes.

4      Q.    And it was the master bedroom appeared where Staci

5   and Matt slept; correct?

6      A.    Yes.

7      Q.    And in that room there was also a crib; correct?

8      A.    Yes.

9      Q.    And the dresser where the ammunition was found was

10   the dresser closest to the crib; correct?

11      A.    I am not sure about that.

12      Q.    And the dresser where the ammunition was found also

13   contained a bunch of women's clothing; correct?

14      A.    I don't know.

15      Q.    Have you ever seen Matt wear women's clothing?

16      A.    I never have.

17      Q.    You also testified regarding a sword that was very

18   sharp, and that was found at the Orem house; correct?

19      A.    Correct.

20      Q.    And, in fact, that sword was fairly rusty?

21      A.    Correct.

22      Q.    And it's actually a bayonet; correct?

23      A.    It appeared, yeah.

24      Q.    And it's a bayonet from 1917; correct?

25      A.    I don't know.

1      Q.   Did you ask Staci or Matt where they got the sword?

2      A.   No.

3      Q.   You didn't ask who it belonged to -- where they

4    found it?

5      A.   I did not.

6      Q.   But this was in the Orem house where Matt was not

7    living; correct?

8      A.   Correct.

9      Q.   And his requirements are not to have dangerous

10   items in his place of residence; correct?

11     A.   I believe that's not possess dangerous items.

12     Q.   What information do you have that Matt was in

13   possession of that bayonet?

14     A.   He has regular access to that residence.

15     Q.   But he wasn't found with it in his possession;

16   correct?

17     A.   No.

18     Q.   And it was actually found downstairs in the Orem

19   house in a storage room; correct?

20     A.   Correct.

21     Q.   And every time you've met with Matt or gone to

22   review his home it was at the Spanish Fork home; correct?

23     A.   I had attempted to see him I believe once at the

24   Orem residence prior to him moving to the Spanish Fork

25   residence, but I did not end up contacting him on that visit.

1      I did contact his wife.  So every other time I had met with

2      Mr. Baker it was at the Spanish Fork residence.

3             Q.   Okay.  And isn't it true regarding the ammo, you

4      never asked Staci Baker about the ammo or who it belonged to;

5      correct?

6             A.   I did not personally.

7             Q.   Okay.  Going to Government's Exhibit Number 5.

8      This is the computer and Internet monitoring program

9      questionnaire.  And this is something I believe you testified

10     Matt filled this out by hand; correct?

11            A.   I didn't say by hand, but I said Matt filled it

12     out.

13            Q.   Well, it looks like handwriting on here; right?

14            A.   It does.

15            Q.   Is this Matt's handwriting or no?

16            A.   I would assume so.  I don't know for sure.

17            Q.   Okay.  You don't know for sure because you weren't

18     the officer that had him fill this out.

19            A.   Correct.

20            Q.   It was actually Officer Law.

21            A.   Correct.

22            Q.   And this was filled out when Mr. Baker was living

23     at the Orem house; correct?

24            A.   I believe so.  Yes.

25            Q.   Okay.  So at that time if you look at Page 1 on

1    Exhibit 5, a couple lines down there in the middle it says:

2    Where is this computer located in the room?  And it says:

3    Upstairs office.

4           The Spanish Fork home doesn't have an upstairs

5    office, does it?

6    A.   No.

7    Q.   In fact, the office is located downstairs.

8    A.   Correct.

9    Q.   And you never went through the Orem house -- well,

10   strike that.

11          So your testimony today is that this questionnaire

12   is not accurate as to what you found at the Spanish Fork

13   house; correct?

14   A.   Correct.

15   Q.   Even though this document was filled out when he

16   was at the Orem house; correct?

17   A.   Correct.

18   Q.   Did you ever ask him to fill out an updated

19   Computer and Internet Monitor Program Questionnaire when he

20   moved to the Spanish Fork house?

21   A.   I did not.

22   Q.   And, in fact, Mr. Baker had several questions for

23   Mr. Law regarding this questionnaire and how he should fill it

24   out; correct?

25   A.   I don't know that.

1        Q.   But you referred to Mr. Law's notes and spoken with

2   him as part of taking over supervision for him; correct?

3        A.   Yes.

4        Q.   And he told you that he and Mr. Baker had a

5   conversation about the computer that Mr. Baker used; correct?

6        A.   He didn't tell me that, no.

7        Q.   And that Mr. Baker told Mr. Law that he only used

8   one computer in the home.

9        A.   I don't know the conversation that occurred between

10   the two of them regarding the SIM questionnaire.

11        Q.   But in any event this was not updated when he moved

12   to the Orem house, was it?  Or excuse me.  When he moved to

13   the Spanish Fork house.

14        A.   No, it was not.

15        Q.   Okay.  Will you go to Defendant's Exhibit Number 8?

16             Do you recognize this?

17        A.   Yes.

18        Q.   These are photographs taken by a probation officer

19   on March 30th?

20        A.   Yes.

21             MR. CRANE:  Move to admit Exhibit Number 8.

22             MS. MUYSKENS:  No objection.

23             THE COURT:  Admitted.

24             (Whereupon, Defendant's Exhibit 8 was received.)

25        Q.   BY MR. CRANE:  This photograph depicts I believe

1    seven computers; is that right?

2         A.   I'm sorry, but I'm only seeing six.

3         Q.   Let's look at Exhibit Number 9.  Do you recognize

4    Exhibit Number 9?

5         A.   Yes.

6         Q.   And these are computers that you found during the

7    March 30th search; correct?

8         A.   Correct.

9              MR. CRANE:  Move to admit Exhibit Number 9.

10             MS. MUYSKENS:  No objection.

11             THE COURT:  Admitted.

12        (Whereupon, Defendant's Exhibit 9 was received.)

13        Q.   BY MR. CRANE:  And these are the computers taken

14   from the garage; correct?

15        A.   It appears so.

16        Q.   And the computers depicted in Number 8 those are

17   located in the garage of the Spanish Fork home; correct?

18        A.   Correct.

19        Q.   And Exhibit Number 9, these computers appear to be

20   quite dusty; is that fair?

21        A.   Correct.

22        Q.   Does it look like -- do you have any knowledge if

23   these computers were actively being used by Matthew or anybody

24   else at that home?

25        A.   It did not appear that they were being actively

1    used.

2          Q.    But yet, these are being listed as seven of the 12

3    of the computers that led to your violations of his condition;

4    correct?

5          A.    Correct.

6          Q.    Exhibit Number 10.  What is this?

7          A.    This is the laundry room.

8          Q.    Okay.

9          A.    A picture of the computers that were located in the

10   laundry room.

11         Q.    And you testified earlier the laundry room had two

12   computers then; correct?

13         A.    Correct.

14         Q.    But only one of those computers is plugged in;

15   correct?

16         A.    Correct.

17         Q.    And you also testified that there was another

18   computer that was plugged in in the kitchen; correct?

19         A.    Correct.

20         Q.    And then downstairs in the office area there were

21   two computers; correct?

22         A.    Correct.

23         Q.    And of the computers downstairs in the office you

24   seized one and you left one; correct?

25         A.    Correct.

1    Q.   Because you determined that one computer was what

2    Matt used; correct?  And one computer was what Staci used;

3    correct?

4    A.   I had testified that I don't know how the officers

5    came to that conclusion, but that was the conclusion that some

6    of the other officers came to.

7    Q.   Right.  So you took Matt's computer, left Staci's.

8    A.   Yes.

9    Q.   And you're familiar that the Bakers also have

10   children; correct?

11   A.   Yes.

12   Q.   And they have children that are in school.

13   A.   Yes.

14   Q.   And they use computers for school.

15   A.   Yes.

16   Q.   And that the computer in the laundry room in the

17   kitchen were the children's computers; correct?

18   A.   I don't know that.

19   Q.   And you know based upon conversations you had with

20   Mr. Law when the questionnaire was originally filled out by

21   Matt Baker he only used one computer.

22   A.   I don't know that.  As I testified, I don't know

23   what that conversation entailed.

24   Q.   And his one computer was disclosed to the pretrial

25   office; correct?

1      A.    There was one computer disclosed to the pretrial

2    office.  I don't know that that was his one computer.

3      Q.    March 30th, 2022, that was not the first day you'd

4    been in the Spanish Fork home; correct?

5      A.    Correct.

6      Q.    You'd actually been there on other occasions and

7    walked through the house; correct?

8      A.    Correct.

9      Q.    And seen these computers in these different rooms;

10   correct?

11     A.    I probably did.  Yes.

12     Q.    Okay.  But you didn't raise a concern with Matt at

13   that time when you saw those computers, did you?

14     A.    No.

15           THE COURT:  Mr. Crane, I don't think you moved to

16   admit Exhibit Number 10.

17           MR. CRANE:  I apologize.  Thank you.  I move to

18   admit Number 10.

19           MS. MUYSKENS:  No objection.

20           THE COURT:  Admitted.

21      (Whereupon, Defendant's Exhibit 10 was received.)

22     Q.    BY MR. CRANE:  And while we're at it let's look at

23   Number 7.

24     A.    I'm sorry.  Defense or --

25     Q.    Defendant's Exhibit 7.  Sorry.  Thank you.

```
 1              A.    No worries.

 2              Q.    Do you recognize Defendant's Exhibit Number 7?

 3              A.    Only from --

 4              Q.    I don't think you're --

 5              A.    -- a few minutes ago.  But this is the one you

 6        asked --

 7              Q.    Look at 7.

 8              A.    Oh, I'm sorry.

 9              Q.    You're okay.

10              A.    Yes.  7.

11              Q.    And this is a photograph from March 30th?

12              A.    Yes.

13                    MR. CRANE:  Move to admit Number 7.

14                    MS. MUYSKENS:  No objection.

15                    THE COURT:  Admitted.

16               (Whereupon, Defendant's Exhibit 7 was received.)

17              Q.    BY MR. CRANE:  And this is just a view -- it's the

18        same view as Exhibit Number 8 but with the drawer open; is

19        that right?

20              A.    Essentially, yeah.

21              Q.    Okay.  Did you open this drawer?

22              A.    I did not.

23              Q.    Did you search through the drawer?

24              A.    I did not personally, no.

25              Q.    Are you aware of anything that was found in that
```

1      drawer?

2              A.   I am.

3              Q.   What's that?

4              A.   A warranty deed, which I believe is the top

5      document in that drawer.

6              Q.   Okay.  Was there a bag found in that drawer?

7              A.   Not that I'm aware of.

8              Q.   Was there anything listed on the inventory sheets

9      indicating a bag was found in that drawer?

10             A.   Not that I'm aware of.

11             Q.   So if there was a bag in that drawer then it was

12     not -- if there was a bag found in that drawer it would have

13     been reported on the inventory sheet; correct?

14             A.   Correct.

15             Q.   And if the lack of a bag either means there was no

16     bag or one was not properly reported; correct?

17             MS. MUYSKENS:  Objection, Your Honor.  To clarify,

18     the inventory report is what was seized, not what was

19     observed.  I just want to clarify.  I want to clarify with the

20     officer that not all of those items were seized.  The

21     inventory only contains a listing of what was seized.

22             THE COURT:  Thank you.  I'll allow Mr. Crane to

23     proceed with his line of questioning, and then to the extent a

24     clarification needs to be made later it can be.

25             Q.   BY MR. CRANE:  If a bag was found in here, you

1    would have been made aware of it; correct?

2         A.   Me personally?

3         Q.   Yeah.

4         A.   Not necessarily.

5         Q.   Who was the officer who was in charge of this

6    search of the house?

7         A.   Both myself and Officer Graham.

8         Q.   Okay.  What did you do in preparation for the

9    search of this house?

10        A.   I, you know, as we discussed I reviewed -- or I'm

11   sorry.  Can you clarify what you mean by preparation?

12        Q.   I guess here's the specific question.

13        A.   Okay.

14        Q.   How did you decide what you were going to seize

15   from the house?  What were you looking for?

16        A.   We were looking for documents related to LLCs.  We

17   were looking for documents related to properties that

18   Mr. Baker may have owned or had interest in.  We were looking

19   for electronic devices.  I believe that was it.

20        Q.   Okay.  And why the electronic devices?

21        A.   So that we could seize them and search them.

22        Q.   And what was purpose of the search of the

23   electronic devices?

24             MS. MUYSKENS:  Objection, Your Honor.  Seeks

25   discovery is beyond the scope of this hearing.  It's a

1    probable cause hearing for violations, not underlying to deal

2    with any sort of suppression or basis.

3           THE COURT:  Mr. Crane, can you help me understand

4    how it's relevant?

5           MR. CRANE:  Yeah.  This goes exactly to the heart

6    of his investigation, the allegations that were later made.  I

7    just have two more questions on this area.

8           THE COURT:  Overruled.  You may proceed.

9    Q.   BY MR. CRANE:  Did you consult with US Attorney's

10   Office on what items you should seize from the house?

11   A.   Yes.

12   Q.   And they gave you a list or direction on what to

13   seize at the house?

14   A.   Yes.

15   Q.   And while you were at the house did you also

16   consult with the US Attorney's Office on what to take from the

17   house?

18   A.   I did not personally.  I believe Officer Graham

19   did.

20   Q.   Okay.  And who did he speak with?

21   A.   AUSA Muyskens.

22   Q.   And she directed what items, what additional items

23   the officers should be looking for to seize for them?

24   A.   I don't know about for them.  But what items may

25   lead to allegations.

1      Q.   Well, I guess what did you do with the items you

2    seized?  Who did you give them to?

3      A.   We turned them over to the FBI.

4      Q.   Okay.  You talked about there were six cellphones

5    seized from the house.  How many cellphones did Matt Baker

6    have on his person that you took?

7      A.   On the day of the search?

8      Q.   Yes.

9      A.   One.

10     Q.   Okay.  And you seized that phone; correct?

11     A.   Yes.

12     Q.   All right.  So he didn't have a cellphone after

13   that, did he?

14     A.   No.

15     Q.   Which of those cellphones were used by the kids?

16     A.   I don't know.

17     Q.   Okay.  Which of the cellphones were used by Staci?

18     A.   I don't know.

19     Q.   Okay.  Which of the cellphones were used by Matt?

20     A.   I don't know.

21     Q.   You don't know whose cellphones there were other

22   than there were cellphones in the house.

23          Was Matt required under the conditions of his

24   pretrial release to disclose to your office the cellphones his

25   kids used?

1          A.   Yes.

2          Q.   Where is that at?

3          A.   Any cellphones that he has access or any electronic

4     devices that he has access to.

5          Q.   But if he's not using those phones they're his

6     kids' phones, he doesn't touch them, use them, he wouldn't

7     have to disclose that, would he?

8          A.   He would have access to them.

9          Q.   How?

10         A.   They're in the house.  They're not secured

11    anywhere.

12         Q.   My cellphone is sitting on counsel's table desk --

13              MS. MUYSKENS:  Objection, Your Honor.

14         Q.   BY MR. CRANE:  -- does he have acces to my phone?

15              THE COURT:  What's the basis of the objection?

16              MS. MUYSKENS:  Your Honor, this is argumentative.

17    At this point he's talking about his own personal cellphone.

18              THE COURT:  I agree.  Sustained.

19         Q.   BY MR. CRANE:  In Government's Exhibit -- let's go

20    to Government's Exhibit Number 6.  This photograph contains

21    several receipts and documents here.  These are all things

22    that were seized by your office; correct?

23         A.   Correct.

24         Q.   And if you look at those documents on the left, the

25    US Bank and then the First Class Mail, those are documents

1    that are listed to Staci; correct?

2         A.    Correct.

3         Q.    So why were those seized if they are Staci Baker's

4    documents?

5         A.    I don't know.

6         Q.    That's beyond the authority of your ability to

7    search Matt Baker's property; correct?

8              MS. MUYSKENS:  Objection, Your Honor.

9    Argumentative and addresses a legal issue, not a factual issue

10   for this officer.

11             MR. CRANE:  I believe that's all he's been

12   testifying to here today.

13             THE COURT:  Overruled.  You may answer the question

14   if you know it.

15             THE WITNESS:  I'm sorry.  Can you repeat the

16   question?

17        Q.    BY MR. CRANE:  The question is, why did you

18   steal -- excuse me -- why did you seize documents that

19   belonged to Staci Baker?

20        A.    I don't know.

21        Q.    You shouldn't have; correct?

22             MS. MUYSKENS:  Objection, Your Honor.

23             THE COURT:  Overruled.

24             THE WITNESS:  We probably shouldn't have, correct.

25        Q.    BY MR. CRANE:  You testified that there's -- in the

1    middle there, there's a boost receipt, I believe it's for

2    $100.  And I believe on direct testimony you testified this

3    was a receipt showing that Matt Baker purchased a boost

4    cellphone; correct?  Is that a fair summary of your testimony?

5           A.   I don't recall if I had said Matt Baker purchased

6    any cellphone.  Perhaps I did.

7           Q.   The question is, how do you reach that conclusion

8    from this receipt?

9           A.   I would have to recall where the specific documents

10   were taken from.  I do know that there were documents found in

11   a truck which Mr. Baker had previously reported to me as his

12   truck.  I don't know if that's where these documents were

13   found.

14          Q.   The testimony, Mr. King, was that this boost

15   receipt shows Matt Baker purchased the cellphone, and I want

16   to know how you reach that conclusion from this receipt.  Is

17   Matt Baker's name on this receipt?

18          A.   No.

19          Q.   Is Matt Baker's credit card information on this

20   receipt?

21          A.   It doesn't appear so.

22          Q.   And, in fact, the receipt has a name of Michael on

23   it; right?  Who's Michael?

24          A.   I don't know.

25          Q.   It's certainly not Matt.  Matt's never gone by

1    Michael, has he?

2         A.   I don't know.

3         Q.   To your knowledge has Matthew ever gone by Michael?

4         A.   To my knowledge, no.

5         Q.   Okay.  But you don't have any information that this

6    receipt shows that Matt Baker purchased a boost cellphone, do

7    you?

8         A.   Again, I would have to refresh my memory on where

9    these items were taken from.

10        Q.   And the remainder of the receipts there, some

11   US Bank receipts, the Chase, do any of those receipts have

12   Matthew Baker's name on them?

13        A.   Not that I see.

14        Q.   Yet they were all seized; correct?

15        A.   Correct.

16        Q.   Why?

17        A.   Again, I would have to refresh my memory on where

18   these were located.  I do know that there were documents and

19   items pulled from a truck that Mr. Baker had previously

20   reported as his.

21        Q.   Well, you testified that you were in charge, you

22   and Mr. Graham were in charge of this.  Did you direct the

23   officers to seize all of these?

24        A.   Not directly.

25        Q.   You had testified that you asked Mr. Baker about

1    how he was living, and he's on several occasions told you the

2    family sustained from the income of the dog business; correct?

3         A.   Correct.

4         Q.   And isn't it true Matthew Baker has never told you

5    that he worked as an employee at the dog business; correct?

6         A.   Not me.  I did --

7         Q.   Or anybody.

8         A.   I did testify that he had told Mr. Law previously

9    that he was helping his wife with the dog business.

10        Q.   But this dog business, you testified it was, the

11   owner was Maple Mountain English Creams; correct?

12        A.   Correct.

13        Q.   And you had verified that that entity and

14   membership is 100 percent Staci Baker; correct?

15        A.   Correct.

16        Q.   And you also verified that Matthew Baker is not an

17   employee of Maple Mountain English Creams; correct?

18        A.   I have not verified that, no.

19        Q.   He's not a W-2 employer, a 1099 employer; correct?

20        A.   Not that I'm aware of.

21        Q.   And that Matthew Baker supports his wife in her

22   business; is that fair to say?

23        A.   That is -- he said he was helping his wife with the

24   dog breeding business.

25        Q.   Okay.  And supporting her, which sometimes means he

 1    takes care of the children while she's working; correct?

 2           A.    It could.

 3           Q.    Their children are small; correct?

 4           A.    Yes.

 5           Q.    Four children under the age of five or six;

 6    correct?

 7           A.    That sounds about right.  Yeah.  I don't know the

 8    exact ages.

 9           Q.    Including twins that are a handful; correct?

10           A.    That's my understanding.

11           Q.    And Matt is often the primary caregiver at the home

12    is your understanding; correct?

13           A.    I can't say for certain.

14           Q.    Well, this is due in large part, do you know that

15    Matthew Baker has some ongoing medical issues; correct?

16           A.    That's what he's reported.

17           Q.    Have you done anything to verify that?

18           A.    Mr. Baker provided a letter from a doctor stating

19    that he could not work.  Outside of that, I haven't done

20    anything, no.

21           Q.    Look at Exhibit Number 4, Defendant's Exhibit 4 in

22    the binder.  Is this what you received from Matthew's doctor?

23           A.    Excuse me.  No, in the sense that whatever is

24    written in handwriting on there is not on the copy that we

25    have on our file.  Otherwise, yes.

1       Q.   Does it say, inflammation of muscles, in

2  handwriting?

3       A.   Yes.

4       MR. CRANE:  Your Honor, I apologize.  That's my

5  handwriting from my notes.  Apparently my copy got copied as

6  opposed to the original.  I apologize.

7       THE COURT:  I understand.  I can just make that

8  note.  And do you want to move to admit this document?

9       MR. CRANE:  Yes, Your Honor.

10      THE COURT:  Miss Crane -- sorry.  Miss Muyskens?

11      MS. MUYSKENS:  No objection, Your Honor.

12      THE COURT:  And with the notation I'll note that

13  that's your handwriting explaining what that is.

14      MR. CRANE:  And I'm fine if we remove it, as well.

15  But I apologize for that.

16     (Whereupon, Defendant's Exhibit 4 was received.)

17      Q.   BY MR. CRANE:  So you and the pretrial office have

18  been aware since you've started supervising Matthew Baker that

19  he's been under debilitating chronic pain for quite sometime;

20  correct?

21      A.   That's what's been reported, yes.

22      Q.   Okay.  And for that reason, he was not able to keep

23  a regular nine-to-five job; correct?

24      A.   That's what he reported, yes.

25      Q.   Well, you say that.  Did you have any reason to

1    dispute it?

2         A.   After this investigation, yes -- or after the

3    search and everything, yes, I do have some reason to question

4    it.

5         Q.   Because you spoke to his doctors?

6         A.   Not because I spoke to his doctors, no.

7         Q.   You got his medical records?

8         A.   No, not because I got his medical records.

9         Q.   So just based upon your observations?

10        A.   Officers' observations, not mine personally.

11        Q.   You testified regarding two puppies that were in

12   the home on March 30th who appeared the puppies were ill; is

13   that right?

14        A.   They did not appear healthy.

15        Q.   Okay.  And they were separated from the other dogs

16   that were part of Ms. Baker's business; correct?

17        A.   Those were the only two dogs, yeah.

18        Q.   It appeared that they were there.  Did you talk to

19   Staci Baker about those dogs?

20        A.   No.

21        Q.   Have you read the reports from the officers who

22   did?

23        A.   Yes.

24        Q.   And you know that she told them that those dogs

25   were ill and she was trying to care for them to get them back

```
 1    to health; correct?

 2          A.    Correct.

 3          Q.    And she had been providing them medications and

 4    extra attention to try to nurse them along; correct?

 5          A.    Correct.

 6          Q.    And that's why they were in the home separated from

 7    the other dogs; correct?

 8          A.    Correct.

 9          Q.    You know that regarding the dog business that the

10    dog business was really quite profitable during the Covid

11    pandemic; is that right?

12          A.    I am aware that a lot of people were purchasing

13    dogs during the pandemic.

14          Q.    Okay.  And the money they made off of selling dogs

15    Staci Baker was able to support the family and the family's

16    needs; correct?

17          A.    That's as it appeared.

18          Q.    And you would -- you had asked Matt for some

19    documentations about the dog business, and he provided you

20    some bank records; correct?

21          A.    Correct.

22          Q.    Okay.  And he didn't fight you to provide those.

23    He provided them just like you'd ask; correct?

24          A.    Yes.

25          Q.    Okay.
```

1     A.    Yeah.

2     Q.    Okay.

3     A.    I did have to ask multiple times.  But yes, he did.

4     Q.    But those were records that actually belonged to

5     Staci Baker; correct?

6     A.    Yes.

7     Q.    You also know from those reports regarding the

8     animal business, the dog business that they had multiple

9     conversations with Staci; correct?

10    A.    Yes.

11    Q.    And Staci in all of those interviews indicated it

12    was her business; correct?

13    A.    I believe there was a statement in there that, I

14    run the business side and Matt cares for the dogs.

15    Q.    Where is that statement?

16    A.    In the Utah County sheriff's report that you're

17    referring to.

18    Q.    That actually her statement was that Matt would

19    sometimes help with watering and feeding if she needed the

20    help; correct?

21    A.    I don't know verbatim what it said.

22    Q.    Okay.  But at all times she never -- in her

23    interviews she always indicated it was 100 percent her

24    business; correct?

25    A.    That's my understanding, yes.

1       Q.   And her entity owned the business; correct?

2       A.   Yes.

3       Q.   She was the sole person on the business' bank

4  account; correct?

5       A.   That I don't know.

6       Q.   And that she never paid Matt Baker as an employee

7  or a 1099 or any other way as part of that business; correct?

8       A.   Not through 1099 or W-2.  I don't know if there

9  were any payments under the table.

10      Q.   And then Matt Baker's involvement with that

11  business were solely supporting his wife and her enterprise.

12      A.   I don't know that she made those statements.

13      Q.   All right.  Let's go back to -- we were discussing

14  earlier Foxtrot.  Let's go back to Foxtrot.

15            Your Honor, if I may approach the witness?

16            THE COURT:  Yes.

17            MR. CRANE:  Did the Court get a copy of the new

18  exhibit?

19            THE COURT:  The assignment of member interest in

20  Foxtrot United?  Yes.

21            MR. CRANE:  Okay.

22      Q.   BY MR. CRANE:  As part of your investigation are

23  you familiar with this document?

24      A.   I don't believe so.

25      Q.   Okay.

1          MR. CRANE:  Your Honor, I would like to ask him

2     about it.  I do have a witness that will lay foundation for

3     this exhibit.  I would move to admit it, but ask the Court --

4     it may be proper for the Court to reserve ruling on that.

5          THE COURT:  You may proceed.

6          MR. CRANE:  Thank you.  And this would be marked as

7     Defendant's Exhibit Number 11.

8          Q.   BY MR. CRANE:  As part of your investigation of

9     Foxtrot did you become familiar with a property located at the

10    address 265 West Center Street in Provo, Utah?

11         A.   I did.

12         Q.   Okay.  And that's the property that was owned by

13    Foxtrot; is that right?

14         A.   I believe so, yes.

15         Q.   Okay.  And actually that property, for simplicity

16    we'll call it the Center Street property in Provo, was

17    acquired by Matt Baker in 2006.  You're aware of that?

18         A.   I believe so, yes.

19         Q.   Okay.  And that at some point Matt created the

20    Foxtrot United entity, and its sole asset was the 265 West

21    Center Street, Provo, Utah, property; correct?

22         A.   I'm not sure if that was its sole asset.

23         Q.   Okay.  But you're aware that that property went

24    into bankruptcy; is that right?

25         A.   Correct.

1      Q.   And that the trustee took over ownership of that

2  property; correct?

3      A.   Correct.

4      Q.   And with Foxtrot being, having only one asset, the

5  Center Street property, once the trustee took the property

6  Foxtrot had no assets; correct?

7      A.   I don't know that.  As I said, I'm not sure that

8  that was its sole asset.  I don't know that information.

9      Q.   Do you have any information that Foxtrot had any

10  other assets?

11      A.   No.

12      Q.   Okay.  And that the bankruptcy occurred prior to

13  August of 2021; correct?

14      A.   Correct.

15      Q.   In looking at this assignment of membership

16  interest, August 18, 2021, Foxtrot United, the entity, was

17  transferred to Staci Baker; correct?

18      A.   Correct.

19      Q.   Which gets back to the question, if the only asset

20  that Foxtrot previously owned was in bankruptcy, meaning

21  Foxtrot didn't own it anymore, what value, what was the value

22  of Foxtrot United when this transfer took place on August 18,

23  2021?

24      A.   If that is the only asset and as you're stating it

25  was then in the possession of the trustee, then Foxtrot United

1    would likely not have any value.

2        Q.   Okay.  And if it had no value, then there was no

3    requirement for Matt to notify you that this entity had been

4    transferred to Staci; correct?

5        A.   Correct.

6        Q.   That was Allegation Number 3, August 18, 2021.  The

7    second date is January 12, 2022.  And I believe your testimony

8    there was regards to Government's Exhibit Number 11, if you'll

9    go to that.

10           When Mr. Baker was supervised with Mr. Law, you had

11   testified that Mr. Baker had some concerns about the $1500

12   reporting requirement, and he expressed those concerns to

13   Officer Law; correct?

14       A.   That's what's in Officer Law's notes.

15       Q.   And that Matt Baker said, you know, there are times

16   where I have to make transfers greater than $1500; correct?

17       A.   The note stated that Mr. Baker had said that he

18   does that all the time.

19       Q.   Okay.  And that was October 1st, 2020.

20       A.   Correct.

21       Q.   All right.  So pretrial office has known for

22   18 months, Matt told him in your words he does that all the

23   time; correct?

24       A.   Correct.

25       Q.   And one of the things he does all the time is make

1    his mortgage payments; correct?

2         A.   I would hope so.

3         Q.   Yeah.  And his mortgage is more than $1500;

4    correct?

5         A.   I don't know that.

6         Q.   And he specifically spoke to Officer Law about

7    this.  And whether or not Officer Law wanted to receive

8    notification every month when he had to pay his mortgage, and

9    Officer Law indicated, no, you don't have to report that.

10   Correct?

11        A.   I don't know.

12        Q.   And that Baker had informed Officer Law that he

13   uses Tango 305 to make his mortgage payments, an account that

14   is owned by Tango 305 to make mortgage payments for his home;

15   correct?

16        A.   There's nothing in Officer Law's note that indicate

17   that.

18        Q.   And this check on Government's Exhibit Number 11,

19   you didn't ask Officer Law about that, did you?

20        A.   No.

21        Q.   And the fact that he was putting money in that

22   account so he could make his mortgage payments; correct?

23        A.   I didn't -- did I ask Officer Law about that?

24        Q.   Did you ask in addition about it?

25        A.   No.

1      Q.   You just assumed that there was some nefarious

2   purpose there.

3      A.   I assumed that there was a transfer of over $1500

4   without my approval.

5      Q.   Okay.  But if Matt were to get direction from

6   Officer Law that direction would still be the same with you;

7   correct?

8      A.   Unless we had definitively said otherwise.

9      Q.   Okay.  So if Officer Law told him, you proceed in

10   this manner unless you tell him something different, he can

11   still proceed as Officer Law told him; correct?

12      A.   Yes.

13      Q.   Okay.  Looking at Government's Exhibit Number 8.

14   You indicated that this appeared to be a check from the

15   trustee; correct?

16      A.   Correct.

17      Q.   And that he received this on November 15, 2021;

18   correct?

19      A.   That's the date of the check, yes.

20      Q.   Or the date of the check, but maybe received a

21   couple days after.  That's fair.

22           And that you are aware, at least now aware that

23   when Foxtrot United was transferred to Staci Baker Matthew

24   retained any provisions that any money that may come out of

25   the trustee's sell from the bankruptcy; correct?

1          A.    I'm not aware of that.

2          Q.    Looking at Government's Exhibit Number 11.

3                It's the -- yeah.  Right above Matthew Baker's

4    signature it says:  Furthermore, it is hereby agreed that any

5    proceeds from the bankruptcy trustee shall belong to Matthew

6    Baker.

7                Correct?  Did I read that correct?

8          A.    I'm sorry.  Did you say government Exhibit 11?

9          Q.    Sorry.  Defendant's Exhibit Number 11.  I

10   apologize.  It's the one page that they -- yes.  Just above

11   the signature.

12         A.    Okay.  I'm sorry.  Can you repeat the question?

13         Q.    Yeah.  I apologize.  So looking at Defendant's

14   Exhibit's Number 11 just above Matthew Baker's signature, it

15   says:  Furthermore, it is hereby agreed that any proceeds from

16   the bankruptcy trustee shall belong to Matthew Baker.

17               He had reserved those rights, so it appears that

18   Government's Exhibit Number 8 are, in fact, the proceeds from

19   the sale of the Center Street property; correct?

20         A.    It would appear so.

21         Q.    And his receipt of those proceeds, he had no

22   requirement that he needed to report that to pretrial, did he?

23         A.    No.

24         Q.    On December 3rd, 2020, Mr. Baker had informed

25   Officer Law of a sale that was involving his wife's property;

```
 1    is that right?

 2         A.   Correct.

 3         Q.   And he did that in writing.

 4         A.   Yes.

 5         Q.   Even though he maybe didn't need to because it was

 6    Staci's property; correct?

 7         A.   Correct.

 8         Q.   Okay.  And Officer Law had no problem with that and

 9    told him that was fine and thanked him for the information;

10    correct?

11         A.   Correct.

12         Q.   And there's no information you have that Matthew's

13    been recording monthly his mortgage payments; correct?

14         A.   No.  Correct.

15         Q.   And that's based upon a conversation he and

16    Officer Law had early in the supervision; correct?

17         A.   I did not see anything in the notes regarding

18    Officer Law saying that he didn't have to report the mortgage

19    payments.

20              MR. CRANE:  Your Honor, if I could just have one

21    minute.

22              THE COURT:  Yes.

23              (Time lapse.)

24              MR. CRANE:  Thank you.

25         Q.   BY MR. CRANE:  On March 30th, 2022, the search and
```

1    seizure of Mr. Baker's home located in the office downstairs

2    there was two checks; correct?

3         A.   Correct.

4         Q.   And you indicated that those checks were seized;

5    correct?

6         A.   Correct.

7         Q.   One of those checks was a check for $39,563.79;

8    correct?

9         A.   I don't remember exactly, but that sounds right.

10        Q.   Who sent that check to Matthew Baker?

11        A.   I don't know.

12        Q.   It was on the check and name of Parsons, Behle and

13   Latimer; correct?

14        A.   I don't know.

15        Q.   And, in fact, on that check that still had the stub

16   attached to it and indicated that it was a refund of a

17   retainer; correct?

18        A.   I don't know.

19        Q.   Why was that check seized?

20        A.   I don't know.

21        Q.   It shouldn't have been, should it?

22             MS. MUYSKENS:  Objection, Your Honor.

23             THE WITNESS:  If it was made --

24             MS. MUYSKENS:  Objection, Your Honor, as to what

25   should or should not have been seized.  It's outside of the

```
 1    scope of this hearing, and it calls for a legal conclusion.

 2                    THE COURT:  Overruled.

 3                    MR. CRANE:  Thank you.

 4                    THE WITNESS:  Can you repeat the question?

 5         Q.   BY MR. CRANE:  The question is, that check should

 6    not have been seized from the Bakers; correct?

 7         A.   I don't know.

 8         Q.   I don't understand why don't you know.  Is that

 9    check evidence of fraud?

10         A.   It wouldn't appear so.

11         Q.   Is that check evidence of Matthew acting as

12    fiduciary?

13         A.   I don't know.

14         Q.   Is that check evidence of Matt's animal cruelty

15    allegation?

16         A.   No.

17         Q.   In fact, it's a refund of a retainer from the law

18    firm that represented him in the qui tam action that the

19    government is well aware of; correct?

20         A.   I don't know.

21         Q.   You didn't look into that?

22         A.   No.

23         Q.   It was also taken from his desk a check for

24    approximately $10,000 from Old Republic Title Company.  Why

25    was that check taken?
```

1          A.   I don't know.

2          Q.   In fact, that check should not have been taken;

3     correct?

4          A.   I don't know.

5          Q.   You're the one that's seizing.  Why are you

6     directing officers to seize that check?

7          A.   I didn't direct them to directly seize that check.

8          Q.   But you're ultimately in charge of what was seized.

9          A.   Correct.

10         Q.   Was this just a grab of everything in Matt's house?

11         A.   No.

12         Q.   You were looking for specific evidence for

13    allegations of violations of law.  So the question is, how are

14    those two checks evidence of violations of the law?

15         A.   We were also looking for allegations of violations

16    of pretrial release, and one of those allegations being

17    transferring of assets.

18         Q.   Okay.  But assets coming to him is not a violation

19    of pretrial release, is it?

20         A.   I wouldn't believe so, no.

21         Q.   Okay.  And those checks were made out to

22    Matthew Baker; correct?

23         A.   Yes.

24         Q.   From a law firm and a title company.

25         A.   I don't have the checks in front of me.  I don't

```
 1    remember every piece of evidence that was taken.

 2         Q.   Why aren't those checks listed in the inventory

 3    sheets?

 4         A.   They were listed under as various financial

 5    documents.

 6         Q.   But those checks were not individually listed nor

 7    the amounts of those checks; correct?

 8         A.   Correct.

 9         Q.   And the check from the Old Republic Title Company

10    actually dated back to an escrow with them for 2019; correct?

11         A.   I don't know.

12         Q.   Did you call the title company?

13         A.   No.

14         Q.   You just took the check.

15         A.   The checks were taken.

16         Q.   Thank you.

17              I pass the witness.

18              THE COURT:  Miss Muyskens?

19              MS. MUYSKENS:  Very briefly, Your Honor.

20                         REDIRECT EXAMINATION

21    BY MS. MUYSKENS:

22         Q.   Now, during the search on March 30th of 2022, what

23    information was Mr. Baker providing to help probation

24    determine what documents were connected to legitimate or not

25    legitimate activities?
```

1      A.    He didn't provide any information.

2      Q.    Did you or other officers ask for some explanation

3    as to where the money, how he was getting the money so that it

4    could be returned to him?

5      A.    After Mr. Baker asked if we were taking the money I

6    told him that we would be seizing the money as possible

7    evidence of money that we had believed was received through

8    fraud.  He did not provide any explanation to that and did not

9    expound any further.

10      Q.    And during the course of his supervision whether on

11    March 30th, 2022, or prior to, had Mr. Baker been providing

12    information to you or other supervision officers to help

13    explain the quantity and variety of financial documents, money

14    and other items that were found in his house?

15      A.    No.

16      Q.    Now, you were asked a number of questions about the

17    Foxtrot United and the transfer to Staci Baker on

18    August 18th of 2021.  You stated that based on your

19    investigation you believe there was a value that Foxtrot

20    United itself had a value greater than $1500 in August of

21    2021.  And what was that based on in relation to this sizeable

22    check that was issued to Foxtrot United three months later?

23      A.    It was based on that check, that there had been

24    funds left over from the bankruptcy proceeding that were still

25    belonging to Foxtrot United.

119

1          Q.   And to be clear, Defendant's Exhibit 11 says that

2     Matthew Baker retains the right to proceeds from the

3     bankruptcy proceeding.  I believe that's what a line in the

4     document.  He and his wife are the only parties to the estate;

5     correct?

6          A.   Correct.

7          Q.   But the check itself was issued to Foxtrot United;

8     correct?

9          A.   Correct.

10         Q.   Care of Matt Baker.

11         A.   Correct.

12         Q.   Now, as it relates to Allegation 3, the transfer of

13    funds on -- that were obtained from the Foxtrot United

14    bankruptcy proceeding, is your allegation based on the fact

15    that Matthew Baker received the money or is it based on how he

16    spent and transferred the money?

17         A.   It's how it was disbursed.

18         Q.   And finally you said that you had reason based on

19    officer's observations to dispute the medical condition of the

20    defendant.  What did you mean by that?

21         A.   When our officers arrived I believe they said that

22    Mr. Baker was carrying a large bag of dog food.  Also when

23    Mr. Baker was arrested the Utah County sheriff's deputy said

24    that he witnessed Mr. Baker carrying very large French doors

25    out of the house seemingly leading me to believe that he was

 1    still capable of doing physical work.

 2         Q.   Thank you.

 3              No further questions.

 4              THE COURT:  Thank you.

 5              Thank you, Mr. King.  You may step down.  I have no

 6    questions for you.

 7              Ms. Muyskens, you have one additional witness to

 8    call; is that correct?

 9              MS. MUYSKENS:  Yes, Your Honor.

10              THE COURT:  And then, Mr. Crane, do you have

11    witnesses to call, as well?

12              MR. CRANE:  Yes.  Eventually based upon I guess how

13    the testimony goes.

14              THE COURT:  How the testimony goes, okay.

15              It is almost the noon hour, but as you all know I

16    have a hard stop today at 2:30.  And so I'm happy to continue

17    to go forward or we could take a short 15- or 30-minute break.

18    Do you have a preference, Miss Muyskens?

19              MS. MUYSKENS:  The United States' preference is to

20    proceed.  This particular witness as I mentioned last week has

21    a hard stop at 2:00 p.m., so my preference is to at least get

22    through even if it's just the direct before we take a break so

23    I have some assurance that she can leave when she needs to.

24              THE COURT:  I completely understand that.  With

25    that information, we'll go ahead and proceed.  Go ahead and

1    call your next witness.

2              MS. MUYSKENS:  Thank you.  The United States calls

3    Special Agent Lindsay Garland.

4              THE COURT:  I'm going to ask you to stand while

5    you're sworn in.  Thank you.

6              THE CLERK:  Please raise your right hand.

7                        LINDSAY GARLAND,

8         called as a witness at the request of Plaintiff,

9             having been first duly sworn, was examined

10                   and testified as follows:

11             THE CLERK:  If so please say, I do.

12             THE WITNESS:  I do.

13             THE CLERK:  Thank you.

14             THE COURT:  Thank you.

15                      DIRECT EXAMINATION

16   BY MS. MUYSKENS:

17        Q.   Good morning.  Can you please state and spell your

18   name for the record?

19        A.   Yes.  Lindsay Garland.  L-I-N-D-S-A-Y,

20   G-A-R-L-A-N-D.

21        Q.   Where are you employed?

22        A.   With the Federal Bureau of Investigation.

23        Q.   How long have you been employed with the Federal

24   Bureau of Investigation?

25        A.   Just over 16 years.

1          Q.   And what is your position?  Are you an agent?

2          A.   I am.

3          Q.   And what is your current assignment?  Is it here in

4     Salt Lake City?

5          A.   It is.  For the last two years.

6          Q.   Now, did you have occasion to participate in an

7     investigation involving Matthew Ambrose Baker?

8          A.   Yes, I did.

9          Q.   Have you ever met Mr. Baker in person?

10         A.   No.  Not met him, no.

11         Q.   When you say met, have you ever sat in a car with

12    him and driven him somewhere?

13         A.   No.  No.  Sorry.

14         Q.   Have you ever physically observed?

15         A.   Correct.  Yes.

16         Q.   All right.  And if you saw him in court, would you

17    be able to recognize him?

18         A.   Yes.

19         Q.   And do you recognize him in court today?

20         A.   Yes, I do.

21              MR. VAN WAGONER:  We stipulate, Your Honor.

22              MS. MUYSKENS:  Thank you.

23              THE COURT:  You may proceed.  All right.  It's

24    stipulated to.  You don't need to do anymore there.  Thanks.

25         Q.   BY MS. MUYSKENS:  Now, I want to direct your

1     attention to the exhibits in front of you.  And if you could

2     look at Government's Exhibit Number 7, which has previously

3     been admitted.

4          A.   Yes.

5          Q.   And this is a two-page document containing an

6     e-mail exchange as well as an articles of incorporation; is

7     that correct?

8          A.   Correct.

9          Q.   All right.  And have you seen this document before?

10         A.   Yes, I have.

11         Q.   Okay.  And as part of your investigation did you

12    contact the Utah Corporation Commission to try to investigate

13    the legitimacy of the articles of incorporation that are

14    attached on Pages 3 and 4 of Government's Exhibit 7?

15         A.   Yes, we did.  We -- initially we looked through

16    their online database to search for all filings, amendments,

17    summary of online changes.  I did not see this on file

18    anywhere with the Utah Division of Corporations in this

19    format.  I then reached out to someone directly to make sure

20    that in our looking through the online database we had not

21    missed something and asked them to conduct a search for any

22    certificate of organization that they have on file for this

23    entity.

24              We were provided with the original.  Not Page 2.

25    We had Page 1 and 2 dated July 30th, 2015, and it did not have

1    the second page as it was submitted to Charter Title on file.

2         Q.    Okay.  Was that second page ever submitted to the

3    Utah Corporation Commission --

4         A.    No.

5         Q.    -- for Sunrise at Spanish Terrace?

6         A.    No.  Sorry.

7         Q.    Thank you.  And during the course of your

8    investigation have you also attempted to get information

9    directly from Charger Title Company, the entity that

10   Government's Exhibit 7 is purported to have received these

11   documents from Matthew Baker?

12        A.    Yes, we did.  We requested and were provided with

13   all documents pertaining to this transaction by Charger Title

14   Insurance Company.

15        Q.    Okay.  And the Government's Exhibit 7, is that one

16   of the e-mail communications that was provided by Charger

17   Title --

18        A.    Yes, it is.

19        Q.    -- as a communication they had with Matthew Baker

20   in connection with the sale of property?

21        A.    Yes, it is.

22        Q.    And Pages 3 and 4 which are the articles of

23   incorporation that are dated differently on Page 1 and 2, were

24   those the documents provided by Charger Title that they

25   represented were received from Matthew Baker?

1      A.    Yes, they were.

2      Q.    Okay.  And have you had an opportunity to review

3   the totality of all of the communications Charger Title

4   provided?

5      A.    Yes, I have.

6      Q.    And were there multiple communications or just that

7   single communication with Matt Baker and Charger Title?

8      A.    No.  Multiple communications starting as early as

9   March 2021 through the conclusion of the transaction I believe

10   in June of 2021.

11      Q.    And were there any communications from Staci Baker?

12      A.    No.  I did not see any communications from Staci

13   Baker to Charter Title.

14      Q.    And in the communications provided by Charger

15   Title, do you have any question about the authenticity of

16   Government's Exhibit Number 7?

17      A.    No, none.

18      Q.    And in the communications provided by Charger

19   Title, is Matt Baker providing documentation and information

20   for the closing of a sale of a property?

21      A.    Yes.

22            MR. VAN WAGONER:  We object.  Leading.

23            THE COURT:  Overruled.

24            THE WITNESS:  Yes, he is.

25      Q.    BY MS. MUYSKENS:  And were you able to review from

1     Charger Title the dollar amount of money that went to

2     Staci Baker's company called Maple Mountain Investments as a

3     result of the closing?

4          A.   Yes.

5          Q.   And approximately how much was it?

6          A.   Approximately, I don't have the document, 8.23.

7     8.3 million.

8          Q.   Was it 8 or was it 2.3?

9          A.   I'm sorry.  2.3.

10         Q.   2.3 million?

11         A.   Yes, correct.

12         Q.   And who was the person that was providing all of

13    the bank routing information?

14         A.   Matt Baker.

15         Q.   Who was the person that was providing all of the

16    documentation to support the $2.3 million transfer of funds to

17    Staci Baker's company?

18         A.   Matt Baker.

19         Q.   Now, I have a question for you regarding Maple

20    Mountain English Cream, the dog breeding business and what's

21    listed as Allegation Number 6.  Are you aware of an

22    investigation involving animal cruelty charges being conducted

23    by the Utah County Sheriff's Office?

24         A.   Yes, I am.

25         Q.   And have you had an opportunity to speak on several

1    occasions with the lead deputy in that, Deputy Gilstrap?

2         A.   Yes, I have.

3         Q.   Okay.  And are you aware that as a result of that

4    investigation 83 dogs were seized from properties, three

5    properties belonging to Matt Baker and Staci Baker?

6         A.   Yes.  Yes.

7         Q.   And approximately how many dogs were seized from

8    the Spanish Fork residence where the defendant was living at

9    the time of his arrest?

10        A.   55.

11        Q.   And were there also dogs seized from the Orem

12   residence?

13        A.   Yes.

14        Q.   And a residence in Provo; correct?

15        A.   Correct.

16        Q.   All right.

17             Now, during the course of that investigation did

18   Officer Gilstrap have occasion to go to the Spanish Fork

19   residence on March 31st, 2022, the day after the US probation

20   search of the defendant's home?

21        A.   Yes, he did.

22        Q.   And who did he meet with there?

23        A.   He met with Staci Baker.

24        Q.   And in terms of his observations did

25   Deputy Gilstrap observe any puppies found inside the home?

1      A.    He did.  As I said he met with Staci Baker at the

2      door.  She invited him into the home and into the kitchen

3      where she told him she had two puppies --

4            MR. VAN WAGONER:  Your Honor, I realize the Rules

5      of Evidence are lax, but there is absolutely no way that I can

6      cross-examine this.  Multiple layers of hearsay.

7            THE COURT:  Miss Muyskens, can you just lay some

8      foundation for how she knows this?

9            MS. MUYSKENS:  Yes.

10           THE COURT:  And I'm going to overrule your

11     objection.  But I do want to understand how she collected this

12     information.

13           MS. MUYSKENS:  Yes, Your Honor.

14     Q.    BY MS. MUYSKENS:  Now, Special Agent Garland, you

15     stated that you had an opportunity to speak with Deputy

16     Gilstrap on multiple occasions; is that correct?

17     A.    Yes.

18     Q.    Have you had an opportunity to talk about the

19     things that he has observed as part of his investigation?

20     A.    Yes.

21     Q.    And have you had an opportunity to talk about the

22     investigative steps he took as part of his investigation?

23     A.    Yes.

24     Q.    Have you also had an opportunity to review his

25     detailed 28-page Utah County report that documents his

1    investigation?

2         A.   Yes.

3         Q.   And have you had an opportunity to speak with

4    Deputy Gilstrap and ask him questions so that you understood

5    the information in the report?

6         A.   Yes.

7         Q.   Thank you.

8              THE COURT:  Thank you.  You may proceed.

9              MS. MUYSKENS:  Thank you.

10        Q.   BY MS. MUYSKENS:  I think I asked you about

11   Deputy Gilstrap's observations of two puppies that may have

12   been in the home.  Can you describe that?

13        A.   Yes.  When he was taken into the kitchen by Staci

14   Baker, she told him that she had a -- well, he saw two puppies

15   in a 2-by-2 crate in the kitchen floor that appeared to be

16   lifeless.  He thought they might actually be deceased, but

17   then he saw the chest of one expanding and contracting.  The

18   other one was propped up in the corner in the kennel and

19   wasn't really moving at all.

20             When he asked Staci what was going on with puppies

21   she indicated that she had a dog breeding business and

22   sometimes puppies get sick and they need extra care so she

23   brings them from the Orem location to the Spanish Fork

24   location and nourishes them back to health.

25        Q.   During that conversation with Officer Gilstrap, did

1    Staci Baker show Officer Gilstrap what she purported to be

2    prescription medication that she was given for the dogs?

3         A.   Yes.  He asked -- based on their condition, he

4    asked, Deputy Gilstrap asked Staci if the puppies had been

5    seen by a vet.  She told him that they had been seen by

6    Dr. Cory Arnold with I believe it was All About Pets

7    veterinary Care in Provo, and that he prescribed this bottle

8    of medication for the puppies.

9         Q.   Did Deputy Gilstrap follow up and conduct an

10   investigation into whether there was any evidence that those

11   puppies had, in fact, been seen by the veterinarian Dr. Arnold

12   and whether or not that medication had ever been prescribed

13   for them?

14        A.   He did contact Dr. Arnold.  He went to the office,

15   and I think he subsequently spoke to him by telephone.  The

16   vet Corey Arnold said he had not seen those two puppies.  He

17   hadn't seen any -- he hadn't been contacted by Staci Baker in

18   at least three months regarding some pet care.  But never saw

19   these puppies and he had not prescribed any medication.

20        Q.   And in a later part of his investigation, did

21   Deputy Gilstrap follow up with another veterinarian to try to

22   determine if care was being provided by Staci Baker as part of

23   the dog breeding business to her animals?

24        A.   Yes.

25        Q.   And was he able to determine whether there was any

1    regular consistent care being provided?

2        A.    There was not regular consistent care.

3        Q.    Now, did Deputy Gilstrap and other officers with

4    law enforcement visit each of the three properties, the Orem

5    residence, the Spanish Fork residence and the Provo property,

6    to determine whether there was the presence of animals and the

7    water and food conditions of those animals prior to conducting

8    a search on April 14th?

9        A.    Yes, they did.

10       Q.    And what did law enforcement observe?

11       A.    They observed at the Spanish Fork location there

12   had actually been previous complaints about the property, and

13   the deputy went back to speak to Staci.  She was not home.  He

14   waited at the entrance of the driveway, I believe, where it's

15   in the vicinity of a blue workshop where they keep the dogs.

16   From the street he could smell the urine and feces coming from

17   the dogs.  He did not notice any food or water that was set

18   out for the dogs.  And the same conditions seemed to have

19   exist in Provo and Orem, as well.

20       Q.    Okay.  Now, based on his investigation, one

21   followup question.  During his first talk with Staci Baker on

22   March 31st, 2022, did Deputy Gilstrap ask Staci Baker if she

23   was licensed and had proper licenses to run her dog breeding

24   business?

25       A.    Yes.

132

1      Q.    And did -- and her answer was that she --

2      A.    That she did.

3      Q.    Okay.  Did Deputy Gilstrap follow up with all of

4    the licensing authorities?

5      A.    He did.  He followed up with several licensing

6    authorities to determine whether there was kennel licenses

7    obtained and/or business licensees.  And there were no kennel

8    licenses that he was able to locate.  There was one business

9    license for the Orem property.  On the application it said

10   that it would be, I believe, what he determined was that it

11   would be an executive office space only and that all of the

12   animals would be maintained at the Provo location.

13     Q.    And in total was Officer Gilstrap able to identify

14   the total number of dogs that Staci Baker was permitted to

15   have at the cumulative three residences?

16     A.    I believe she was only supposed to have four

17   technically at the Provo location, and I believe they seized

18   26 from that location; I thought two at the Orem house; and

19   Spanish Fork, I don't recall.

20     Q.    Okay.  Was it over -- was she permitted to have

21   over five or six or in that number?

22     A.    Within that range.

23     Q.    Okay.  Now, on April 14th, 2022, did law

24   enforcement execute searches of the Orem residence, Spanish

25   Fork residence and the Provo residence?

1      A.    They did.

2      Q.    And you previously said they removed 83 dogs.

3  Speaking with Deputy Gilstrap you've also been able to look at

4  photographs, correct, and other documentary evidence?  What

5  was the condition of the dogs that they recovered?

6      A.    According to Deputy Gilstrap who was on the scene

7  it was in his words the most horrific scene that he has seen

8  for the care of animals during his time as an officer.  The

9  animals were covered in feces and smelled and soaked in their

10  own urine.  They were maintained in kennels where the feces

11  was coming up through the bottom grates that hadn't been

12  cleaned.

13            At the Spanish Fork location, they were kept in a

14  blue workshop where the smell I guess caused numerous officers

15  that were there and animal control volunteers, caused them to

16  dry heave.  I mean, the smell was horrendous.  And again, no

17  food or water --

18      Q.    Okay.

19      A.    -- visible for the dogs.

20      Q.    And during the search did Officer Gilstrap attempt

21  to locate the two puppies that he had seen inside the Spanish

22  Fork home on March 31st, 2022?

23      A.    He did.

24      Q.    And what were the results?

25      A.    He was unable to locate them.

1          Q.    They were not found at all at any of the

2     residences?

3          A.    Not at any of the residences.

4          Q.    Now, in terms of Matthew Baker's involvement with

5     the dogs did Staci Baker make statements to Deputy Gilstrap

6     about what Matthew Baker did with respect to the dog breeding

7     business?

8          A.    Yes.  She told Deputy Gilstrap that Matt Baker was

9     the one to go feed the dogs.

10         Q.    And what was her role with respect to the dogs?

11         A.    The business side of it.

12         Q.    Did Deputy Gilstrap also interview neighbors at the

13    Provo location?

14         A.    Yes.

15         Q.    And did a neighbor report that it had observed

16    Matt Baker caring for animals?

17         A.    Yes.

18         Q.    At the time of his arrest on April 13th, 2022, did

19    law enforcement observe Matt Baker taking any steps that

20    appeared to be for the care of the dogs?

21         A.    Yes.  He was observed at the Orem residence where

22    there appeared to be new boxes delivered by Chewy, a pet care

23    provider, appeared to be loading those boxes and/or bags of

24    food onto a trailer.

25              MS. MUYSKENS:  No further questions.

```
 1                    THE COURT:  Thank you.

 2                         CROSS-EXAMINATION

 3    BY MR. VAN WAGONER:

 4          Q.   Good afternoon.

 5          A.   Thank you.  Good afternoon.

 6          Q.   Now you said you're an agent.  And are you a

 7    Special Agent?

 8          A.   Yes, sir.

 9          Q.   All right.  And you've been in Utah two years?

10          A.   Just over.  Yeah.  Yes.

11          Q.   Where were you before?

12          A.   New Jersey.

13          Q.   That's a bit of a change.

14          A.   It is.

15          Q.   You've talked a fair amount about an interview or

16    meeting that you had with Officer Gilstrap.  Did you prepare

17    like a memorandum of interview, a 302 or anything like that?

18          A.   He is referenced in one.  Yes.

19          Q.   Do you know whether that's been provided to

20    counsel?

21          A.   No, it has not.  It's the arrest 302, Matthew

22    Baker.

23          Q.   Okay.  So what you've testified to you referenced

24    in a memorandum, but it's not been provided to us.

25          A.   So the post -- a lot of my communication with
```

1    Mr. Gilstrap was leading up to the arrest of Mr. Baker and

2    coordinating the transport of him.  And I received -- there is

3    discussion of that conversation with him.  The rest of it I've

4    had a conversation with AUSA Muyskens and Deputy Gilstrap at

5    length about his police report.

6          Q.   Okay.  So the information that was -- was it --

7    well, I'll back up.

8               Your conversations with him, were they in person?

9          A.   No.

10          Q.   Over the phone?

11          A.   Yes.

12          Q.   Or Zoom?

13          A.   The phone.

14          Q.   The phone?  How many conversations have you had

15    with Officer Gilstrap?

16          A.   Two.  I mean, approximately two.  Outside --

17    approximately two in relation to the condition of the animals

18    at the locations.

19          Q.   Okay.  We'll probably come back to that.

20          A.   Okay.

21          Q.   I'd like to go to the discussion about Charger

22    Title.

23          A.   Okay.

24          Q.   Now you said you have reviewed all of the documents

25    in relation to this closing; correct?

1       A.   Yes.

2       Q.   Okay.  Look at the Government's Exhibit Number 7.

3       A.   Yes.

4       Q.   And you've been sitting in court throughout this

5  proceeding today; correct?

6       A.   Correct.

7       Q.   All right.  You were here -- you're here the entire

8  time?

9       A.   Yes.

10       Q.   All right.  Now if you go up to Page 2 of

11  Exhibit 7, it says at the bottom -- or excuse me.  It says --

12  yeah.  Matt or Staci, can you please assist us with the

13  requested items below?  Right?

14            Now since you've reviewed the entire file what

15  specifically were those requested items below?

16       A.   So this is the file that we received in entirety.

17  I did not see or notice anything prior to this e-mail chain.

18  I don't know -- I didn't see -- I don't recall the followup

19  e-mail to this.

20       Q.   Well, since this is -- since the first count in the

21  probation violation allegation is an allegation of fraud and

22  this appears to be a response to a request, don't you think it

23  would be important to know specifically what the request was?

24       A.   Well, I know that what was provided is what we're

25  basing the charge --

1        Q.   That wasn't the question.  Do you know specifically

2   what the request was?

3        A.   I do not.

4        Q.   All right.  Now, you've seen the entire discovery

5   file that's been provided to the defense, haven't you, in

6   connection with these probation violation allegations?

7        A.   Yes.

8        Q.   And in that file is Page 3; correct?

9        A.   There were a lot of documents.

10            MR. VAN WAGONER:  May I?

11            THE COURT:  Yes, you may.

12            THE WITNESS:  Thank you.

13       Q.   BY MR. VAN WAGONER:  So I'd like to show you what

14  will be marked as Defendant's Exhibit 12.  Now looking at

15  Pages 1 and 2 those are the same as Pages 1 and 2 of the

16  government's exhibit; correct?

17       A.   Correct.

18       Q.   All right.  Page 3 isn't part of the government's

19  exhibit; right?  Is that right?

20       A.   Right.

21       Q.   All right.

22       A.   Sorry.

23       Q.   So since you say you have reviewed all of the

24  government's exhibits and all of the discovery, can you say

25  whether this Page 3 of this document is the page that is a

139

 1     list of the things that Charger Title was looking for?

 2          A.   It could be.  Presumably since this e-mail was

 3     responded to with the articles of incorporation or the

 4     certificate of organization and this asks for it.

 5          Q.   Okay.  It asks for the articles of the

 6     organization; correct?

 7          A.   It does.

 8          Q.   It doesn't ask for the certificate of organization;

 9     correct?

10          A.   It does.  I think some people use them

11     interchangeably.

12          Q.   Really?  So your testimony is that a certificate of

13     organization is the same as articles of the organization?

14          A.   No.  I think sometimes people refer to them, but

15     I'm not certain.

16          Q.   All right.  So if --

17               And I'll offer this exhibit, Your Honor.

18               MS. MUYSKENS:  No objection, Your Honor.

19               THE COURT:  Admitted.

20          (Whereupon, Defendant's Exhibit 12 was received.)

21          Q.   BY MR. VAN WAGONER:  So referring to Page 3 of this

22     exhibit, Articles for Spanish Terrace, LLC.  Matt Baker did

23     not send Articles for Spanish Terrace, did he?

24          A.   Right.  Correct.

25          Q.   He sent at least the first page of certificate of

1    organization and what appears to be based upon what we heard

2    Officer King testify to, the second page the second page of

3    BAG1, certificate of organization; right?

4          A.   Uh-huh (affirmative).

5          Q.   All right.  As a matter of fact, he reviewed those

6    and said they are identical.

7          A.   Yes.  Page 2 of another entity was attached to

8    Page 1 --

9          Q.   Right.

10         A.   -- of Sunrise and submitted to Charger Title.

11         Q.   Correct.

12         A.   Correct.

13         Q.   Okay.  Now let's look at Defendant's Exhibit

14   Number 3.  It's been admitted.  Have you seen this document

15   before?

16         A.   It does not look familiar to me.

17         Q.   All right.  It states that it's Operating Agreement

18   of Sunrise At Spanish Terrace, LLC, as of April 14, 2019;

19   correct?

20         A.   Correct.

21         Q.   And you're aware that's the day Matt Baker

22   transferred both the membership and the management of SAST or

23   Sunrise at Spanish Terrace, to Staci Baker; correct?

24         A.   I thought the summary of online changes, if that's

25   what you're referring to?

```
 1            Q.   No.  That's not what I'm referring to.

 2            A.   Then I apologize.

 3            Q.   Okay.  We can go back to Exhibit -- to

 4    Defendant's Exhibit 2.

 5            A.   Okay.

 6            Q.   People can go on in and make online changes at a

 7    subsequent date.  That happens all the time, doesn't it?

 8            A.   Right.

 9            Q.   All right.

10            A.   Sorry.  I haven't seen Defendant's Exhibit 2.  I

11    was here for the prior testimony, but I didn't see the

12    exhibit.

13            Q.   All right.  You hadn't seen Exhibit 2?

14            A.   No.

15            Q.   And you hadn't seen Exhibit 3; right?

16            A.   Correct.

17            Q.   All right.  So based upon what we heard from

18    Officer King, Mr. Baker transferred, and it's in his notes,

19    transferred this entity SAST to his wife on April 14th, 2019;

20    correct?

21            A.   Correct.

22            Q.   All right.  Now you are aware that when there's a

23    real estate closing there are a lot of things that a title

24    company needs to get in order to be able to close it properly;

25    correct?
```

1        A.    Correct.

2        Q.    All right.  Sometimes there's a rush to get things

3    submitted to the title company from the seller or from the

4    buyer; correct?

5        A.    Correct.

6        Q.    All right.  And from what I believe Officer King

7    testified to, at least his understanding of why government --

8    or excuse me -- why the title company wanted the articles of

9    organization was to verify that Staci Baker had authority to

10   close the transaction; is that correct?

11       A.    I would assume.

12       Q.    All right.

13             You're aware that she signed the REPC with the

14   buyer, aren't you?

15       A.    Yes.

16       Q.    And she signed all the addenda, didn't she?

17       A.    Yes.

18       Q.    All right.  And she did that because the entity and

19   the property it held were hers; correct?

20       A.    Correct.

21       Q.    All right.  So if Matt Baker or Staci Baker,

22   because it was requested of both of them in an e-mail, had

23   sent the articles, not a certificate, but these articles would

24   the transaction had been the same?

25             MS. MUYSKENS:  Objection, Your Honor.  Speculation.

```
 1          Q.   BY MR. VAN WAGONER:  That would be (inaudible. )
 2     That would have been (inaudible) closing the transaction.
 3          A.   I don't know.
 4          Q.   Are you a lawyer?
 5          A.   I am actually.
 6          Q.   You understand about the materiality (inaudible)?
 7          A.   Loosely.
 8          Q.   If somebody (inaudible) fraudulent.  It has to
 9     matter, doesn't it?
10          A.   So I've seen instances where --
11          Q.   That's a yes or no.  Does it have to matter or not?
12          A.   I don't know.  Are you speaking of this particular
13     transaction?
14          Q.   I'm talking about materiality.  She don't dispute
15     (inaudible).
16          A.   Right.  Correct.
17          Q.   You don't dispute that she had authority to close
18     this transaction.
19          A.   Correct.
20          Q.   All right.  You're just saying, (inaudible)?
21          A.   Right.  And the document that they received was not
22     a true and accurate document anywhere.  It's Page 1 of one and
23     Page 2 of another.
24          Q.   Right.  So in the rush to close the transaction
25     (inaudible) -- let me finish.
```

 1          A.    Yeah.

 2          Q.    (Inaudible.)  Maybe it was a collation problem.  Do

 3     you have any reason to think it might have been a collation

 4     problem or a mismatch?

 5          A.    I have no idea.

 6          Q.    All right.  And if it was a collation problem or

 7     mismatch it wouldn't have mattered because she was the owner;

 8     correct?

 9          A.    So I don't know that it would have mattered because

10     if the proper Page 2 had been submitted it would have shown

11     Matt Baker as the managing member.

12          Q.    Right.  And (inaudible) that send us the articles

13     of organization?

14          A.    Well, then at least the title company would have

15     had that opportunity --

16                THE COURT:  What was the objection?  I couldn't

17     hear that.

18                MS. MUYSKENS:  Speculation.  We're now speaking

19     hypotheticals about what an entity would do, and it sounds

20     like legal argument.

21                THE COURT:  I'm going to overrule that.  To the

22     extent she knows she can answer the question.

23                THE WITNESS:  I don't know what the title

24     company would do.

25          Q.    BY MR. VAN WAGONER:  And, in fact, to the best of

1     your knowledge the title company asked for one thing, correct,

2     but got another?

3          A.   Correct.

4          Q.   And to the best of your knowledge, the title

5     company did all but say, send us the right one.  Send us the

6     articles, not the certificate.

7          A.   Correct.

8          Q.   They didn't.

9          A.   As far as I know.

10              MR. VAN WAGONER:  May I just have a moment, Your

11    Honor?

12              THE COURT:  Yes.

13              (Time lapse.)

14         Q.   BY MR. VAN WAGONER:  Now you've been here, you were

15    here, you heard via testimony of Officer King about the

16    materials he received and some of which you reviewed relating

17    to a dispute between Mr. Grimmer, who's a lawyer, and Staci

18    Baker or entities that she owns; is that correct?

19         A.   Correct.

20         Q.   All right.  And you, too, have had the opportunity,

21    haven't you, to review materials provided by either

22    Mr. Grimmer or his law partner in connection with those

23    claims; correct?

24         A.   Correct.

25         Q.   All right.  So just by way of a little bit of

```
 1    background, Mr. Grimmer is a lawyer; you're aware of that.
 2         A.   Yes.
 3         Q.   And he owns a company that buys debt or judgments;
 4    right?
 5         A.   That I don't know.
 6         Q.   Okay.  And you've heard testimony that on
 7    August the 18th Mr. Baker transferred the membership interest
 8    to Foxtrot to Staci Baker --
 9         A.   Correct.
10         Q.   -- correct?
11              MS. MUYSKENS:  Objection, Your Honor.  Outside the
12    scope of this witness' --
13              MR. VAN WAGONER:  We're happy to call her in our
14    case, Your Honor.
15              MS. MUYSKENS:  If they want to do it, that's fine.
16    Then I would simply ask that they not lead the witness.
17              THE COURT:  All right.  With that it is --
18              MR. VAN WAGONER:  It's an adverse witness, Your
19    Honor.  I think I'm allowed to lead.
20              THE COURT:  With that I will allow you to proceed
21    forward.  And because this portion relates to adverse witness,
22    I agree that you could submit leading questions.
23              MR. VAN WAGONER:  Thank you.
24         Q.   BY MR. VAN WAGONER:  So on September the 15th of
25    2021 there was a judgment in small claims court that entered
```

```
 1    against Matt Baker for $4,654.58; correct?

 2           A.    Umm, it sounds familiar.

 3           Q.    Okay.

 4           A.    Do you mean by whom or by --

 5           Q.    By Jones Paint and Glass.

 6           A.    Okay.

 7           Q.    They sued an entity that Matt Baker had owned that

 8    was defunct and obtained a judgment against him personally for

 9    that amount.

10           A.    Okay.

11           Q.    Are you aware of that?

12           A.    I've -- I do know some information about it.

13           Q.    All right.

14           A.    And I'm not --

15           Q.    And you're aware that Mr. Grimmer purchased that

16    judgment through a company that he owns?

17           A.    Yes.

18           Q.    All right.  You're aware, too, that the company he

19    owns is called Sunny Skies Capital.

20           A.    Yes.

21           Q.    Are you aware of that?

22                 All right.  Now, Sunny Skies Capital that bought

23    that judgment for under $5,000 you're aware that they filed a

24    request in small claims court for a writ of execution.

25           A.    It sound accurate.
```

1      Q.    Are you aware of that?

2      A.    I'm not completely sure about that.

3      Q.    All right.  But you've prepared two 302s, one of

4   Matt --

5      A.    Uh-huh (affirmative).

6      Q.    -- Grimmer's law partner Mr. Davis and one with

7   both Mr. Grimmer and Mr. Davis; correct?

8      A.    Correct.

9      Q.    And they went through in those 302s this history

10  that I'm going through now.

11     A.    Yes.  And I apologize.  I just don't remember the

12  specific beginning of it and that context of it.

13     Q.    All right.  Okay.

14     A.    It does sound familiar.

15     Q.    Are you aware that under Utah law an entity cannot

16  execute on a judgment against an LLC without a charging order?

17     A.    No, I'm not aware of that.

18     Q.    You're not aware of that.  Okay.

19           So what happened was the entity that Mr. Grimmer

20  owns sought a writ of execution against assets of Mr. Baker;

21  right?  You're aware of that?

22     A.    Yes.

23     Q.    Okay.  And at the time Mr. Baker didn't own

24  Foxtrot, did he?

25     A.    You said the date was September 2021?

149

1          Q.    At the time that they obtained the writ of

2     execution, which was November the 9th, 2021, he did not own

3     any interest in Foxtrot; correct?

4          A.    According to the assignment of ownership interest

5     to Staci.

6          Q.    All right.  But regardless of that Mr. Grimmer's

7     entity sought to collect against Foxtrot; right?

8          A.    Correct.

9          Q.    And the judge issued not a charging order, but a

10    writ of execution, and Foxtrot was put up for sale at auction;

11    right?

12         A.    Correct.

13         Q.    And Mr. Grimmer's entity reported to purchase that

14    interest; is that right?

15         A.    Yes.

16         Q.    And despite the fact that Mr. Baker owned no

17    membership interest in Foxtrot.  Is that your understanding?

18         A.    This is a civil proceeding that I'm not directly

19    involved in, so I'm not aware of all the --

20         Q.    But you've prepared two detailed 302s to go through

21    this.

22         A.    Right.  There's two constable sales, though.  So

23    I'm just trying to make sure I don't confuse one for the

24    other.

25         Q.    Right.  Okay.  Just -- okay.

                                                                150

 1          MS. MUYSKENS:  Your Honor, I will object at this

 2     point to the relevance of the six allegations.  The Court

 3     advised the parties to focus on the six allegations, and the

 4     government intended to do so in trying to understand a civil

 5     proceeding matter and who has what when we've been very clear

 6     about what the allegations are.  It's not about his ownership

 7     in Foxtrot.  The Allegation Number 3 is the transfer of assets

 8     simply put by Matthew Baker.

 9          THE COURT:  Thank you.

10          Mr. Van Wagoner, I would agree.  I'm having a

11     difficult time following.

12          MR. VAN WAGONER:  And I apologize.  But this goes

13     to the reason behind Mr. Baker's transfer of funds, the funds

14     that he received in bankruptcy.

15          THE COURT:  All right.  So this goes to the second

16     portion of what we talked about at the prior hearing, which is

17     the justification for why he may have done it.

18          MR. VAN WAGONER:  Correct.

19          THE COURT:  And if I'm following you correctly, you

20     are saying that Mr. Grimmer purchased the judgment which then

21     was put up for auction which then he went and purchased

22     Foxtrot at the auction despite perhaps not the legality of

23     being able to do so, which is therefore why Mr. Baker may have

24     engaged in the way that is alleged to have occurred.  Is that

25     correct?

1              MR. VAN WAGONER:  That's part of it.  And despite

2      the fact that Mr. Baker owned no interest in Foxtrot at that

3      time.

4              THE COURT:  Okay.  I think I have that now.

5              MR. VAN WAGONER:  All right.

6              THE COURT:  So if you want to move forward.

7              MR. VAN WAGONER:  Thank you.

8         Q.   BY MR. VAN WAGONER:  I just want to ask a couple

9      more questions about Mr. Grimmer.  You mentioned that there

10     was another sale, an auction of another entity?

11        A.   I thought that there were two constable sales --

12        Q.   Yeah.

13        A.   -- one of which I don't believe Mr. Baker was

14     present for, if I have that -- I'm sorry.  It's been a while

15     since I've --

16        Q.   Right.  SAST.  Mr. Grimmer tried to do the same

17     thing against SAST even though the entity had transferred to

18     Staci Baker (inaudible).

19        A.   Okay.

20        Q.   Now, in your communications with Mr. Grimmer were

21     you aware that Mr. Grimmer was (inaudible) we're talking

22     (inaudible).

23        A.   No.  I mean, the context of the civil lawsuits are

24     all that I'm aware of.

25        Q.   Are you aware that there (inaudible)?

                                                              152

```
 1           A.   No.

 2           Q.   (Inaudible)?

 3           A.   No.  That does not sound familiar.

 4           Q.   Are you aware that there were (inaudible)

 5      settlement agreement (inaudible)?

 6           A.   I don't recall that.

 7           Q.   Did Mr. Grimmer ever (inaudible) you that or were

 8      you aware (inaudible) Grimmer would go (inaudible)?

 9           A.   No.  I'm not aware of that.  Never heard --

10           Q.   Have you (inaudible)?

11           A.   No.

12           Q.   If you had become aware of that, would you

13      investigate that as extortion?

14           A.   It could potentially.  You could look into that.  I

15      was not presented with that.

16                MR. VAN WAGONER:  Just a moment, Your Honor.

17                (Time lapse.)

18                MR. VAN WAGONER:  I think that's all I have, Your

19      Honor.

20                THE COURT:  Thank you.

21                Miss Muyskens?

22                MS. MUYSKENS:  I have no further questions for this

23      witness.

24                THE COURT:  All right.

25                Thank you.  You are released.  Thank you.
```

1                    THE WITNESS:  Thank you.

2                    THE COURT:  Ms. Muyskens, do you have any

3       additional witnesses?

4                    MS. MUYSKENS:  No additional witnesses, Your Honor.

5       But at this time I would like to ask the Court to take

6       judicial notice of 18 USC Section 922(G)(1), which is the

7       statute that governs unlawful possession of a firearm or

8       ammunition by a convicted felon.  The government would also

9       ask the Court to take judicial notice --

10                   THE COURT:  Sorry.  Can you repeat that section

11      again?  18 USC 922(G)(1); is that what you said?

12                   MS. MUYSKENS:  Yes, Your Honor; which is the

13      statutory provision that prohibits a convicted felon from

14      being in possession of ammunition.

15                   The government would also ask the Court to take

16      judicial notice of Utah Code Section 76-9-301, which is

17      cruelty to animal provision, which makes it unlawful in

18      Subsection 2 to fail to provide necessary food, water, care or

19      shelter for an animal in the person's custody and to do so

20      intentionally, knowingly, recklessly or with criminal

21      negligence.  And the provision further defines necessary food,

22      water, care, shelter to take into account the species, the age

23      and the physical condition of the animal, and includes

24      appropriate and essential food and water as well as other

25      essential care.

```
 1                    THE COURT:  Thank you.  All right.

 2                    Mr. Crane, how many witnesses do you have to call?

 3                    MR. CRANE:  Potentially two, Your Honor.

 4                    THE COURT:  Two witnesses?  All right.  What I'm

 5       going to do is I'm going to take a 15-minute break so we will

 6       come back at 1:00, and then I will proceed forward with your

 7       case.  Thank you.

 8                    MR. CRANE:  Thank you, Your Honor.

 9                    (Recess.)

10                    THE COURT:  -- and Mr. Van Wagoner.

11                    MR. CRANE:  Your Honor, just one thing.  For

12       reasons I'm not quite clear the marshals would like the Court

13       again to order that the handcuffs be removed.

14                    THE COURT:  Yes.  If you would please remove the

15       handcuffs.  Thank you.

16                    MR. CRANE:  Our next witness will be Kennedy Nate.

17                    THE CLERK:  Please raise your right hand.

18                              KENNEDY NATE,

19            called as a witness at the request of Defendant,

20               having been first duly sworn, was examined

21                       and testified as follows:

22                    THE CLERK:  If so please say I do.

23                    THE WITNESS:  I do.

24                    THE CLERK:  Thank you.

25       //
```

```
 1                        DIRECT EXAMINATION

 2    BY MR. CRANE:

 3         Q.   Mr. Nate, will you please state your name and spell

 4    it for the record?

 5         A.   Yes.  My first name is Kennedy, and my last name is

 6    Nate.  Kennedy is spelled K-E-N-N-E-D-Y; Nate is spelled

 7    N-A-T-E.

 8         Q.   Thank you.  Mr. Nate, how are you employed?

 9         A.   I'm an attorney.  I'm currently a partner with the

10    law firm of McNeill Von Maack.

11         Q.   And at that law firm do you specialize in civil

12    litigation?

13         A.   I do.

14         Q.   Do you represent an entity known as Sunrise at

15    Spanish Terrace, LLC?

16         A.   I do.

17         Q.   Do you represent an entity known as Foxtrot United?

18         A.   Yes.

19         Q.   And do you also represent Staci Baker?

20         A.   Yes, I do.

21         Q.   Okay.  And I want to make it very clear from the

22    beginning here, I do not want to get into any privileged

23    communications with any of your clients.  And if I do, please

24    stop me or refuse to answer.  I would just like to ask you

25    some questions about some things that are public record.
```

1   Okay?  Just to make that clear.

2         A.   Understood.  And I would do so.

3         Q.   Okay.  In your representation of -- let me ask

4   this.  You represent Sunrise at Spanish Terrace.  Who's the

5   owner of that entity?

6         A.   That is Staci Baker.

7         Q.   Is there other owners of that entity?

8         A.   No.  She's the sole owner.

9         Q.   Okay.  What about Foxtrot United?  Who owns that

10  entity?

11        A.   Once again Staci Baker.

12        Q.   Any other owners?

13        A.   None.

14        Q.   Okay.  Are you involved on behalf of your clients,

15  these two entities and Ms. Baker, involved in litigation with

16  entities owned by Matthew Grimmer?

17        A.   Yes, I believe so; with an entity by the name of

18  Sunny Skies Capital, LLC.

19        Q.   Okay.

20        A.   And then also we do have, in one of the lawsuit,

21  there are currently three.  One of them there are claims that

22  are alleged directly against Mr. Grimmer individually and also

23  against his law firm.

24        Q.   Okay.  You've referenced three litigations going

25  on.  Is one of them <u>Sunny Skies Capital vs. Staci Milligan</u>

1    <u>Baker</u>?

2         A.   Yes.

3         Q.   And then there's counterclaims of <u>Miss Baker vs.</u>

4    <u>Sunny Skies Capital</u>.  And the case number, the last four

5    digits are 0032?

6         A.   Yes, that's correct.  That's one of those cases.

7         Q.   Okay.  And that's pending in Fourth Judicial Court?

8         A.   Correct.

9         Q.   And is one of the other lawsuits <u>Sunrise at Spanish</u>

10   <u>Terrace vs. Maple Mountain Investments, Staci Milligan and</u>

11   <u>Charger Title Insurance Company</u>?

12        A.   Yes.

13        Q.   And the last four digits of that lawsuit are 0082;

14   is that right?

15        A.   That's correct.

16        Q.   And that also is pending in the Fourth Judicial

17   Court?

18        A.   Correct.

19        Q.   And then the third lawsuit is <u>Old Republic Title</u>

20   <u>vs. Cap Fund 73, Matthew Baker and Shane Baker</u>; is that right?

21        A.   Yes.

22        Q.   And you represent Foxtrot United who has been

23   brought in as a counter claimant and cross claimant in that

24   matter?

25        A.   Yes, that's correct.

1          Q.    And the last numbers of that case number are 1089?

2          A.    Correct.

3          Q.    Okay.  And that's also in the Fourth Judicial

4     District Court?

5          A.    Yes.

6          Q.    Are all of these lawsuits -- I mean, are they

7     similarly related?

8          A.    Yes.  They're related in facts.  And if you'd like

9     I'm happy to explain kind of the genesis of what the lawsuits

10    relate to.

11         Q.    That's what I want to get into.  And specifically I

12    just want to know if things that are public record, what's

13    been in public filings.  But what's the history of these

14    lawsuits that led to Mr. Grimmer, his involvement?

15         A.    Absolutely.  Let me start with the, I'll call it

16    the Old Republic matter.  And the Old Republic matter is a

17    case that's been ongoing for a number of years.  It's

18    currently on hold as there are related allegations in that

19    case that relate to some claims that have been brought

20    criminally against Mr. Baker.  So that case is currently on

21    hold.  But it relates to essentially a piece of real property

22    over which there are various disputes among all the entities

23    that are involved in that case.

24         Q.    Okay.

25         A.    The next case, the second case is the Sunny --

1        pardon me, <u>Sunrise at Spanish Terrace, LLC vs. Staci Milligan</u>

2        <u>Baker</u> matter.  That is a case where Mr. Grimmer represents or

3        purports to represent the entity I'll refer to as SAST so I

4        don't confuse it with Sunny Skies.  But SAST filed a lawsuit

5        against Mrs. Baker alleging that she had put a wrongful lien

6        on the property that was owned by SAST and ultimately sold by

7        SAST.  That case was initially dismissed because Mrs. Baker is

8        the owner of SAST.  And --

9            Q.   Let me stop you there.  SAST is short for Sunrise

10       at Spanish Terrace?

11           A.   Yes.  SAST is short for Sunrise at Spanish Terrace;

12       that is correct.

13           Q.   So just to be clear, you said that Mr. Grimmer

14       brought a lawsuit on behalf of Sunrise at Spanish Terrace

15       against Miss Baker, the owner of Sunrise at Spanish Terrace?

16           A.   That's correct.  And I'll -- go ahead.  I'm sorry.

17           Q.   And explain how that happens or what happened

18       there.

19           A.   Yes.  So I'll back up there and maybe provide a

20       little bit of background that helps provide some context.

21                So as I think we've heard testimony here today that

22       an entity, a painting entity brought a small claims lawsuit

23       against Mr. Baker in his individual capacity and ultimately

24       obtained a judgment.  That judgment was acquired by Sunny

25       Skies Capital, which is an entity of which Mr. Grimmer owns

1    ownership or has ownership in, in approximately August or

2    September of 2021.  And once that judgment was acquired by

3    Sunny Skies Capital, Sunny Skies Capital attempted to start to

4    collect on the judgments against Mr. Baker.

5         Q.   What was the approximate amount of the judgment?

6         A.   It was about $4,500, in that range.

7         Q.   Okay.

8         A.   So small claims matter.

9              After the judgment was obtained, Sunny Skies filed

10   for various writs of execution, two of which sought to seize

11   ownership of Sunrise at Spanish Terrace or SAST and Foxtrot.

12        Q.   And those are -- so the judgment that Mr. Grimmer

13   obtained from small claims court was against Mr. Baker.

14        A.   That's correct.

15        Q.   And then he took that and tried to take over

16   entities owned by Staci Baker?

17        A.   That's correct.

18        Q.   Did Matt Baker at the time have any interest in

19   those entities that were owned by Staci Baker?

20        A.   No.  Based on the publicly or the documents that

21   have been presented today, the operating agreement and the --

22   the operating agreements and the assignments, it showed that

23   Staci Baker acquired full ownership of SAST in approximately

24   April of 2019 and that she acquired full ownership of Foxtrot

25   in approximately August of 2021.

1        Q.   Okay.

2        A.   Both of which predated the entry of the judgment

3   and then also the writs of execution.

4        Q.   Okay.  And so I guess what happened next with

5   those -- how did that lead to the lawsuits?

6        A.   So after the writs of execution were issued,

7   ultimately constable sales were held, and in those constable

8   sales the ownership of Foxtrot and SAST were auctioned for

9   sale and ultimately acquired I believe a credit bid by Sunny

10  Skies.  And Mr. Grimmer represented Sunny Skies at both of

11  those separate auctions.

12       Q.   Were those writs of execution properly obtained?

13       A.   No.  In fact, we have argued and have papers

14  pending before state courts that argue that such writs were

15  improper under Utah Code Section 48 essentially, that they had

16  to obtain a charging order, which was never acquired.  Instead

17  they short -- or did an end run around the Utah Code that

18  provides how you obtain ownership interest in an LLC and

19  instead got the writs of execution.

20       Q.   Okay.

21       A.   And that is currently the subject of two of the

22  three cases that we are litigating.

23       Q.   Okay.  Has Mr. Grimmer through his entity Sunny

24  Skies been fairly aggressive in trying to seize the assets of

25  Mr. Baker?

1          A.    Yes.  To my understanding, yes, including by

2    attempting to seize various LLCs through that same process by

3    obtaining writs of execution and then seeking to foreclose

4    upon them or execute upon them through a constable sale.

5          Q.    And has he also been aggressive in trying to seize

6    assets and money that belongs to Staci Baker?

7          A.    It is my understanding that he has, yes.

8          Q.    Okay.  Well, including it sounds like he's claiming

9    ownership of entities that are clearly owned by her.

10         A.    That is correct.

11         Q.    And then trying to obtain the assets of those

12   entities; is that right?

13         A.    Yes.  I'm not sure -- I mean, by attempting to

14   obtain the assets, I guess I'm not sure what you mean.

15         Q.    Okay.

16         A.    I would say that he has filed claims.  For example,

17   the claim that was filed by -- a case that was filed by

18   Sunrise at Spanish Terrace against Mrs. Baker is one of those

19   attempts to obtain money or funds from the judgment -- or

20   pardon me, the execution upon SAST.

21         Q.    Okay.

22         A.    And so that's the genesis of that lawsuit, is after

23   Sunny Skies purportedly foreclosed upon the ownership interest

24   of SAST they then filed a lawsuit against Staci Baker alleging

25   that when Staci had placed certain liens on property that was

                                                              163

```
 1    owned by SAST they were wrongful liens, and he had demanded

 2    money I believe to the -- not he, pardon me, Sunny Skies

 3    through their counsel had demanded approximately $2 million as

 4    payment for those wrongful liens and other associated claims.

 5    But that was the genesis of the SAST claim.

 6         Q.   And is it fair to say in each of these three cases

 7    and in particular the Sunrise at Spanish Terrace lawsuit and

 8    the Sunny Skies lawsuit where they're listed as a plaintiff

 9    that there's been several filings by both parties?

10         A.   That's correct.

11         Q.   And those are all public record?

12         A.   Yes, they are.

13         Q.   And you have laid out in your filings in memos and

14    motions with the Court the ownership history of Sunrise at

15    Spanish Terrace; is that correct?

16         A.   That is correct.

17         Q.   Okay.

18         A.   And all of that is publicly available on the record

19    in those two cases.

20              MR. CRANE:  I'll pass the witness.

21              THE COURT:  Thank you.

22              Miss Muyskens?

23                         CROSS-EXAMINATION

24    BY MS. MUYSKENS:

25         Q.   What personal knowledge do you have regarding
```

1    whether the defendant failed to comply with the Internet

2    provisions required under his pretrial release order?

3        A.   None.

4        Q.   Okay.  What information do you have as to, personal

5    information as to whether the defendant possessed a firearm,

6    ammunition or device on about March 30th of 2022?

7        A.   None.

8        Q.   And what information do you have regarding whether

9    the defendant obtained approval to transfer assets in excess

10   of $1500 from his probation officer during this scope of his

11   supervision?

12       A.   I have no personal knowledge.

13       Q.   Okay.  And you weren't the attorney of record that

14   was on any sort of communication sent on June 9th of 2021 to

15   Charger Title, were you?

16       A.   No, I was not.

17       Q.   Okay.  And what personal knowledge do you have

18   regarding whether the defendant committed animal cruelty on or

19   about March 31st of 2022?

20       A.   No knowledge.

21       Q.   Thank you.

22            No further questions.

23            THE COURT:  Thank you.

24            Mr. Crane?

25            MR. CRANE:  No further questions.  Thank you.

1                    THE COURT:  All right.  Thank you.  You may step

2      down.

3                    MR. CRANE:  I call Mr. Baker.

4                    THE CLERK:  Please raise your right hand.

5                              MATTHEW BAKER,

6           called as a witness at the request of Defendant,

7                having been first duly sworn, was examined

8                          and testified as follows:

9                    THE CLERK:  If so please say I do.

10                   THE WITNESS:  I do.

11                   THE COURT:  Thank you.

12                            DIRECT EXAMINATION

13      BY MR. CRANE:

14           Q.   Mr. Baker, please state your name and spell it for

15      the record.

16           A.   Matthew Baker.  M-A-T-T-H-E-W, B-A-K-E-R.

17           Q.   Thank you.  Mr. Baker, I want to go through the

18      allegations that you reviewed here, and specifically six of

19      them.  I want to start first with, where do you currently

20      live?

21           A.   At 7825 South River Bottom Road in Spanish Fork.

22           Q.   When did you move into that house?

23           A.   Approximately October-November of last year.

24           Q.   Okay.  And prior to that you were living in an Orem

25      house; is that correct?

```
1              A.    That's correct.

2              Q.    All right.  When you moved, did you inform your

3     pretrial officer that you were moving?

4              A.    Yes, I did.

5              Q.    And you were given permission to move?

6              A.    That's correct.

7              Q.    Okay.  With the Orem residence do you ever spend

8     the night there?  Do you live there?

9              A.    No.

10             Q.    Okay.  Where do you primarily reside?

11             A.    I completely reside at River Bottom Drive in

12    Spanish Fork.

13             Q.    Okay.  Is there still some personal effects at the

14    Orem house?

15             A.    There were a few, yes.

16             Q.    Okay.  But do you go to that house very often?

17             A.    From time to time.

18             Q.    Okay.  At your home in Orem who do you live with?

19    Excuse me, in Spanish Fork.

20             A.    I live with my wife and my four children.

21             Q.    What are the ages of your children?

22             A.    I have a six-year-old daughter, twin boys that are

23    five years old, and then I have a daughter who is 14 months.

24             Q.    Okay.  At that home in your master bedroom there's

25    been an allegation that some ammunition was found in your
```

```
1    bedroom.  Are you familiar with the dresser drawers where a

2    box of ammo was found?

3            A.   I am through the pictures, yes.

4            Q.   Okay.  Do you recognize that drawer, that dresser?

5            A.   I do.

6            Q.   Whose dresser drawer is it?

7            A.   It's my wife's dresser.

8            Q.   In the drawer where the ammo was found do you have

9    any personal effects of your own in there?

10           A.   Not that I'm aware of.

11           Q.   Okay.  Did you know that there was ammunition in

12   that drawer?

13           A.   I did not.

14           Q.   You know when it got there?

15           A.   I don't.

16           Q.   Okay.  Were you aware of the condition that you

17   could not own or possess firearms or ammunition?

18           A.   I was, yes.  I am.

19           Q.   And prior to your criminal case and including the

20   prior one, you did own firearms; is that right?

21           A.   Yes, I did.

22           Q.   What did you do when you were first indicted clear

23   back on the first case regarding the firearms and the

24   ammunition?

25           A.   When I was made aware that I needed to get rid of
```

168

1    them, I had probably approximately 20 firearms and several

2    thousand rounds of ammunition, and I got rid of all of them.

3         Q.   Okay.  And did you keep any ammunition?

4         A.   No.

5         Q.   To your knowledge all ammunition was out of the

6    house.

7         A.   I attempted to comply in every which way I could

8    with the requirement not to have those.

9         Q.   Okay.  The dresser drawer, where was it physically

10   located in the master bedroom?

11        A.   Well, there's two sides of the bed, obviously.

12   There's a dresser on one side which I sleep on which was my

13   dresser; on the other side our, you know, 14-month old baby

14   sleeps in her crib, and there's a dresser right next to it,

15   and it's on my wife's side of the room.

16        Q.   So the ammunition was found in the dresser near the

17   crib?

18        A.   That's correct.

19        Q.   On your wife's side of the room, you said?

20        A.   That's correct.

21        Q.   Okay.  And your dresser that you use for your

22   clothes is located closer on the other side of the room?

23        A.   Yes.  Right next to my side of the bed.

24        Q.   Okay.  There was also ammunition found in a bag

25   that contained some money.  Were you aware there was

```
 1    ammunition in that bag?

 2         A.    I was not.

 3         Q.    Whose bag, whose money is that?

 4         A.    That's my wife's.

 5         Q.    Did you ever get into that bag?

 6         A.    No.

 7         Q.    Why not?

 8         A.    First of all, to be quite frank I wasn't aware

 9    where it was or that it existed.  I knew she had some cash

10    somewhere put away, but that's all I knew.

11         Q.    Okay.  Did you know that there was ammunition in

12    that bag?

13         A.    I did not.

14         Q.    If you knew there was ammunition in that bag, what

15    would you have done?

16         A.    I would have made sure it was removed.

17         Q.    Was there any firearms in the home?

18         A.    No.

19         Q.    There was a bayonet sword that was located at the

20    Orem house.  Were you aware of that bayonet?

21         A.    I was vaguely aware of it.  My wife had brought it

22    with her possessions when she got married -- when we got

23    married.  She'd shown it to me a number of years, four or five

24    or six years previously, told me a little bit about it.  I of

25    course had forgotten entirely about it.
```

```
 1        Q.   Is that a bayonet she found when she was a small

 2   child?

 3        A.   She did.  She found it in a ravine behind her home

 4   she said when she was playing, growing up.

 5        Q.   Okay.  And she's kept it ever since?

 6        A.   Yeah.

 7        Q.   Is it something you ever used or had access -- I

 8   mean ever used in any way?

 9        A.   I don't have any skills with a sword, no.  I

10   haven't taken any sword classes, so no.

11        Q.   Okay.  What's the general condition of that

12   bayonet?

13        A.   It's clearly -- I mean, it was found in a ravine.

14   It's clearly old and rusty.

15        Q.   Was it sharp?

16        A.   I never inspected it for sharpness.  I doubt that

17   it was sharp enough to cut anything with.

18        Q.   Okay.  When you -- you were at one point supervised

19   by pretrial Officer Law; is that right?

20        A.   That's correct.

21        Q.   Okay.  When you began your supervision, were you

22   living at the Orem house?

23        A.   Correct.

24        Q.   And as part of -- when you first became on

25   supervision is it fair to say you had a lot of questions about
```

1    what you could or could not do?

2         A.    I did have some questions, yes.

3         Q.    Okay.  And did you discuss those with Officer Law?

4         A.    I did.

5         Q.    Was one of those regarding the requirement that you

6    not transfer $1500 in assets?

7         A.    Yes, it was.

8         Q.    What was your conversations with Officer Law?

9         A.    I actually had two different conversations with him

10   in that regard.  Initially I asked him about that requirement

11   and how it applied.  I indicated to him that I had multiple

12   bills every month such as mortgages as well as attorney's fees

13   that were well in excess of the $1500 requirement.  And I

14   asked him if that was something that he wanted or needed to

15   have be approved.

16        Q.    What did he tell you?

17        A.    At that point he indicated, well, I'm not really

18   sure.  I'm not familiar with the case.  You need to check with

19   your attorneys.  So I went and checked with counsel, and

20   essentially the response that I got was, well, you need to

21   check with your probation officer.

22        Q.    Okay.

23        A.    So then I went back to the probation officer, and

24   he said -- and discussed it with him.  And at that point we

25   had the discussion about in general I think that the condition

1    was, my understanding in discussion with him the condition was

2    there was a claim that the government was making that I was

3    attempting to hide assets, and this condition was an attempt

4    to not allow that to happen or not have that be a problem.

5    And in discussion with him paying my monthly bills didn't have

6    anything to do with the underlying reason of hiding assets

7    from the government and completely arbitrary number, you know,

8    $1500 a transfer.

9           So after having that discussion with him, my

10   conclusion and understanding with him was that those things

11   that were routine monthly bills such as mortgages and/or

12   attorney's fees are not things that needed to be brought to

13   him and discussed or approved as they didn't relate to hiding

14   assets from the government.

15        Q.   Okay.  So your understanding from Officer Law that

16   he didn't -- you didn't need to inform him about regular

17   monthly bills; is that right?

18        A.   Not my full understanding.  I expressly asked after

19   having that conversation.  He said those things wouldn't need

20   to be approved going forward.

21        Q.   Did Officer Law ever tell you something different

22   than that?

23        A.   He did not.

24        Q.   Did Officer King ever tell you something different

25   than that?

173

1          A.    He did not.

2          Q.    All right.  Did anyone from probation office tell

3     you something different than what Officer Law told you?

4          A.    Nobody ever did, no.

5          Q.    Okay.

6                Officer Law also had you fill out a sheet regarding

7     the computers in your home; is that right?

8          A.    He did, yes.

9          Q.    And let's go, so we're on the same page, it's

10    Government's Exhibit Number 5.  It's in the looseleaf there.

11         A.    Okay.

12         Q.    Do you recognize that document?

13         A.    I do.

14         Q.    Okay.  Are you the one that filled it out?

15         A.    I am.

16         Q.    Where were you living when you filled this out?

17         A.    In the Orem residence.

18         Q.    Okay.  Did you have questions about this document

19    as you were filling it out that you asked Officer Law?

20         A.    Yes, I did.

21         Q.    What were some of those questions?

22         A.    Well, again, specifically it was attempting to

23    understand what needed to be reported to him and what was

24    important in context with what the claims were and what the

25    provision restriction was meant to restrict.  And so along

1     those lines I asked him, well, what's important here?  What

2     does it mean to have access to a computer?  I explained to him

3     that I had a company, a business that had just been shut down

4     and I have at least 20 computers in storage.  Did he want me

5     to list each and every single one of those?

6          Q.    And that was from your hospice business?

7          A.    That was from that healthcare business, that's

8     correct.

9          Q.    Okay.

10         A.    I also told him, I mean, I can go to a friend or

11    neighbor's house and ask if I can use your computer, and

12    everybody's going to say, sure.  No problem.  Does that

13    constitute access that I need to, you know, get the numbers of

14    all my friends and neighbors?  I can go to the library or

15    kiosk and have access.  I mean, am I supposed to get those

16    numbers from you or what?  So I was unclear, like I'm not sure

17    what I'm supposed to put on here.

18              Again, we had the same discussion in context

19    specifically the method by which the government's claiming

20    that I'm hiding assets is by getting onto the state website

21    and changing the, you know, the manager on an LLC, which can

22    be reviewed from the other end.

23              So the question was in context, I mean, what's

24    critical here?  You know, what's appropriate and what needs to

25    be listed?  And in that context he indicated to me that, you

1    know, what you're using for your online access, your Internet

2    access is an appropriate thing to be listed.  And in that

3    again specifically asked him, well, I mean, again, my wife's

4    got a computer downstairs.  I don't use it, but I can clearly

5    go access it.  Do I need to list those?  He indicated no.

6    Just list the primary computer that I use, which was the

7    computer that I was using to access and get online.  I didn't

8    have a business.  I didn't have employment at that point, so

9    that was my primary computer.  And he indicated just to list

10   that one.

11        Q.   Okay.  So of the computers in your home, you listed

12   one after this conversation with Officer Law?

13        A.   That's correct.

14        Q.   You use one computer for your personal use; is that

15   right?

16        A.   Yes.

17        Q.   Okay.  Do your children use computers in your home?

18        A.   They do, yes.

19        Q.   And do they do that for schoolwork, for play or

20   both or what?

21        A.   For both.  Yeah.  They have educational programs as

22   well as some of their schoolwork.

23        Q.   And in your Spanish Fork home, where are the

24   computers located that were used by your children?

25        A.   The children interestingly all seemed to want to

1      play on the computer all at the same time, you know, when

2      somebody else is doing it.  So we set up two different

3      computers, one of them so that whenever one jumped on the

4      other one could go also on the computer.  One was located in

5      the laundry room, and the other one was located out in the

6      front kitchen dining room area.

7           Q.   Okay.  And the computer that you used, that was

8      located in the basement of the Spanish Fork home?

9           A.   That is correct.

10          Q.   All right.  When you moved from the Orem home to

11     the Spanish Fork home, were you asked to update this computer

12     Internet monitoring questionnaire?

13          A.   I was not.

14          Q.   So here on the first page where it says, where is

15     the computer located?  Upstairs office, is what you wrote.

16     What was that referring to?

17          A.   I was referring to the location of my computer when

18     I was living in the Orem residence.

19          Q.   And if would have updated that for your Spanish

20     Fork home what would you have put there?

21          A.   I would have said downstairs office.

22          Q.   Okay.  This document doesn't list any thumb drives.

23     Is there a reason for that or external storage devices?

24          A.   Yeah.  Similar to the same discussion.  Again I had

25     a discussion with Officer Law about that, and I had a couple

1       of thumb drives that were evidence from the government in my

2       case.  I had blank CDs or thumb drives that are used to submit

3       large amounts of information when you're doing things.  And

4       I've said, you know, I've got a set here, you know, comes in a

5       five pack of memory cards, and I haven't used any of them.  Am

6       I supposed to list those on there?

7               And again, his response was, his advice to me was,

8       well, if you're not using those things, you know, if you have

9       them, if they're not being used there wasn't -- in the context

10      they didn't have anything to do with the underlying claims and

11      therefore wasn't really relevant to list them.

12      Q.   But you understood that being on pretrial

13      supervision pretrial had a right to monitor your computers and

14      you had agreed to that; is that correct?

15      A.   Yeah.  The agreement here is fairly explicit and

16      indicates a lot of different things that they could do.  They

17      could monitor it, they could put software on it.  That

18      indicates that the probation officer would actually would

19      monitor it, affirmatively would monitor it and would make sure

20      that I was in cooperation.

21      Q.   Okay.  Did they ever ask to put monitoring software

22      on your computer?

23      A.   They did not.

24      Q.   You heard Officer King testify that you had told

25      him that the family's primary source of support was your

178

1   wife's dog breeding business.  Are you an owner or part owner
2   with her in that business?
3        A.   I do not have any ownership in the business, no.
4        Q.   Okay.  Who started that business?
5        A.   My wife did.
6        Q.   Who was responsible for the financials for that
7   business?
8        A.   My wife.
9        Q.   Who ran the businesses website?
10       A.   My wife.
11       Q.   Who did -- who would access chat rooms to talk with
12   other breeders and the kennel association?
13       A.   I understood my wife did some of that stuff.
14       Q.   Okay.  Did you do any of that?
15       A.   No.
16       Q.   What was your role in that business?
17       A.   My role mostly was to assist my wife with things
18   that were needed.  So I assisted with -- I mean, we discussed
19   strategies and marketing and things like that.  I helped with
20   infrastructure, with kennels and stuff like that.  And from
21   time to time I would help out with, you know, when she was
22   busy or unable or had something come up I would help her with
23   feeding and/or watering them.
24       Q.   Okay.  Ultimately who was responsible for that
25   business?

1           A.    My wife.

2           Q.    If there was a decision to be made who would make

3      it?

4           A.    Well, like most things in our marriage we discuss

5      them.  But they were ultimately, it was her business.  She

6      would make the decisions.  It's her business.

7           Q.    Okay.  Okay.  You heard Officer King question your

8      health claims based upon observations from some third parties

9      that you were moving things.  Tell us about your health.

10          A.    Yeah.  I was rather surprised actually to see those

11     claims made in there that somehow that I don't have serious

12     medical issues or conditions.  I'm not quite sure how he

13     believed that, he derived that.

14          Q.    Answer me this, Mr. Baker.  When did your health

15     problems begin?

16          A.    Sorry.  It's kind of a long answer so I was getting

17     to it.

18          Q.    It's all right.  I'm going to focus you in a little

19     bit.

20          A.    So I initially began having some health issues

21     about eight or nine years ago in about 2013 or 2014.

22     Initially I started having numbness, tingling pain in my

23     extremities, and over the next year or so that spread pretty

24     much throughout my entire body.  So pretty much for the last

25     seven or eight years I have constant pain pretty much

1     everywhere.  It's worse in my extremities and my legs and feet

2     and arms.  But there's some pretty much constant nonstop pain

3     that I have and a lot of numbness.

4            We went and over the course of several years have

5     tried all different kinds of things.  We've seen a lot of

6     doctors, a lot of specialists, attempted to find some kind of

7     help or resolution or improvement in it.  To be quite honest

8     we really haven't found anything that's been very helpful.

9     I've been diagnosed with Lyme disease, fibromyalgia, chronic

10    fatigue syndrome as well as arthritis.

11           Q.   Do you suffer from an inflammation of the muscles?

12    Is that part of the problems?

13           A.   Yeah.  I mean, I suffer from -- yeah.  I have pain

14    in all of my muscles and all of my tendons, and it doesn't go

15    away.  And it probably is from inflammation.  I have to take

16    the diagnoses of my doctors, and that's what they say that I

17    have, but I'm not sure that we have resolved that issue.  But

18    it's not only -- obviously it's not only the pain I mentioned.

19    I've been diagnosed with chronic fatigue syndrome.  So I'm not

20    only tired, I'm exhausted.

21           Q.   Are there times when --

22           A.   Give me just a second.

23           Q.   Okay.

24           (Time lapse.)

25           THE WITNESS:  Sorry.  Forgive me.  I'm going to try

1    to get through this, but --

2         Q.   BY MR. CRANE:  Okay.  Let me ask a question.

3         A.   No.  I'd like to finish answering that.

4         Q.   Okay.

5         A.   I have constant fatigue.  There is not a waking

6    moment for the last eight years of my life that I'm not only

7    in pain but for the most part exhausted, as well.  And it

8    doesn't matter how much I sleep or what I do.  From the moment

9    I get up I'm tired and exhausted, and I pretty much have to

10   drag myself through the day.  The last couple years that's

11   meant seeing to and attending to the needs of three or four

12   small children.  But I pretty much get up when it's time for

13   them to get up, try to take care of their needs throughout the

14   day and then get them to bed at night.  I'm more in the habit

15   of snuggling them or sleeping with them.  But I'm usually the

16   first one to fall asleep with them because I'm exhausted.

17        So yeah, pretty much everything I do each and every

18   day it's through fatigue and exhaustion and pain.

19        Q.   So are there times when you're able to do things

20   like lift an object or move a dog gate, but other times that's

21   physically impossible?

22        A.   Yeah.  I'm able to do some of those things.

23   There's times actually when I have flare-ups and things that

24   are worse, and there's times when they're better.  But it

25   never goes away.  So, yeah, I don't deny at all that I'm able

1    to lift up a door or a bag of dog food or one of my kids to

2    take care of them.

3         Q.   But there's bad days where it's very difficult to

4    get out of bed or go and do those tasks.

5         A.   Pretty much every day it's difficult to get out of

6    bed.  I get out --

7              (Time lapse.)

8              THE COURT:  Mr. Crane, I think the point that

9    you're making on that is made.  And why don't you move on to

10   your next line of questioning.

11             MR. CRANE:  Sure.  Thank you.

12             THE WITNESS:  I get out of bed every day to take

13   care of my children.  That's why I get out of my bed.

14        Q.   BY MR. CRANE:  Okay.  Let's move to Government's

15   Exhibit Number 8.  Do you have that in front of you?

16        A.   I do.

17        Q.   What can you tell us about this check that you

18   received from Trustee Hofmann?

19        A.   This check was the -- excuse me for a second.

20             This check is the leftover proceeds from the sale

21   of a property in Provo called Center Street property.  It was

22   the only asset that Foxtrot United held.

23        Q.   Was that Center Street property in bankruptcy?

24        A.   It was put into bankruptcy in 2020.  And actually

25   the property itself was sold in I believe March of 2021, last

1    year.

2         Q.    Okay.  When the property went into bankruptcy in

3    2020, that's when Foxtrot lost its ownership and control of

4    the Center Street property; is that right?

5         A.    Yes.

6         Q.    Okay.  And the proceeds the bankruptcy here,

7    meaning that the trustee sold the property, paid off all of

8    the creditors, and this was what was left over from the

9    proceeds from that sale; is that right?

10        A.    That's correct.  The sale, as I mentioned it,

11   happened in March of last year.  I had had a couple

12   conversations with him, and he indicated that they were

13   finalizing the accounting and making sure everybody was paid

14   off and then the proceeds would be disbursed, which took

15   approximately another eight months.

16        Q.    Okay.  So when you transferred ownership of Foxtrot

17   to Staci you were hopeful that there would be at some point in

18   the future proceeds from the bankruptcy sale; is that right?

19        A.    Well, I was expecting proceeds from the bankruptcy

20   sales.  Mr. Hofmann had indicated to me that there were

21   proceeds, which is the final accounting to take place.

22        Q.    Okay.  So on August 18, 2021, when you transferred

23   ownership you reserved the right to any proceeds that were to

24   paid; is that correct?

25        A.    That's what I attempted to do, yes.

```
 1        Q.   Okay.  So what was the value?  What assets did

 2   Foxtrot own on August 18, 2021?

 3        A.   I don't believe it owned any assets.  The only

 4   thing it had actually was a liability that was involved in a

 5   lawsuit.

 6        Q.   Okay.  So its value was zero or maybe less than

 7   zero depending on that lawsuit.

 8        A.   I would probably put it at less than zero.

 9        Q.   Okay.

10        A.   It had, again it was in the lawsuit and there were

11   legal fees that it needed to pay.

12        Q.   Okay.  You go to Government's Exhibit Number 9.

13        A.   Okay.

14        Q.   Do you see that's a wire of $200,000 to Gregory

15   Hoole.  Who's Gregory Hoole?

16        A.   Gregory Hoole, Greg Hoole actually represents me

17   quite often and has represented me in several civil matters in

18   the past, although he's been closely involved with some of my

19   criminal defense because there's an overlap.

20        Q.   Okay.  And this payment to him, this was for legal

21   fees?

22        A.   This was --

23        Q.   Or retainer for future legal fees?

24        A.   -- a retainer for fees as well as for legal fees

25   for work that had already been done, yes.
```

1     Q.   Okay.  Why was this not disclosed to your pretrial

2     officer?

3     A.   Well, I think that there's probably three bases or

4     reasons for why it was not disclosed, the first one being that

5     as I had discussed with Officer Law my normal ordinary bills

6     and invoices for attorney's fees were religious to add their

7     expenses, and there's no hiding assets from the government

8     underlying tone here.  And so for that reason it didn't need

9     to be disclosed.

10         Additionally -- and I'm a person who takes

11    responsibility for their actions and decisions and choices

12    they make and I'm not one to try to hide or shift stuff on

13    somebody else.  And I take responsibility, always have.

14         In this instance whether I got bad advice or

15    whether I misunderstood the discussion and the advice that I

16    had with counsel, my understanding at the time was that the

17    conditions restricting me from transferring the $1500 were

18    based on the claim that the government had made that they were

19    owed money and that I was hiding assets from them.  And those

20    claims, Counts 1 and 2 of the indictment have been dismissed

21    several months previous to this.  There were two outstanding

22    counts on the indictment, but they had nothing to do with

23    hiding money from the government.  And I had understood that

24    the restriction, the prohibition of the $1500 was tied

25    directly to transferring -- to the claim that I was hiding

1    funds from the government in Counts 1 and 2.

2           And when those were dismissed, again, whether I was

3    given bad advice or if I misunderstood many of the discussions

4    that we had, I understood that those provisions no longer

5    applied, so that was my understanding.  It's been explained to

6    me since that those would have required a court order to go

7    back and have those addressed.  In hindsight that makes great

8    sense.  But it's not what I understood at the time.

9           Q.   Early on you had spoken to Mr. Law about legal fees

10   that you had that were ongoing.  And I believe your testimony

11   was that Mr. Law didn't need to know about each one of those

12   payments; am I misstating that?

13          A.   That's correct.

14          Q.   Okay.

15          A.   So, yeah.  My ongoing expenses which I spoke with

16   him were mortgages, and I clearly had legal fees every single

17   month.  They were greatly in excess of $1500 just for my

18   criminal defense.  So I explained that to him, and he

19   acknowledged that paying for your criminal defense probably

20   isn't one of the things we're looking at.

21          Q.   Okay.  Go to Government's Exhibit Number 10.

22          A.   Okay.

23          Q.   This is a check to you in the amount of $628,000.

24   And why did you -- what happened here with this cashier's

25   check?

1          A.    Umm, well, to explain this one I need to back up

2     just a little bit.  I know we've talked and touched on

3     Mr. Grimmer --

4          Q.    Right.

5          A.    -- and his suits.  To be quite frank, I guess I've

6     become fairly well aware of the legal process and what's

7     appropriate and what's not appropriate and what needed to be,

8     conditions needed to be followed.  Also I've become aware from

9     a recent 302, one of the ones that were discussed that

10    Miss Garland prepared that had both Grimmer and his partner

11    Jacob in it, and I'll call it the Grimmer 302, I became aware

12    that Mr. Grimmer -- I guess I have to step back further than

13    that.

14         Q.    Mr. Baker, let's -- for this check I think what's

15    helpful and relevant to the Court is, what did you know at the

16    time?  What was going on there?  Not what you learned

17    previously.

18         A.    Okay.

19         Q.    Let's talk about what led you to get this check.

20         A.    So at the time approximately on -- there was to be

21    a constable sale held on the 22nd of December for all of my

22    interest in Foxtrot United.  I did not receive -- as has been

23    discussed Mr. Grimmer obtained these writs of execution.  I

24    was not aware of the writs of execution, nor was I aware, was

25    I given proper notice or any notice that this sale was being

1  held.  It just happened that my wife actually saw the posted

2  notice at the courthouse a couple days prior to the sale.

3          We were attempting to get some counsel in that

4  regard to see what was going on, but the sale was to be held

5  on the 22nd.  And --

6      Q.    December 22nd?

7      A.    December 22nd.  And even though I held no interest

8  in Foxtrot, I had already transferred that, I didn't want

9  Mr. Grimmer to have some kind of claim of action that he

10  somehow believed that he might have some entitlement to the

11  funds or that he might in some method move to seize or hold

12  the funds.

13          And so wanting to avoid that, the day prior to the

14  sale I transferred the funds out of Fox Trot's account into my

15  personal account at the same institution.  And then the sale,

16  the purported sale of my interest in the entity were held the

17  next day.

18      Q.    Okay.  So these -- was this an attempt to hide

19  money from your pretrial officer?

20      A.    No.

21      Q.    Now you said that you transferred it out of

22  Foxtrot's account.  At this time the bank account was still in

23  your name?

24      A.    Well, I'm not sure what you mean by "in my name."

25  It was in Foxtrot's, LLC's, name, but I was the associated

1     member with it.

2           Q.   You had signatory authority on that account.

3           A.   Yes.

4           Q.   And prior to this bankruptcy money coming into it,

5     the account balance was low or zero?

6           A.   Yeah.  It probably would have been less than

7     $1,000.  Yes.

8           Q.   Okay.  Is there any reason why the account was not

9     transferred to Staci when the entity was transferred to her?

10          A.   Yes.  Because I had exclusively reserved those

11    rights and those interests in those proceeds to myself.  At

12    the time to be frank, I didn't know what method the trustee

13    would issue the check.  And so, yeah, he issued it in the name

14    of Foxtrot, so I deposited it in my previous Foxtrot account.

15          Q.   Okay.  Based upon this trustee sale or the actions

16    by Grimmer and going after your assets and Staci's asset, does

17    she make -- did she similarly move funds between accounts?

18          A.   Well --

19          Q.   Well, let me strike that.

20               Let me show you what we're going to offer as

21    Defendant's proposed Exhibit Number 13.  Do you recognize

22    this?

23          A.   I do recognize that.

24          Q.   What is it?

25          A.   It's a check that's written out of my wife's

1    checking account for SAST, Sunrise at Spanish Terrace.  And

2    it's a transfer of funds to another LLC she holds or owns

3    called S4M, LLC.

4              MR. CRANE:  Your Honor, move to admit Exhibit 13.

5              MS. MUYSKENS:  No objection.

6              THE COURT:  Admitted.

7         (Whereupon, Defendant's Exhibit 13 was received.)

8         Q.   BY MR. CRANE:  So Sunrise at Spanish Terrace, this

9    check is dated February 3rd, 2022, on Sunrise at Spanish

10   Terrace account.  And Staci was the owner of Sunrise at

11   Spanish Terrace at this time; is that correct?

12        A.   That's correct.

13        Q.   And in the signature line that's Staci's signature?

14        A.   It is.

15        Q.   All right.  And it's paid to the order of S4M, LLC.

16   Are you familiar with that entity?

17        A.   Yes.

18        Q.   What is that?

19        A.   Again, it's an LLC that my wife holds.

20        Q.   What does S4M stand for?

21        A.   I don't remember exactly, but I believe it stands

22   for Staci's Maple Mountain Money Management.

23        Q.   So Maple Mountain Money Management, four Ms?

24        A.   Is the four Ms.

25        Q.   That's 4M.  Okay.  So tell us about this check and

1    why she wrote the check from Sunrise at Spanish Terrace to

2    S4M.

3         A.    Okay.  In order to do that I'll have to back up a

4    little bit because there was quite a bit that intervened

5    between December 21st when I transferred the funds from

6    Foxtrot to my personal account in the same institution.

7         Q.    December 21st, 2021.

8         A.    2021.

9         Q.    Okay.  Go ahead.

10        A.    That was done prior to the purported sale that

11   happened by Grimmer on December 22nd of Foxtrot.  When we

12   attended that sale we were informed that there had been a

13   prior sale about a month previous where Grimmer had also sold

14   Sunrise at Spanish Terrace.  We weren't aware of that until

15   that point.  At that point I said, we thought, oh, wow, he's

16   purchased interest in two LLCs, interest by credit bidding in

17   two LLCs that we have, I have no ownership in.  So I thought

18   oh, well, that's probably the end of it.  No big deal.

19               Not long after that, I believe the date was about

20   January 10th of this year, Staci received an e-mail

21   communication from Mr. Grimmer.  And attached to that e-mail

22   was what I would call, there was a proposed complaint as well

23   as a settlement agreement, a prewritten settlement agreement,

24   and a letter which I would indicate was not -- I've seen

25   demand letters before.  I would characterize it not as a

1    demand letter, but as an extortion letter, letter of

2    extortion.

3         Q.   So he was threatening civil litigation but also

4    criminal prosecution?

5         A.   Well, his threat was that he made a claim that --

6    and to be honest with you, the whole claim is not even

7    comprehendible to me, so it's kind of hard to explain it.  But

8    in essence his claim was that the lien that Staci had put on

9    her own property six months prior to him even being

10   purportedly gaining interest in it by purchasing an interest I

11   didn't have had somehow defrauded him after the fact and that

12   he was entitled to three times the amount of the funds, which

13   was 2.35 million, so we're talking about at least, about

14   $7 million there.  Plus he claimed that he was on a

15   contingency fee or some kind of a fee on top of that.  So

16   something in excess of $7 million.

17            He also indicated that he was aware that I was on

18   probation and under indictment, and that these type of

19   allegations I probably wouldn't want to be made public.  But

20   if we could sign the settlement agreement, which he had

21   totally prepared, completely prepared with the only thing

22   blank was the amount of the settlement.  But if we could come

23   to terms on that, then he wouldn't pursue it any further and

24   these claims wouldn't be made public.

25        Q.   And he was seeking millions from Staci and you.

1          A.    It appeared so, yes.

2          Q.    Okay.  And so when we go back to Government's

3     Exhibit Number 10, this December 21, 2021, check, that was the

4     day before the December 22nd constable sale that Grimmer was

5     involved with?

6          A.    That's correct.

7          Q.    Okay.

8          A.    And this check, I apologize it's a long way of

9     getting to your answer.  But this check here on

10    February 3rd -- so that was on the 10th, again, illegally and

11    improperly he claimed that sending the e-mail to Staci was

12    proper service and that he was going to file it if she didn't

13    respond.  We responded that we weren't going to entertain his

14    complaint or his settlement.

15          Not long after that he did file it and started

16    issuing -- he also indicated at the time that he changed the

17    names on Staci's LLCs with the Department of Commerce, that he

18    removed her as the manager on her own LLCs and put his own

19    information in there.  And after having done that, then he

20    began -- he filed a lawsuit against Staci -- against Staci

21    with her own LLC and worded it very craftily to indicate that

22    he was the owner of the LLC and that he was therefore suing

23    her for something that she had done.

24          Q.    Okay.

25          A.    But he also began started issuing subpoenas to our

1    financial institutions including Foxtrot United's bank account

2    at Sunrise -- at Security First Credit Union.  And on that

3    subpoena for documents from Security First Credit Union for

4    Foxtrot, he also put on there that this is an account that is

5    linked to Matt Baker.  And he my Social Security number, date

6    of birth and other information.

7              So we were in the process of getting new counsel.

8    I attempted to use Greg Hoole, who I had used on quite a few

9    civil matters, but he had a conflict.  So we started looking

10   for other counsel to represent Staci.

11        Q.   This is when he spoke with Mr. Jeff Gross?

12        A.   Yes.  One of the people we spoke to, and he entered

13   an appearance with Jeff Gross.

14        Q.   An appearance in this civil case --

15        A.   In the civil cases.

16        Q.   -- involving Mr. Grimmer?

17        A.   That's correct.

18        Q.   Okay.

19        A.   And the suits from Mr. Grimmer against Staci.

20             During this discussion I explained to him that

21   there was -- that he'd issued these subpoenas and that Staci

22   had -- and that he went and changed the information on the

23   state website regarding ownership of the entities, and we were

24   concerned about what he was going to do.  We also indicated

25   that we had funds in these accounts that we were concerned,

1    you know, what actions he might take.

2            The advice I got from counsel was to move those

3    funds so that he somehow didn't inappropriately seize or

4    freeze or somehow get his hands on them because even if it was

5    inappropriate, it's much harder to get the money back than it

6    is ever to hold onto it to begin with.  So he advised that we

7    transfer the funds out of those accounts so that they would --

8    so that Mr. Grimmer wouldn't have access to them.

9            So on February 3rd, again, long answer to your

10   question.  But on February 3rd we took steps to transfer the

11   funds from two different accounts, both of which were

12   entities, the accounts for entities that Mr. Grimmer was going

13   after.  The one was Sunrise at Spanish Terrace.  And these

14   funds that were sitting in there had been in there for almost

15   eight months since the closing of the sale in June of the

16   previous year.  They had been sitting there for the entire

17   time.  And this is the balance of the funds that were there.

18   So we had Staci transfer her funds, even though Mr. Grimmer

19   would never have any right or claim to them.  But out of an

20   abundance of caution so he didn't accidentally seize them, she

21   transferred the funds out of the Sunrise at Spanish Terrace

22   account into a different LLC; S4M, LLC, that she owned.

23       Q.   And that's Exhibit Number 13, Defendant's

24   Exhibit 13.

25       A.   And I did the same thing.  That same day,

                                                              196

1        February 3rd, we were concerned that if we left the funds

2        anywhere in an account that Mr. Grimmer had already subpoenaed

3        and was getting documents on that he might somehow seize or

4        freeze them again.  And so we went and transferred the

5        remaining balance in my account, but it was proceeds from the

6        sale with Foxtrot, into this same LLC that Staci held.  And in

7        the entirety -- in the primary -- the only purpose was those

8        funds still sit will today.  They haven't been touched or

9        moved or expensed or anything else.  They sit there as they

10       were.  The entire -- the intended purpose was to keep them so

11       that Mr. Grimmer didn't get his hands on them.

12           Q.   Okay.

13           A.   And my mindset at the time, I would like to add,

14       was that I was fully engaged in -- again, I have a fairly good

15       understanding of law and process, but I'll characterize it

16       this way because I don't know any better way of characterizing

17       it.  I had a wild man attorney out there that was using every

18       method that he could to not only harass but to intimidate and

19       attempt to extort Staci and I, and we didn't know what his

20       next move was going to be.  And so my mind was fully consumed

21       with attempting to mitigate that.  And to be frank, there was

22       no correlation or connection or even thought from me that, oh,

23       somehow by protecting this money I'm violating some

24       requirement that the government claims that I'm trying to hide

25       money from them.  It didn't even correlate in my mind.  It

1    didn't come up, didn't think of it.

2         Q.   Okay.  So when you're looking at Government's

3    Exhibit 12, your explanation you just gave would apply to

4    Government's Exhibit 12, as well?

5         A.   12 I'm assuming is the 600,000 transfer?

6         Q.   Yes.

7         A.   Okay.  Yes, I found it here.  So, yes.  If you

8    notice that was transferred on the exact same day.  Obviously

9    this is from an account I controlled, but it was related to

10   Foxtrot.  And it was transferred on the exact same day,

11   February 3rd, into the same exact account, the S4M account

12   that Staci has control of, to safeguard the money.

13        Q.   Okay.  Let's go to Government's Exhibit Number 11.

14        A.   Okay.

15        Q.   This is several checks here.  I believe we are only

16   going to focus on two.  I guess the second one down, is that a

17   payment to Utah County Treasurer?  Is that for taxes that were

18   owing for 2021?

19        A.   It is.  For property taxes, yes.

20        Q.   All right.  And then there's a $3,000 check for

21   SS Marine.  What was that for?

22        A.   It was actually for -- we had an older model boat

23   that had some engine damage, and I'd taken it into a boat

24   repair shop, and I believe it was actually late 2018, to have

25   some work done on it.  And then I was indicted, and a bunch of

1      other stuff transpired.  And it sat there for four years.  And

2      I actually had thought that they'd gotten rid of it, but they

3      gave me a phone call and said, hey, we have your boat here and

4      we would like to get paid for it.

5           Q.   Okay.  So that check was to pay the outstanding

6      balance to them?

7           A.   It was.

8           Q.   And then down at the bottom there's a

9      January 12, 2022, $10,000 to Tango 305.  What's this check

10     for?

11          A.   The Tango 305 account is used exclusively for

12     paying different mortgages.  And so it's -- there was, it had

13     repeatedly fallen short, and I was getting charged additional

14     fees and whatnot over the last year and a half.  So this was

15     just some additional funds to put in there to leave a little

16     bit of a balance so that the mortgages and other obligations

17     that I had, mortgage-type obligations could be paid.

18          Q.   Okay.  So that $10,000 was taken from your personal

19     account in order to satisfy your mortgage.

20          A.   Yes.

21          Q.   And that's part of the payments that you had

22     discussed with Officer Law clear back when you first were

23     under supervision; is that right?

24          A.   That's correct.

25          Q.   Okay.  Going to Defendant's Exhibit Number 2 in the

```
1    binder --

2         A.   Okay.

3         Q.   -- do you recognize that?

4         A.   A member assignment of interest?

5         Q.   Yeah.

6         A.   I do.

7         Q.   And that's your signature on this assignment of

8    interest?

9         A.   It is.

10             MR. CRANE:  And, Your Honor, I move to admit this

11   one if this one hasn't already been admitted.

12             THE COURT:  I have a note that it's been admitted.

13             MR CRANE:  Okay.  Perfect.

14        Q.   BY MR. CRANE:  And this you transferred all of

15   your, all your interest to Staci on April 14, 2019; is that

16   correct?

17        A.   That is correct.

18        Q.   Going to Government's Exhibit Number 5 -- excuse

19   me -- Defendant's Exhibit Number 5.  Do you recognize this

20   document?

21        A.   I do.

22        Q.   And this is a certificate of organization you filed

23   for Sunrise at Spanish Terrace back on July 30th, 2015?

24        A.   That's correct.

25             MR. CRANE:  I don't know if I admitted this, and I
```

1      apologize, Your Honor.  I'll move to admit this one.

2                  THE COURT:  Number 5 has already been admitted.

3                  MR. CRANE:  Perfect.  I guess boot and suspenders.

4      That's not even the term.  Belt and suspenders.

5                  THE COURT:  I get those wrong all the time, as

6      well.

7                  MR CRANE:  Can I have that erased from the record,

8      please?  I sound like an idiot.

9                  THE COURT:  Yes.

10         Q.   BY MR. CRANE:  Number -- Defendant's Exhibit

11     Number 6.  Do you recognize this document?

12         A.   I'm familiar with it, yes.

13         Q.   And what is it?

14         A.   It's the certificate of organization for BAG1

15     Funding, which is an LLC that Staci owns.

16         Q.   Okay.  And Staci is the one that filed this with

17     the State?

18         A.   It looks so, yes.

19         Q.   Okay.

20              Move to admit Defendant's Exhibit Number 6.

21              MS. MUYSKENS:  No objection.  I thought it was

22     already admitted.

23              THE COURT:  It was tentatively admitted while he --

24     yeah.  But it's admitted now.  Thanks.

25              MR. CRANE:  Thank you.

```
 1                    (Whereupon, Defendant's Exhibit 6 was received.)

 2          Q.   BY MR. CRANE:  And then let's go to Defendant's

 3     Exhibit Number 11.  I believe that was tentatively admitted,

 4     as well.

 5                    THE COURT:  That's correct.

 6          Q.   BY MR. CRANE:  Okay.  It doesn't have a tab.  It's

 7     probably a loose piece of paper.  It's the assignment of

 8     membership interest in Foxtrot.

 9          A.   Yes.

10          Q.   Do you see that there?

11          A.   Uh-huh (affirmative).

12          Q.   Do you recognize that document?

13          A.   I do.

14          Q.   And your signature is on this document dated

15     August 8th, 2021?

16          A.   August 18th, yes.

17          Q.   Yes.  Thank you.

18                    Move to admit August -- Exhibit 11, Defendant's

19     Exhibit 11.

20                    MS. MUYSKENS:  I have no objection.

21                    THE COURT:  Admitted.

22                    (Whereupon, Defendant's Exhibit 11 was received.)

23          Q.   BY MR. CRANE:  And this is the day that you

24     assigned 100-percent interest a member manager to Staci in

25     Foxtrot; is that right?
```

1          A.    That's correct.

2          Q.    And you specifically reserved the right to any

3     proceeds from the bankruptcy sale of the Center Street

4     property; is that correct?

5          A.    Correct.

6          Q.    Okay.  Let's turn to Defendant's -- excuse me --

7     Government's Exhibit Number 7.

8                THE COURT:  Mr. Crane?

9                MR. CRANE:  Yes.

10               THE COURT:  If you could give me a minute.  I'm

11    actually going to push back the obligation that I have at 2:30

12    because --

13               Do I have something else, too?

14               Okay.  Because I want to finish with the

15    questioning today before we leave so that's all done.  And

16    Miss Muyskens has or needs the opportunity to cross.  So if

17    you could give me a second so I can do that.

18               THE COURT:  Okay.

19               (Time lapse.)

20               THE COURT:  All right.  You may proceed.

21               MR CRANE:  Thank you, Your Honor.

22         Q.    BY MR. CRANE:  So I believe we were on Government's

23    Exhibit Number 7.  Do you have that in front of you?

24         A.    Yes.

25         Q.    Do you recognize this document?

1     A.    I'm familiar with it, yes.

2     Q.    Okay.  And it seems that the title company Charger

3     was attempting to verify who owned Sunrise at Spanish Terrace;

4     is that right?

5     A.    My interpretation of it would be that as a good

6     practice that the title company was wanting to ensure that

7     whoever they were having close on the transaction, meaning

8     Staci, that she actually had authority and rights and

9     ownership rights to Sunrise at Spanish Terrace and therefore

10    could they do that, yes.

11    Q.    So that's what they're attempting to verify?

12    A.    That's my understanding, yes.

13    Q.    Do you have a specific memory of sending this

14    e-mail?

15    A.    I don't, actually.

16    Q.    Do you have any memory of what was attached there,

17    the certificate of organization for Sunrise at Spanish

18    Terrace, at least Page 1 of that?

19    A.    No, not specifically.  Sending over these type of

20    documents is really a, you know, secretarial type duty just

21    submitting documents.  So it's nothing that did or would stand

22    out in my memory.

23    Q.    Okay.  But on June 9th of 2021, when this

24    information -- well, in June of 2021 when Charger is trying to

25    verify who the actual owner was of Sunrise at Spanish Terrace

1    who was the owner?

2         A.    Staci.

3         Q.    And there's no dispute about that?

4         A.    I don't think anybody disputes that.

5         Q.    Okay.  You heard testimony that at your home on

6    March 3rd, you had two checks in your office, one for 39,000

7    from Parsons, Behle and Latimer.  What was that check?

8         A.    That check was a refund of retainer from

9    representation on a qui tam issue.

10        Q.    And what had happened?  Did you get new counsel?

11   Or what happened with the case?

12        A.    The case was voluntarily dismissed.

13        Q.    And so the representation of you was over?

14        A.    Yes.

15        Q.    And the 39,000-and-change, that was a refund of the

16   retainer you had with them?

17        A.    That's correct.

18        Q.    There was also a check in the amount of,

19   approximately in the amount of $10,000 from Old Republic.

20   What was that check?

21        A.    That was a refund from a real estate sales or

22   transaction that had occurred in 2019, a sale of Ashton

23   Springs, Phase One, to Z-act (phonetic).

24        Q.    And was it $10,000 the approximate amount of money

25   you had in escrow with them?

1           A.    At the time of the closing, there was some unknowns

2     about what some costs were going to be.  And so they escrowed

3     excess funds until those costs were determined.  And then once

4     those costs were determined, then they refund the escrow

5     balance or the available balance, yes.

6           Q.    Okay.  I'm sorry.  I want to go back to

7     Government's Exhibit Number 7.  I just had one more question

8     for you.

9           A.    Okay.

10          Q.    With the attachment that was e-mailed to Charger

11    Title was it your intent to deceive Charger Title as to who

12    the owner was of Sunrise at Spanish Terrace?

13          A.    No.  It was my intent to help them verify who the

14    owner of Spanish Terrace was.

15          Q.    Okay.  And you would agree that this attachment is

16    a mismatch of two documents.

17          A.    It appeared so.  Yes.

18          Q.    But at the end of the day Staci was the owner of

19    Sunrise at Spanish Terrace.

20          A.    Absolutely.

21          Q.    So it was conveying the correct information, just

22    the wrong way to do it.

23          A.    That's a fair way of saying it.

24          Q.    Okay.

25                I'll pass the witness.

 1                    THE COURT:  Thank you.

 2                         CROSS-EXAMINATION

 3    BY MS. MUYSKENS:

 4         Q.   Good afternoon, Mr. Baker.

 5         A.   Good afternoon.

 6         Q.   Who is Daniel Nebeker?

 7         A.   I don't know.

 8         Q.   You don't know why Daniel Lorenzo Nebeker had his

 9    wallet in your car at the time you were stopped by US

10    Probation on March 30th, 2022?

11         A.   In that context, I do not and did not know who

12    Daniel Nebeker was, no.  I found his wallet on the sidewalk

13    outside my home.

14         Q.   Okay.  Now, you previously testified that you had

15    no knowledge of the ammunition in the underwear drawer; is

16    that correct?

17         A.   That's correct.

18         Q.   The men's underwear drawer?

19         A.   I don't think anybody said it was a men's underwear

20    drawer.

21         Q.   Do you want to take a look at Government's

22    Exhibit Number 3?

23         A.   Sure.  I'm looking at it.

24         Q.   Yeah.  Is it your position that those are not men's

25    boxer shorts that are just over the top of the ammunition?

```
 1        A.   That is my position that those are not men's boxer
 2   shorts.
 3        Q.   And that the other clothing in there are not not
 4   appear to be men's socks and other items and the condoms?
 5        A.   Are you implying that only men use condoms?
 6        Q.   I'm asking whether you would agree.
 7        A.   That's my statement.  For one I can't -- everything
 8   is blurry mostly in that drawer.  But I can tell you that
 9   that's -- yeah, not my ammunition, that's not my dresser and
10   it wasn't used by me.
11        Q.   Okay.  And in terms of the money that was found in
12   the house there's almost $90,000 recovered by probation on
13   March 30th, 2022; correct?
14        A.   That's my understanding.
15        Q.   Yeah.  None of that money was yours?
16        A.   Some of it was mine.
17        Q.   Where was the money that was yours?
18        A.   I had it in my jacket pocket.
19        Q.   Other than the jacket pocket the money found in the
20   house, you're saying that was not in any way yours?
21        A.   It belongs to my wife.  I haven't had any
22   employment for five years now, so I don't have any income.
23        Q.   Where did it come from?
24        A.   What's that?
25             MR. CRANE:  I ask to let him finish his testimony.
```

```
 1                  MS. MUYSKENS:  Okay.  I apologize.
 2          Q.   BY MS. MUYSKENS:  Where did the money come from?
 3          A.   My wife's money?
 4          Q.   Yes.
 5          A.   That's probably a question best asked of her.
 6          Q.   Did you have any items of value in the house that
 7   belonged to you?
 8          A.   I did.
 9          Q.   Other than the -- what kinds of items did you have
10   in the house of value that belonged to you?
11          A.   I mean, I had clothes and the computer equipment.
12          Q.   Did you have watches?
13          A.   Did I have watches?
14          Q.   Yeah, watches.
15          A.   I don't -- I may have had watches.  I haven't worn
16   a watch for 25 years.
17          Q.   Rolex watches, who would those belong to?
18          A.   Those -- actually I had some watches from my
19   ex-wife.
20          Q.   From your ex-wife?
21          A.   Yeah.
22          Q.   Rolex watches?
23          A.   Yeah.
24          Q.   That were yours?
25          A.   Yes.
```

1          Q.   Okay.  So speaking of Rolex watches, let me show

2     you a couple of pictures.  These were previously produced to

3     defense counsel.

4               Your Honor, I'll mark these photographs as

5     Government's Exhibit Number I believe we're on 13?

6               THE COURT:  Do you have a copy for me?

7               MS. MUYSKENS:  I do.

8               May I approach the witness, Your Honor?

9               THE COURT:  Yes, you may.

10         Q.   BY MS. MUYSKENS:  Mr. Baker, I'm handing you a

11     series of photographs.  You've seen this photographs.  They

12     were produced to your counsel; correct?

13         A.   I don't know if they were produced or not.  But no,

14     I haven't seen them previously.

15         Q.   So if you want to take a look at Government's

16     Exhibit 3, and then look at that first picture on Government's

17     Exhibit's 13.

18               Okay.  On the first page that appears to be the

19     same dresser, the same drawer; correct?

20         A.   It would appear so.

21         Q.   Okay.  Let's move to the next picture.

22               And that's another photograph of the same dresser;

23     correct?

24         A.   It looks like it, yes.

25         Q.   All right.  In fact, you can even see the little

1     leaves in the picture up top.  It's the same picture; right?

2          A.   Yeah.  I don't dispute that.

3          Q.   Okay.  And there's some money peeking out of that

4     top; right?

5          A.   Okay.

6          Q.   Okay.  The next picture, please.

7               That's a top view of the drawer; is that correct?

8          A.   It looks like it is.

9          Q.   Okay.  It seems to be the same dresser.  There's a

10    square box that appears dark green.  Can you make out the word

11    Rolex on it, on top of that; correct?

12         A.   Okay.

13         Q.   All right.  Next picture.

14              Another picture of the drawer; correct?  Items

15    being taken out, money counted; correct?

16         A.   I'll agree with the items being taken out, yeah.

17         Q.   All right.  And then the last picture.  I appears

18    to be that same green box opened up with two men's Rolex

19    watches in it; correct?

20         A.   Okay.

21         Q.   All right.  In the top location depicted three

22    photographs before in the same dresser with the ammunition is

23    what appears to be men's underwear; correct?

24         A.   Okay.

25         Q.   Now, you testified a few moments ago, and you said

1    it twice, I want to make sure I got this down right, acting on

2    the advice of counsel you moved funds out of the businesses

3    and into more personal accounts or other businesses; correct?

4         A.   That's correct.

5         Q.   Okay.  So what was that advice of counsel?

6         A.   The advice of counsel was that those funds were at

7    risk in those accounts, and they advised me to move them to

8    some other account where they wouldn't be at risk.

9         Q.   And describe the communications that took place to

10   reach that opinion.

11             I believe a waiver has occurred, Your Honor.

12        A.   Describe what, please?

13        Q.   The communications between you and counsel

14   regarding what was being discussed before that advice was

15   given.

16        A.   Well, we discussed -- we discussed the actions that

17   had taken place, essentially what's been discussed here today

18   with regards to what Grimmer, the actions that he had taken

19   and that he was currently taking.  We discussed the subpoena

20   that he had recently issued for the funds at -- they were in

21   Security Service Federal Credit Union.  And then I indicated

22   to counsel that we -- that Staci also had an additional

23   account at Key Bank that had funds in it.  He asked how much.

24   I told him it was about $155,000.

25        Q.   You said you told "them."  I'm sorry to interrupt,

1    but I wanted to clarify.  Who was "them"?

2          A.   It was a discussion with Jeff Gross, and he had a

3    partner with him at the time.

4          Q.   Thank you.  Now, you testified on direct that you

5    weren't -- when you transferred the money you weren't

6    intending to hide it from your PO, and then you stopped

7    talking.  You were intending to hide it from Grimmer; correct?

8          A.   Was I -- no, I wasn't necessarily attempting to

9    hide it from him.  Clearly if he got copies of the bank

10   statements and wire transfers as he did, it would be quite

11   clear for him as it was and as he's produced where the funds

12   were transferred.  So it's very clear that the funds were

13   transferred to an Alpine Credit Union account.  So I wasn't

14   attempting to hide them from him; I was attempting to protect

15   them from him so that he didn't access or seize them or freeze

16   them inappropriately.

17         Q.   So you weren't trying to hide it, but you were

18   trying to move it around so you could keep assets; is that

19   right?

20         A.   I was attempting to protect assets that Mr. Grimmer

21   had no right to, that's correct.

22         Q.   That you believed you had a right to.

23         A.   I don't think anybody disputes that I had a right

24   to those funds.

25         Q.   So "those funds."  All the funds?

1          A.    Which funds are you referring to?

2          Q.    Well, you said "those funds."  So I want to know

3     what you're defining it as.

4          A.    You'll have to back up and tell me which funds

5     you're talking about.  I thought we were on the same page

6     about funds we were talking about.

7          Q.    All right.  Mr. Baker, you previously testified

8     that when you transferred your ownership interest in Foxtrot

9     United on August 18th of 2021, Foxtrot had no assets.

10         A.    I think the document itself speaks for itself and

11    is very clear that there were -- the only asset that it held

12    previous to that was interest in Center Street property, but

13    there were proceeds that would be coming from those, and those

14    were to be retained by me.

15         Q.    Okay.  So Foxtrot United did have assets; correct?

16    It had the proceeds in the bankruptcy.

17         A.    If it did those were not transferred.  Those were

18    retained.

19         Q.    And when you received those assets it was Foxtrot

20    United that received it; correct?

21         A.    The check was issued in Foxtrot's name, that's

22    correct.

23         Q.    But you controlled the account?

24         A.    That's correct.

25         Q.    You moved the money.

214

1          A.    Yes.

2          Q.    You transferred money to your lawyer; correct?

3          A.    I paid my lawyer, yes.

4          Q.    You then transferred money to your personal

5     account.

6          A.    Prior to a sale.

7          Q.    The day before the sale.

8          A.    That's correct.  To protect the funds I transferred

9     those, that's correct.

10         Q.    Funds that you just testified that you believed

11    belonged to you; correct?

12         A.    I wouldn't use the terms that I believed that.  I

13    don't know that anybody's disputed that Foxtrot by retention

14    of those funds in an agreement that those funds belong to me.

15    So, yeah.

16         Q.    Funds that you then took $600,000 and transferred

17    out of your name into an account in your wife's name; correct?

18         A.    That's what I've said.  Yes.

19         Q.    Now, as it relates to the June 9th, 2021, e-mail

20    that you sent to Charger Title, you said you had no specific

21    recollection, you called it secretarial function; is that

22    correct?

23         A.    Yes.

24         Q.    You were more than a secretary in the sale of that

25    property; isn't that correct?

```
 1          A.    No.

 2          Q.    No?  Well, Mr. Baker, do you recall reaching out to

 3     the title company and advising them that there was a trust

 4     deed recorded about a month ago and you hadn't heard anything,

 5     and you wanted to make sure they didn't miss a trust deed.  Do

 6     you recall e-mailing them that on June 14th of 2021?

 7          A.    Sure.

 8          Q.    So you did e-mail that.  And then they couldn't

 9     find the trust deed; right?  So you then promptly e-mailed on

10     June 15th of 2021 a trust deed that purported to give Maple

11     Mountain Investments $2.3 million right to the proceeds from

12     the sale of the property; correct?

13          A.    Your face indicates that there's something

14     nefarious there about that transaction.

15          Q.    No.  I'm just asking if you did it, sir.

16          A.    No.  Your face said a lot more than that.  Yes.

17     Nobody's denied that.

18          Q.    And as part of that e-mail, you made a note that,

19     here's a copy of the trust deed.  It's a big one.  That's why

20     I didn't want it missed.  You also provided information about

21     the lender that you said e-mail is most effective to reach

22     this person.  And you provided your account number stating, my

23     account number is 2021MM151; correct?

24          A.    I'm not sure what the account number is referring

25     to.  But, yes, those are all secretarial type duties, passing
```

1     along information to facilitate --

2          Q.   You believe these are secretarial type duties to

3     effect a $2.3 million transfer of funds?

4          A.   It could have been 23.3 million or two dollar

5     short.  This is passing along information.

6          Q.   And who are you acting as a secretary on behalf of?

7          A.   My wife, of course.

8          Q.   Your wife or a business?

9          A.   Well, my wife's business.

10         Q.   Which business?

11         A.   Which e-mail are you referring to?

12         Q.   Well, you were acting both in the capacity as for

13    Sunrise at Spanish Terrace; correct, which was selling the

14    property when you provided the articles of incorporation;

15    correct?

16         A.   Uh-huh (affirmative).

17         Q.   Is that okay or yes?

18         A.   What was the question again?  Was I acting as a

19    secretary?

20         Q.   For the business of Sunrise at Spanish Terrace when

21    you provided the articles of incorporation.  It was Sunrise at

22    Spanish Terrace; correct?

23         A.   I'm not sure that I understand the question.

24         Q.   Which entities were you acting in this capacity

25    for?

1        A.    Which capacity?

2        Q.    Well, you described it as secretarial.  But which

3    entities were you communicating on behalf of your wife's

4    business, which businesses were you communicating on their

5    behalf for with the title company?

6        A.    Okay.  Then you'll have to tell me which e-mail

7    you're referring to.

8        Q.    Did you communicate with more than -- regarding

9    more than one business?

10       A.    I may have.  Do you have something specific?

11       Q.    Well, you have in front of you Government's Exhibit

12   Number 7 --

13       A.    Okay.

14       Q.    -- the June 9th e-mail.  Which business were you

15   communicating on behalf of for that e-mail?

16       A.    The one that requests the articles for SAST and for

17   which -- is that the one you're referring to?

18       Q.    Correct.

19       A.    It appears, then, that this was assisting with

20   regards to SAST.

21       Q.    That is Sunrise at Spanish Terrace.  Were you also

22   assisting Sunrise at Spanish Terrace when you provided rent

23   rolls and gave a detailed description of adjustments that

24   needed to be made for purposes of the closing on June 16th?

25       A.    Yes.

1      Q.   And were you acting on behalf of the business

2  entity Maple Mountain Investments when you provided a copy of

3  the trust deed as well as information about Maple Mountain

4  itself?

5      A.   I think that that could have been acting on behalf

6  of either Maple Mountain or SAST.

7      Q.   Maple Mountain Investment was a newly formed

8  business that was controlled by your wife; correct?

9      A.   Owned and controlled, yes.

10      Q.   And for which you played only the secretarial

11  duties?

12      A.   By when?

13      Q.   During the course of the closing of a sale that

14  netted Maple Mountain Investments $2.3 million.

15      A.   Yes.

16      Q.   Did you receive any commission or any other benefit

17  as a result of this sale?

18      A.   The love and appreciation of my wife.

19      Q.   Now, at the time that you're serving as a secretary

20  for the closing --

21          MR. CRANE:   Objection; misstates testimony.

22      Q.   BY MS. MUYSKENS:   At the time that you were sending

23  e-mails to Charger Title Company to effect a $2.3 million

24  transfer to your wife's business, did you appear in court in a

25  misdemeanor case and request appointed counsel because you

1    were unable to pay?

2         A.    I'm not sure.  I don't recall.

3         Q.    You don't recall if you'd been appointed counsel

4    due to your claimed inability to pay?

5         A.    You asked during a specific time period.  I'm not

6    sure.

7         Q.    Okay.  Now, you stated that from time to time you

8    would assist with the dogs; is that correct?

9         A.    That's correct.

10        Q.    Now, what you've heard testimony about was your

11   contact today was your contact with the United States

12   probation officers on March 30th; correct, of 2022?  And we've

13   also heard information about your contact with law enforcement

14   at the time of your arrest on April 13th of 2022; correct?

15        A.    Yes.

16        Q.    On both instances you were actually first located

17   at the Orem property in possession of things like dog food and

18   appearing to tend to the dogs at that residence; correct?

19        A.    On which?

20        Q.    On both of those occasions.

21        A.    No.

22        Q.    No, you were not tending to the dogs?

23        A.    No.

24        Q.    At either time?

25        A.    You tell me, what was the testimony again?

1          Q.    I'm asking on March 30th, 2022, were you tending to
2    the dogs when you were at the Orem location?
3          A.    I believe that I watered the dogs on that day, yes.
4          Q.    And on April 13th of 2022 at the time of your
5    arrest when you were transporting heavy doors and had large
6    bags of dog food in your truck, were you tending to the dogs
7    at that time?
8          A.    No, I was not.
9          Q.    Do you carry around dog food everywhere you go?
10         A.    Does having dog food in one's possession mean you
11    were tending to the dogs?
12              THE COURT:  I'm going to ask you to answer the
13    question, please.
14              THE WITNESS:  Do I carry dog food around with me
15    everywhere I go?
16         Q.    BY MS. MUYSKENS:  Correct.
17         A.    No, I do not carry dog food everywhere I go.
18         Q.    Is it your testimony that -- how often would you
19    provide care for the dogs?
20         A.    Is it my testimony how often I would?
21         Q.    I'll rephrase.  How often would you provide care
22    for the dogs at any of the three properties that were searched
23    by Utah County?
24         A.    It varied from time to time.
25         Q.    What does "varied" mean?

1           A.   It means sometimes it was more often, sometimes it

2    was less often.

3           Q.   How many times in a month, sir?

4           A.   On average probably five times a month.

5           Q.   Who else was going up and watering, putting water

6    out for the dogs and the food?

7           A.   Where are you referring to?

8           Q.   Any of the -- each of the locations.  You can take

9    them one at a time.

10          A.   Pretty much all of the locations had automatic

11   waterers.  They were being watered automatically.

12          Q.   What about food?

13          A.   They also had large feeders that could be filled

14   for sufficient food for three to five days.

15          Q.   Who besides yourself was tending to those items on

16   a regular monthly basis?

17          A.   My wife.

18          Q.   And how often would your wife do it?

19          A.   Well, the dogs were seen at all locations pretty

20   much every single day, so that would leave the remainder of

21   the times that I didn't.

22          Q.   Okay.  Now, as you sit here today you have two

23   prior convictions; correct?

24          A.   Two guilty pleas, yes.

25          Q.   A conviction.  And the first conviction is for

1    what?

2            A.   I don't know.  You have to remind me.

3            Q.   Were you convicted in 2019 in connection with a

4    healthcare fraud count?

5            A.   I accepted a guilty plea in that, yes.

6            Q.   And your on postconviction supervision.

7            A.   That's correct.

8            Q.   And you were also convicted relating to the

9    altering of falsification of documents in Count 2 in 2019; is

10   that correct?

11           A.   I accepted a guilty plea in that regard.

12                MS. MUYSKENS:  No other questions.

13                THE COURT:  Thank you.

14                Mr. Crane?

15                        REDIRECT EXAMINATION

16   BY MR. CRANE:

17           Q.   You were asked questions about the advice of

18   counsel that you received from Mr. Gross.  Was that pursuant

19   to a meeting that you and Staci had at his law firm?

20           A.   No.  It was actually over the phone.

21           Q.   Okay.  The Foxtrot asset, you were asked questions

22   about the value of Foxtrot.  You had reserved -- on April when

23   the transfer of Foxtrot occurred from you to Staci, you had

24   reserved your right -- you had reserved the rights to any

25   proceeds from the bankruptcy.  Did Foxtrot have any other

1    assets --

2         A.   No, they did not.

3         Q.   -- besides the potential right to proceeds?

4         A.   Did not.

5         Q.   Okay.  And that's why you say the value of Foxtrot

6    at the time of the assignment was zero or less than zero

7    depending on other creditors or the lawsuit?

8         A.   If you take away the proceeds, there was no other

9    value.  It was most likely a liability.

10        Q.   Okay.  In the e-mail in Government's Exhibit

11   Number 7 that you sent to Charger Title, were you acting as a

12   fiduciary on behalf of Sunrise at Spanish Terrace?

13        A.   I definitely don't believe I was acting as a

14   fiduciary.  Furthermore, my understanding of my conditions are

15   that I was not to be employed as a fiduciary, which I

16   definitely have no form of employment.  And it furthermore

17   states that I was not supposed to be in control of any

18   personal information or credit, which again was not any of the

19   information that was transmitted.  This was again merely

20   secretarial transmission of information.

21        Q.   You were just providing documents that they

22   requested because you had them or knew where they were.

23        A.   Yes.

24        Q.   Okay.  On March 30th when probation came to your

25   house among other things they seized your cellphone; is that

1    right?

2              A.   That's correct.

3              Q.   And then did you go and get a new cellphone because

4    you no longer had a phone after March 30th?

5              A.   That's correct.

6              Q.   And when you were arrested in April, I believe

7    April 13, the phone in your pocket was the new cellphone you

8    had obtained because your prior phone had been taken; is that

9    right?

10             A.   Yes.   Furthermore --

11             Q.   Prior to March 30th -- I'm sorry.   I didn't mean to

12   consult you off.

13             A.   Furthermore, yeah, I didn't have any of the

14   contacts from my old phone.   My computer was taken.   I didn't

15   have Officer King's phone number or contact.   I didn't have

16   his e-mail.   I didn't have a computer in which to access

17   anything.   So, yeah, I pretty much didn't have any method of

18   communication in order to take care of the children and

19   communicate there.

20             Q.   Okay.

21             A.   I got another phone.

22             Q.   Okay.   So your testimony is you didn't have a

23   chance to report that number to Mr. King yet?

24             A.   That's correct.

25             Q.   Okay.   And prior to March 30th, you were just using

1     one cellphone; is that right?

2              A.    That's correct.

3              Q.    All right.  The other cellphones that were found at

4     your house, did you use those?

5              A.    I did not.

6                    MR. CRANE:  I have no further questions.

7                    THE COURT:  Thank you.  You may step down.

8                    Any additional witnesses, Mr. Crane?

9                    MR. CRANE:  No additional witnesses.  I would move

10    to admit Defendant's Exhibit Number 1.

11                   THE COURT:  Ms. Muyskens?

12                   MS. MUYSKENS:  The government objects, Your Honor,

13    in the sense that it has zero opportunity to confront the

14    witness to inquire.  There is sort of blanket statements in

15    here that I think are inconsistent with several pieces of

16    testimony today.  So the government would object.

17                   THE COURT:  The objection is overruled.  And the

18    points that you just made I will evaluate as part of the

19    weight that I give to this particular document.

20                   Mr. Crane, anything further?

21                   MR. CRANE:  Your Honor, I believe then all of the

22    defendant's exhibits have been admitted?

23                   THE COURT:  From my notes they have all been

24    admitted.

25                   Miss Muyskens, do you have anything different?

1          MS. MUYSKENS:  Not on the defendant's exhibits.

2    I'm just waiting for my turn to move in Exhibit 13.

3          THE COURT:  Okay.  That's what I was going to say.

4    I think there's one outstanding one, which is the Government's

5    Exhibit 13.

6          Mr. Crane, do you have any objection to that one?

7          MR. CRANE:  No, Your Honor.

8          THE COURT:  All right.  That will be admitted.

9          (Whereupon, Government's Exhibit 13 was received.)

10          THE COURT:  Does that take care of all of these

11    exhibits and testimony from your perspective, Mr. Crane?

12          MR. CRANE:  It does, Your Honor.  Thank you.

13          THE COURT:  Okay.  So I'm debating because as I

14    told you before the statute requires that I first have to make

15    a determination as to whether or not the revocation standard

16    has been met.  And then once that is met, then we can look at

17    whether or not release or detention is appropriate.  So

18    there's a two-part analysis.

19          You've all just presented your evidence, and I'm

20    inclined to hear argument from you today as to whether or not

21    you have met -- I guess the government has met the burden that

22    it has, and then a response of Mr. Baker.  I know we've been

23    going for a long time, and I said we'd be done at 2:30.  But

24    since we're close on the first time I'm inclined to continue.

25    But I'm willing if you think you need more time we can discuss

1     that.

2            So Ms. Muyskens, what's your position on that?

3            MS. MUYSKENS:  The government is prepared for

4     argument now.

5            THE COURT:  Mr. Crane?

6            MR. CRANE:  We're ready, Your Honor.

7            THE COURT:  All right.  Let's go ahead and hear

8     argument.

9            MS. MUYSKENS:  Thank you, Your Honor.

10           With respect to the first question, the question,

11    and I assume that's all we're answering right now, rather as

12    oppose to 3142 factors.

13           THE COURT:  Yes.  So let me just give you some

14    guidance so you understand.  I only want to hear argument with

15    respect to whether or not the first part of the statute has

16    been met, whether or not it's appropriate or the standard for

17    revocation has been met.  Then what I'm going to do I'm likely

18    going to take that under advisement so I can think about that

19    over the weekend and review the information that you've all

20    presented.  And then I think we can come up with a time on

21    Monday to come back and address the second portion after I

22    give my ruling with respect to revocation.  Just so you have

23    that understanding.

24           And then, Lynsie, I'm going to ask you to see in

25    the afternoon on Monday, is there any availability for where

1    he's being housed?  And then I can have -- I can have somebody

2    cover the calendar in the afternoon and drug court.

3              THE CLERK:  We can have him come in at 2:30.

4              THE COURT:  That may not be enough time because he

5    needs to -- could he come in -- could I have him come in at

6    1:00 or 1:30?  I can have somebody cover those going down from

7    there.  Would that work?

8              THE CLERK:  Yeah, we could do that, Your Honor.

9              THE COURT:  Okay.  I just wanted to make sure.  So

10   I think what we'll do is we'll talk about coming in at 1:00 or

11   1:30 and concluding the second portion during that time.  Just

12   so that you have an idea.

13             All right.

14             MS. MUYSKENS:  Thank you, Your Honor.

15             THE COURT:  Go ahead, Ms. Muyskens.

16             MS. MUYSKENS:  So with respect to Allegation

17   Number 1, it also relates to Allegation Number 2 so I'll

18   address these.  This involves the June 9th, 2021, e-mail that

19   the defendant sent to Charger Title in which he transmits a

20   document that I don't think there's any dispute was not a true

21   copy of the articles of incorporation of Page 1, but Page 2 is

22   not and was never filed.  The government would note that the

23   document itself was requested as evidence in the defendant's

24   exhibit by the company.  They asked for, I don't remember what

25   they called, articles, they asked for articles, and this is

1      what was produced.  The defendant transmitted this document,

2      and it is on its face a fraudulent document in the sense that

3      it is not the complete and accurate copy.

4           And what I would note, though, is that during

5      counsel's cross-examination of Special Agent Garland he

6      focused a lot on materiality.  But the materiality standard,

7      Your Honor, is whether or not the document is capable of

8      influencing the person to whom it is addressed.  And even by

9      the defendant's own testimony, he said it's good business

10     practice for the title company to ensure that the person

11     that's engaged in the sale has the authority to do so.  The

12     reason for the document, is this matching up.

13          And Special Agent Garland testified as the

14     documents that the defense moved in show the true copy of the

15     articles of incorporation would have reflected that Matt Baker

16     was the managing member.

17          Now that's separate and apart as to whether or not

18     Staci Baker did, in fact, own it.  It was with choice to send

19     that document with the second page changed as to whether

20     that's capable of influencing a person to whom it was

21     addressed.  Not whether, well, had we sent some other

22     documents we could have potentially shown it didn't matter.

23     This is what it sounds like has been argued, it didn't matter.

24          But the government submits that it is a document

25     that had Charger Title Company known there's probable cause to

1    believe Charger Title Company would have taken steps if the

2    document in front of them was not an accurate document to

3    further verify or to conduct further investigation as to who

4    the proper owner was.

5              Dovetailing with that as it relates to Allegation

6    Number 2, both in Government's Exhibit 7 but also in the

7    testimony of the defendant as well as the testimony of

8    Special Agent Garland, the defendant was engaged in numerous

9    communications with the title company, and by his own

10   statement either on behalf of or for Sunrise at Spanish

11   Terrace or Maple Mountain Investments.  And the end result was

12   to secure a $2.3 million payout to Maple Mountain Investments

13   controlled by his wife.

14             He argues this is secretarial.  The government

15   submits that his role seems to be under a clear and convincing

16   standard that he certainly took a more of a fiduciary role and

17   a role in capacity to provide all of this information and to

18   kind of facilitate this very large payout.

19             With respect to Allegation Number 3, the government

20   believes that the evidence is very clear that the defendant

21   transferred assets greater than $1500.  He acknowledged he

22   transferred assets in January and in February.

23             And the government submits that I think the

24   testimony is in some ways inconsistent about whether there was

25   value of Foxtrot on August 18th of 2021.  By the defendant's

1    and his wife's own apparent agreement the assignment says,

2    well, it doesn't account for anything.  Foxtrot has nothing.

3             We know from the facts that Foxtrot United was paid

4    over $800,000.  Now, Mr. Baker says that was his money.  I

5    retained my rights.  But there was value in Foxtrot United.

6    There was big value in those checks that he got and very large

7    transfers.

8             And what the government is saying is not whether or

9    not Matt Baker was entitled to the money, not whether or not

10   as a matter of law could transfer it, but the problem is is we

11   have multiple instances where he failed to seek the permission

12   of his supervision officer.  And we even have him

13   acknowledging that he collectively with his wife was moving

14   money out to keep it away from this man Mr. Grimmer.

15            And there's been a lot of testimony about Grimmer.

16   None of the allegations are about Mr. Grimmer or the civil

17   suits.  The allegations are about what the defendant had an

18   obligation to do or not do and what his conduct was.

19            And in this instance, we have three instances of

20   substantial transfers.  This isn't small stuff that we submit

21   he didn't seek the approval from his probation officer.  And I

22   submit that the testimony of Jacob King is more credible, and

23   the lack of any reference in notes, he said he reviewed the

24   entire notes, there is no indication in the file that the

25   defendant had this exchange with the prior supervision officer

1   who granted the approval.  In fact, what Jacob can testify to

2   was that the supervision officer had recorded in the file a

3   reference that the defendant was unhappy with the $1500

4   transfer because he does it all the time, and also the time

5   that he did talk to him about them.

6           So I think these are really big transfers of funds,

7   and the government's position is it is a violation.  He didn't

8   do it.  We can deal with the 3142(g) factors in justification,

9   but straight on its face it is a violation.  He didn't ask,

10  and he acknowledges such.  He said he didn't even think about

11  it.

12          With respect to Allegation Number 4, the government

13  believes that the evidence is clear and convincing and also

14  probable cause that defendant possessed ammunition.  And on

15  this point, Your Honor, we have ammunition in two locations.

16  We have it in a drawer where the law enforcement has said it

17  was under men's boxer shorts.  We have a picture of it, not

18  withstanding the defendant's I submit self-serving arguments

19  as well as his wife's own unchallenged statement that this is

20  somehow hers, the physical evidence doesn't appear to have a

21  number of feminine items.  But the drawer and the dresser

22  itself as contained in Government's Exhibit Number 13, the

23  lies, the defendant's testimony that that's his wife's dresser

24  and he doesn't know anything about it as his Rolex watches are

25  the drawer above it.

1                    And what the government would also note is that the

2       other rounds of ammunition were found in a bag containing

3       large sums of money.  And the defendant made a number of

4       comments, are you stealing my money?  And they can say he's

5       talking about money in his pocket and not the almost $90,000

6       recovered, but I think when you look at the totality of the

7       statements and the evidence and you couple that with the fact

8       that as Jacob King testified, that bag was recovered from a

9       previously locked room where it was the defendant who used a

10      key to open it for them.  So the government submits that the

11      defendant was in legal possession of ammunition in two

12      separate locations.

13                   I would also note --

14                   THE COURT:  I'm sorry.  You said something.  You

15      said he used a key to unlock it previous to this incident; is

16      that correct?

17                   MS. MUYSKENS:  Jacob King said that the door was

18      locked where the bag was found and that Mr. Baker opened it, I

19      believe he testified unlocked it for them.  I'm assuming a

20      key.  But he unlocked it for them, meaning he had access to

21      and ability to unlock an otherwise locked room where the bag

22      was found.

23                   The government would also note that at the time of

24      the search on March 30th of 2022, Staci Baker, there was a

25      discussion with her about ammunition.  And her response was, I

1    didn't know my husband couldn't possess it.  Not, it's mine,

2    not, he knew nothing about it.  I keep it in different

3    locations.  It was, I didn't know he couldn't possess it.  So

4    I think that you have to then consider the defendant's

5    statements as well as this declaration when you look at that

6    evidence.

7             With respect to Allegation Number 5, the

8    government -- there were a lot of electronic devices.  I'm

9    focused principally on stuff that was operable.  And Jacob

10   King testified that, look, the stuff that was operable, I

11   looked at what was operable and running.  To the extent it was

12   apparent it belonged to the wife they didn't seize it.  But

13   there was multiple computers.  Multiple storage devices.  Six

14   cellphones.  None of this is recorded by the defendant.

15            And it's not Mr. King's obligation to remind the

16   defendant of what he signed, which is that:  He shall obtain

17   permission from USPO prior to obtaining or accessing any

18   additional computer hardware, software or making any

19   alterations to my system.

20            That was from Government's Exhibit Number 4.  It is

21   the defendant's obligation.  He is the one on supervision.  He

22   is the one with the conditions imposed.  Conditions that were

23   imposed by this Court.

24            And so I submit that the lack of listing of the

25   items, the complete, as Mr. King said, surprise of the extent

1    of the items, and number of the items, is in and of itself a

2    failure.  Again, a lot of his testimony goes to the

3    justification for it, but it is a violation.  He signed and

4    acknowledged that he knew he had to talk to probation, and he

5    didn't.

6              And finally, with respect to the animal cruelty

7    charges, we believe there is probable cause that animal

8    cruelty as is defined under Utah law occurred in this case

9    with respect to animals at the defendant's Spanish Fork home

10   and with respect to Orem, and Staci Baker's statements to law

11   enforcement that it was her husband who took care of the

12   animals.  The defendant himself acknowledged that by his

13   estimate five times a month he cared for the animals.  But the

14   lack of the water, the food and the horrific conditions that

15   the officers discovered we submit under a probable cause

16   standard is that the defendant did, in fact, engage in animal

17   cruelty under Utah law.

18             And I say all of these because we have to find a

19   violation, but I will also note that the additional evidence

20   as to particularly some of the financial stuff that was -- the

21   additional evidence that Jacob can testify to, which is that

22   he has also since discovered another sale of property.  And

23   there's no evidence disputing what he said, which is that on

24   August 12, 2021, he found that the defendant transferred

25   property out of a joint trust belonging to he and his wife

```
 1    solely into his wife and she subsequently sold it.
 2              So when you consider that and you consider the
 3    litany of financial documents and statements and you're
 4    looking at, do we have a violation here, what the government
 5    submits is that we do in total have we believe six violations
 6    under the standard, probable cause standard for Allegation 1
 7    and Allegation 4, and the clear and convincing standard as it
 8    relates to Allegations 2 through 6 -- I'm sorry.  1 and 6 is
 9    probable cause; 2 through 5 is clear and convincing.  Thank
10    you.
11              THE COURT:  Thank you.
12              Mr. Van Wagoner?
13              MR. VAN WAGONER:  Thank you.  May I --
14              THE COURT:  Of course.
15              MR. VAN WAGONER:  -- stand at the podium?
16              THE COURT:  Yes.  The courtroom is now open.
17              MR. VAN WAGONER:  Pardon?
18              THE COURT:  The courtroom is open now.  So feel
19    free to go to the podium.
20              MR. VAN WAGONER:  Your Honor, throughout this
21    hearing the Court has repeatedly said, well, okay.  Hearsay or
22    hearsay on hearsay.  It will go to the weight.  There are so
23    many aspects of the government's presentation that go to that
24    problem.  We can't cross-examine Mr. Law.  We can't
25    cross-examine Officer Gilstrap.  We can't cross-examine the
```

1   various officers who conducted the search and apparently

2   presented information to Officer King.

3           So as we go through this and when we hear counsel

4   make the argument, for example, that, well, Staci Baker said,

5   I didn't know my husband could have ammunition, that is

6   hearsay or hearsay on hearsay.  So I want the Court -- I hope

7   that the Court will take that into consideration in evaluating

8   this.

9           I want to start with Number 1, the fraud.  Fraud as

10  she uses it, it's a fraudulent document.  Well, the

11  information wasn't fraudulent.  The information was correct.

12  It was just conveyed with the wrong document.  There was no

13  benefit, no benefit whatsoever to Mr. Baker to have submitted

14  that as compared to the actual document that the title company

15  asked for, which is Exhibit 3 of the defense exhibits, which

16  is the articles of organization.

17          There is also no dispute whatsoever that Staci

18  Baker owned SAST and that she could do the closing.  She had

19  authority.  There was no fraud on the title company.  There

20  was no fraud on a lending institution.  There was no fraud on

21  Staci Baker.  There was no fraud on the buyer.  There was no

22  benefit whatsoever to submit it this way, because everybody

23  knew.  They just wanted verification that she was the owner.

24  Your Honor, there was no fraud.  There's no probable cause.

25  There is no clear and convincing evidence.  There is no fraud.

1          With respect to Number 2, employment in a fiduciary

2     capacity, what does that mean?  What does that mean?  Was that

3     explained?  Do we know whether that was explained to Mr. Baker

4     that if he assists his wife or assists his wife with one of

5     her companies by conveying information that he has somehow,

6     quote-unquote, employed in a fiduciary capacity.  He was not,

7     and he did not.  What he did was assist in --  because he had

8     knowledge he assisted in providing information that a title

9     company wants in order to effect a closing.  If he'd had a

10    secretary or if his wife had had a secretary, what they would

11    have done is they would have said, get that information to the

12    title company, please.  And the secretary would have pulled

13    the information and provided it to the title company.

14    Assisting one's spouse or assisting one's spouse in a business

15    that she has, I don't see that falling within the definition

16    of employed in a fiduciary capacity.

17          Number 3, the transfer of assets or greater than

18    $1500.  The Court has heard Mr. Baker's explanation.  He's

19    heard the discussion he had with Mr. Law.  And, you know, I've

20    represented a lot of people who have had ongoing conversations

21    with their probation officer.  What do I do?  How should I do

22    it?  Mr. Baker made the inquiry.  He asked counsel.  Counsel

23    said, you got to talk to your probation officer.

24          He had a number of bills that routinely -- he had

25    to pay on a recurring basis mortgages.  He had -- and it makes

1     sense to me.  I've had probation officers, you know, modify

2     the terms in order to fit the individual in the circumstances

3     of the individuals.  And that's what happened here.  If

4     Mr. Baker had had to notify his probation officer every time

5     he made a mortgage payment, I can guarantee that probation

6     officer would have said, stop.  Knock it off.  I don't want to

7     hear about your recurring bills.  You've got legal fees, I

8     don't want to hear about those things.

9             So with respect to the three days, you've got a

10    transfer of Foxtrot in August.  At the time that was

11    transferred he had reserved to himself the right to any

12    proceeds, transferred the membership interest to his wife that

13    had zero or less than zero value at the time.

14            With respect to a $10,000 check, that we believe

15    falls into the category or fell into the category of, I've got

16    recurring monthly bills that I have to pay.  The $600,000, you

17    heard his explanation.  There was a rush to protect, protect,

18    not hide, because Mr. Grimmer and the government has full

19    ability to look and find out where money is, where it's been

20    transferred.  It's still sitting there.  His focus was on

21    protecting it from someone he believed was illegally

22    attempting to obtain the money, and he consulted counsel and

23    counsel said, move the money.  Do I wish he had talked to his

24    probation officer?  I do.  But he didn't.  And he wasn't

25    thinking about that.  At the time he's giving his explanation,

1    the Court may or may not be aware that defendants filed a

2    motion to dismiss Count 1, 2 of the indictment.  Count 1 was a

3    conspiracy to defraud the United States by purportedly hiding

4    money.  The government claimed that he was on notice that the

5    government wanted some of his money that ultimately was part

6    of the qui tam action that has since been dismissed.

7           We disputed that.  We moved to dismiss that on

8    multiple grounds.  And also the government claimed in Count 2

9    that he had had obstructed a government agency.  And the

10   government agency as originally indicted was HHS.  Same thing,

11   that he hidden assets from the government.  We filed a motion.

12   Counsel reviewed the motion, turned around and moved to

13   dismiss Counts 1 and 2.

14          Count 3 and Count 4 are what's left.  Count 3 is a

15   wire fraud wherein he's accused of having committed a fraud

16   involving his brother.  Government holds right now over

17   $700,000, which is nearly double the amount of money that they

18   claim he defrauded his brother.

19          And the fourth count is an aggravated identity

20   theft in which the government claims that what he did was he

21   used -- he went online on September the 5th of 2019 and made a

22   change of ownership on an entity Cap Fund.  And they claim

23   that he used someone else's identity, even though the

24   government knows by looking at the document itself he went in

25   as himself, not as anybody else.  He did not.

1          So the two remaining counts have nothing to do with

2     hiding money.  It's not -- I agree he should have come in and

3     gotten an order, but it's not unreasonable for him to have

4     thought the counts relating to hiding money from the

5     government are gone.  And they're holding $700,000 of my money

6     for a claim that's about 4- to $500,000, if the government

7     prevails.

8          With respect to the ammunition, the testimony was

9     that there were no guns.  The testimony was that at the time

10    he knew that he had to -- that he would become a restricted

11    person.  He got rid of more than 20 firearms and thousands,

12    thousands of rounds of ammunition.  When they searched they

13    found ammunition, the Court knows, .38 special and

14    9 millimeter, total of about 78 shells in two locations.

15         Mr. Baker's testimony is that the dresser from

16    where the first one was found was next to her side of the bed

17    next to the -- where the baby slept.  He had no knowledge, and

18    there was no reason for him to.  So I think that it has to be

19    a knowing, a knowing possession.  He didn't know.  He had --

20    and there was no reason for there to be ammunition.  And when

21    the officers found the ammunition, they ran back to Orem to

22    search.  And they didn't find any guns.  There are no guns.

23    There's ammunition.  And if the Court looks at the affidavit

24    of Staci Baker the Court will learn that while he was in

25    prison, she obtained ammunition and never got rid of it.

1          With respect to the computers, Your Honor, the

2     testimony has been that he -- that Mr. Baker notified

3     Officer Law that he had a closed business with some

4     20 computers, and they were sitting in storage.

5          THE COURT:  Sorry.  I'm going to interrupt you

6     there.  I think I'm not -- I don't think the inoperable ones

7     are what the Court will focus on.

8          MR. VAN WAGONER:  Okay.

9          THE COURT:  But I would like to hear argument with

10    respect to the computer in the laundry, in the kitchen storage

11    room and then downstairs.

12         MR. VAN WAGONER:  Okay.  Mr. Baker's testimony is

13    that he used one computer, and that's it, and his wife also

14    had a computer downstairs.  And apparently they didn't seize

15    that.  He used one computer, his children used a computer that

16    was -- because they all want to use computers at the same

17    time, as we've probably all experienced if we had more than

18    one child.  So the kids used the computers in the kitchen area

19    and downstairs, and they used the computers for both school

20    and fun.

21         And the government seized the computers.  But do we

22    have -- we don't have access to the computers.  We don't know

23    what the computers show.  We don't know, the government hasn't

24    shown that he used more than one computer.  They have the

25    computers.  They have the ability to search.  And here we are,

1    the government's burden, and they haven't shown that he used

2    more than one computer.

3         And the same goes with respect to the cellphones.

4    He had one cellphone that he used.  And after it was seized he

5    got a new one, and that's what he used.  His children, his

6    wife used their cellphones.  If all of those were seized, the

7    same thing is true.  The government has the ability to tell us

8    whether Mr. Baker used those.

9         The other point that I want to make, Your Honor, is

10   the probation officers are no strangers to Mr. Baker's home.

11   They go.  They walk through.  They review.  They search.  Was

12   he ever written up?  No, he wasn't written up.  Was he ever

13   told, oh, you know what, you've got too many computers.  You

14   got one in the kitchen even though your kids use it, you've

15   got one downstairs even though that's your wife's, you've got

16   one that you use and all these others.  They had full access

17   to his home.  They walked through his home.  They never raised

18   an issue.

19        With respect to the dogs, Your Honor, and this goes

20   to some especially because I heard new information today that

21   I hadn't heard before.  I hadn't read in a police report.  I

22   haven't seen a 302.  I can't cross-examine Agent -- or

23   Officer Gilstrap, but I have reviewed the police report.

24   Matt's name is in there very seldom, let me put it that way.

25   It is Staci, Staci, Staci, Staci.  The owner, she does the --

1          it's a bank account, finances, online social media, chat room,

2          all of that is Staci.

3                    And the allegation as I read it, Your Honor, and

4          I'm being literal here just like I was with, what does it mean

5          to be employed in a fiduciary capacity?  I'll be literal here.

6          If you look at Paragraph 6, on or about March 31, he committed

7          an offense, animal cruelty.  What evidence did they put on

8          that on that date he did that?

9                    To the best of our knowledge, he's not been

10         charged.  I realize that's not the standard.  His testimony is

11         that his wife, that he -- that the dogs were visited virtually

12         every day and that they had automatic water system and that

13         they had feeding in a way that they would get -- it could be

14         loaded up so the dogs could be fed every -- for about five

15         days in a row.  But that they were visited every day or

16         virtually every day, but that he assisted her five days a

17         month.

18                    May I have just a moment, Your Honor?

19                    THE COURT:  Yes, you may.

20                    (Time lapse.)

21                    MR. VAN WAGONER:  That's all I have, Your Honor.

22                    THE COURT:  Thank you.  All right.  What we're

23         going to do is the Court will take this under advisement, and

24         on Monday I will give my ruling with respect to the first

25         prong of the statute that applies into whether or not the

```
1    standard has been met as to revocation.  And then on Monday
2    after that ruling, assuming the standard has been met, we will
3    address the second part, so you should be prepared to do that.
4    Let me see here.
5            I'm going to set it for Monday at 1:30.  And I'm
6    going to ask you to pay attention to which courtroom we're
7    going to be in because it may need to be in a different one
8    because I'll have to ask somebody to cover the other hearing
9    that I have at that time.  So please watch for that.  We'll
10   get that figured out before I leave today.
11           With that, we will conclude the hearing for today
12   and be in recess.  Thank you.
13       (Whereupon, the court proceedings were continued to
14               Monday, May 9, 2022, at 1:30 p.m.)
15                    *   *   *   *   *
16
17
18
19
20
21
22
23
24
25
```

```
 1    STATE OF UTAH        )

 2                         ) ss.

 3    COUNTY OF SALT LAKE  )

 4              I, KELLY BROWN HICKEN, do hereby certify that I am

 5    a certified court reporter for the State of Utah;

 6              That as such reporter, I attended the hearing of

 7    the foregoing matter on May 6, 2022, and thereat reported in

 8    Stenotype all of the testimony and proceedings had, and caused

 9    said notes to be transcribed into typewriting; and the

10    foregoing pages number from 1 through 246 constitute a full,

11    true and correct report of the same.

12              That I am not of kin to any of the parties and have

13    no interest in the outcome of the matter;

14              And hereby set my hand and seal, this ____ day of

15    _____ 2022.

16

17

18

19

20          _____
                   KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25
```

247